**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NEW GULF RESOURCES, LLC, *et al.* | ) Case No. 15-12566 (_____) |
| | ) |
| Debtors.[1] | ) Joint Administration Pending |
| | ) |

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (A) (1) AUTHORIZING THE DEBTORS
TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION
FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING
LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(4) GRANTING ADEQUATE PROTECTION, AND (5) MODIFYING THE
AUTOMATIC STAY; (B) SCHEDULING A FINAL HEARING,
<u>AND (C) GRANTING RELATED RELIEF</u>**

The debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), hereby move (the "<u>Motion</u>") for entry of interim and final orders: (i) authorizing the Debtors to (a) obtain postpetition financing and (b) use cash collateral; (ii) granting adequate protection; (iii) modifying the automatic stay; (iv) scheduling a final hearing; and (v) granting related relief. In support of the Motion, the Debtors rely upon (i) the *Declaration of Danni Morris in Support of Chapter 11 Petitions and First Day Relief* (the "<u>First Day Declaration</u>") and (ii) the *Declaration of George Mack in Support of the Debtors' Motion to Approve Dip Financing* (the "<u>Mack Declaration</u>"), each of which are filed contemporaneous herewith and incorporated herein by reference. In further support of the Motion, the Debtors respectfully state as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: NGR Holding Company LLC (1782), New Gulf Resources, LLC (1365); NGR Finance Corp. (5563) and NGR Texas, LLC (a disregarded entity for tax purposes). The Debtors' mailing address is 10441 S. Regal Boulevard, Suite 210, Tulsa, Oklahoma 74133.

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-2 and 9013-1(m) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## Relief Requested

3.      By this Motion, the Debtors request entry of an interim order substantially in the form attached hereto as **Exhibit I** (the "Interim Order")[2] and the Final Order (together with the Interim Order, the "DIP Orders"):

   a.      authorizing the Debtors to obtain senior secured postpetition financing on a priming, superpriority basis (the "DIP Facility"; the loans under the DIP Facility, the "DIP Loans") pursuant to the terms and conditions of the DIP Orders and that certain Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement substantially in the form attached to the Interim Order as Exhibit A,[3] by and among each of Debtors, as borrowers (collectively, the "DIP Loan Parties"), U.S. Bank, National Association, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time (collectively, the "DIP Lenders", and together with the DIP Agent, the "DIP Secured Parties") providing for, *inter alia*, (i) a new money, senior secured priming superpriority multiple draw term loan facility, providing for the borrowing of term loans in an aggregate maximum principal amount not to exceed

---

[2]     Capitalized terms used but not defined herein shall have the meaning given to them in the DIP Loan Documents and the DIP Orders, as applicable.

[3]     The Debtors intend to file the substantially final form of the DIP Credit Agreement prior to the hearing to consider entry of the Interim Order.

$75,000,000, of which, an aggregate principal amount of $55,000,000 shall be available to and shall be drawn in a single draw by the Debtors on the Closing Date (as defined in the DIP Credit Agreement), and (ii) following entry of the Final Order, up to two (2) additional drawings of the DIP Facility in an aggregate principal amount of $20,000,000;

b.      authorizing the Debtors to execute, deliver to the DIP Secured Parties, and perform under the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Loan Documents;

c.      authorizing and directing the Debtors to incur and pay all DIP Obligations, including the fees specified in that certain fee letter dated as of December 15, 2015, between the Debtors and the DIP Agent;

d.      providing for the indefeasible payment in full of the First Lien Obligations due in respect of the First Lien Credit Agreement, subject to the terms of the Interim Order; and

e.      granting to the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral, including, without limitation, all Cash Collateral to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth in the Interim Order;

f.      granting to the DIP Secured Parties allowed superpriority administrative expense claims in respect of all DIP Obligations, as set forth in the Interim Order;

g.      authorizing the Debtors' use of the proceeds of the DIP Facility and Cash Collateral pursuant to the Approved Budget, the Interim Order and the DIP Loan Documents;

h.      providing adequate protection to the Second Lien Agent and the Second Lien Noteholders for any Diminution in Value of their interests in the Prepetition Second Lien Collateral, including Cash Collateral;

i.      vacating and modifying the automatic stay imposed by section 362 to the extent necessary to implement and effectuate the terms and provisions of the DIP Orders and the DIP Loan Documents, and providing for the immediate effectiveness of the DIP Orders; and

j.      scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order authorizing the relief requested in the DIP Motion on a final basis, and approving the form of notice with respect to the Final Hearing.

### The Proposed DIP Facility

4.      The Debtors submit this statement listing certain material terms set forth in the

DIP Credit Agreement and the Interim Order.  Specifically, the significant terms of the DIP

Credit Agreement and the other DIP Loan Documents to be executed in connection therewith

and to which the DIP Facility refers are as follows:

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| **Borrowers:** | Each of the Debtors |
| **DIP Agent:** | U.S. Bank, National Association, as administrative agent and collateral agent |
| **DIP Lenders:** | Värde Partners, Inc. (and/or one or more of its related funds or affiliates), PennantPark Investment Corporation (and/or one or more of its related funds or affiliates), Castle Hill Asset Management LLP (and/or one or more of its related funds or affiliates), and Millstreet Capital Management LLC (and/or one or more of its related funds or affiliates) (collectively, the "DIP Lenders"). |
| **DIP Facility:** | The $75,000,000 DIP Term Facility, of which $55,000,000 of will be made available upon entry of the Interim Order. *Interim Order ¶ 3 & DIP Credit Agreement § 2.1* |
| **Uses of Proceeds/Payoff of First Lien Obligations:** | The DIP Facility will be used: (i) for the indefeasible payment in full of the First Lien Obligations; (ii) for the payment of prepetition amounts acceptable to the DIP Lenders as authorized by the Court pursuant to orders approving the first day motions filed by the Debtors; (iii) in accordance with the terms of the DIP Loan Documents and the DIP Orders (as applicable), (A) for the payment of working capital and other general corporate needs of the Debtors in the ordinary course of business, and (B) for the payment of expenses incurred in connection with the Chapter 11 Cases; (iv) to make the adequate protection payments; and (v) to pay the fees and expenses related to the DIP Facility. The initial Approved Budget is attached to the Interim Order as Exhibit B, and is subject to "Permitted Variances" and limitations on capital expenditures as identified in the Interim Order and DIP Credit Agreement. *Interim Order ¶ 9(b), 15 & DIP Credit Agreement § 1.1 & 7.1.7* |
| **Use of Cash Collateral; Entities with an Interest in Cash Collateral:** | The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in the Interim Order, the Approved Budget (and Permitted Variances) and the DIP Loan Documents. "Cash Collateral" shall mean and include all of the Debtors' cash, whether existing on the Petition Date or thereafter, including, without |

| | |
|---|---|
| | limitation, any cash in deposit accounts of the Debtors, or wherever located, constitutes cash collateral of the Prepetition Agents and the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code "cash collateral," as defined in section 363 of the Bankruptcy Code |
| | The entities with an interest in Cash Collateral are the DIP Agent and DIP Lenders, the First Lien Agent and First Lien Lenders, and the Second Lien Agent and Second Lien Noteholders. |
| | *Interim Order ¶¶ E(viii), 9(b) & 10* |
| **Interest Rates/Default Rate:** | <u>LIBOR Rate Loans</u>:  Shall bear interest at the LIBOR Rate, which is subject to a floor of 1.00%, plus an Applicable Margin of 10.00%. |
| | <u>Default Rate</u>:  the rate per annum otherwise applicable from time to time, plus two percent (2.0%) per annum. |
| | *DIP Credit Agreement §§ 1.1 & 2.3* |
| **Fees:** | <u>Agent Fee</u>.  The Debtors agree to pay to the DIP Agent an advance fee in the amount of $5,000 and an annual fee in the amount of $50,000, as specified in the Agent Fee Letter. |
| | *DIP Credit Agreement § 2.7* |
| | <u>Original Issue Discount</u>.  The DIP Loans issued on the Closing Date shall be funded net of a discount of $2,250,000, which is equal to 3% of the DIP Loan Commitments. |
| | *Interim Order ¶ 3(c) & DIP Credit Agreement § 2.1(b)* |
| | <u>Professional Fees and Expenses</u>.  Subject to the review procedures set forth in the DIP Orders, the Debtors are obligated to pay the professional fees and expenses of the DIP Agent and DIP Lenders. |
| | *Interim Order ¶ 26; DIP Credit Agreement § 9.5* |
| **Conditions to Borrowing:** | Certain customary conditions precedent to extensions of credit, including, among other things, (a) execution of loan documents, (b) entry of the Orders, (c) payment of certain fees and expenses required by the DIP Loan Documents, (d) receipt of a Borrowing Request accompanied by required certificates, (e) compliance with the Approved Budget, (g) limitations on material indebtedness, and (h) no Default, Event of Default or Material Adverse Effect shall have occurred or be existing. |
| | *DIP Credit Agreement Article III.* |
| **DIP Collateral:** | "DIP Collateral" means all assets and properties (real and personal) of the Debtors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation:  (i) all Prepetition Collateral; (ii) all Oil and Gas Properties (as defined in the Second Lien Note Indenture); (iii) all cash and cash equivalents; (iv) all funds in the DIP Priority Account (as defined below) or any other deposit account, securities account or other account of the Debtors and all cash and other property deposited |

| | |
|---|---|
| | therein or credited thereto from time to time; (v) all accounts and other receivables; (vi) all contract rights; (vii) all instruments, documents and chattel paper; (viii) all securities (whether or not marketable); (ix) all goods, as-extracted collateral, equipment, inventory and fixtures; (x) all real property interests; (xi) all interests in leaseholds, (xii) all franchise rights; (xiii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xiv) all general intangibles; (xv) all capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations; (xviii) all letters of credit and letter of credit rights; (xix) all commercial tort claims; (xx) all other claims and causes of action and the proceeds thereof (including, upon entry of the Final Order, the proceeds of all claims and causes of action arising under chapter 5 of the Bankruptcy Code); (xxi) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxii) to the extent not covered by the foregoing, all other assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxiii) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; *provided*, *however*, that the DIP Collateral shall not include Excluded Property;[4] *provided*, *further*, however, that the DIP Collateral shall include all proceeds and products of Excluded Property.<br><br>*Interim Order ¶ 5(a)* |
| **Liens and Priorities of DIP Obligations:** | To secure the DIP Obligations, the DIP Agent, for the benefit of itself and the DIP Lenders, shall be granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows:<br><br>(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date, including all funds in the DIP Priority Account or any other account of the Debtors, subject only to the Carve-Out;<br><br>(ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out; and<br><br>(iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, |

---

[4]    "Excluded Property" means (a) any Excluded Deposit Account (as defined in the DIP Credit Agreement); and (b) any Voting Stock (as defined in the DIP Credit Agreement) in a CFC (as defined in the DIP Credit Agreement) in excess of 65% of the outstanding Voting Stock of such CFC.

valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all Prepetition Collateral securing the Prepetition Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Agent shall be senior to the Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens (as defined below) granted hereunder, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out.

Except as expressly set forth in the Interim Order, the DIP Liens and the DIP Superpriority Claim (as defined below):  (i) shall not be made subject to or pari passu with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c) (upon entry of the Final Order), 510, 549, 550 or 551 of the Bankruptcy Code.

*Interim Order ¶ 6*

Effective immediately upon entry of this Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "Superpriority DIP Claim"), for all of the DIP Obligations, (a) with priority over any and all administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents, and (iii) the Second Lien Noteholders' Adequate Protection Claim (as defined below), and (b) which shall at all times be senior to the rights of the Debtors or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law. The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, without limitation, proceeds of claims and causes of action arising under Chapter 5 of the Bankruptcy Code).  Notwithstanding the foregoing, the DIP

| | |
|---|---|
| | Superpriority Claim shall be junior and subject only to the Carve-Out.<br><br>*Interim Order ¶ 7* |
| **Carve-Out:** | "Carve-Out" shall mean the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; (iii) to the extent allowed by the Court, all accrued and unpaid fees, disbursements, costs and expenses incurred on or prior to the delivery of a Carve-Out Trigger Notice (as defined below) by professionals or professional firms retained by the Debtors (the "Estate Professionals"), pursuant to a final order of the Court (which order has not been vacated or stayed) under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, in the case of each Estate Professional, as calculated pursuant to the professional fee schedule attached to the Interim Order as Exhibit C (the "Professional Fee Schedule"); and (iv) all unpaid fees, disbursements, costs and expenses incurred after the date of the delivery by the DIP Agent, at the direction of the Required Lenders, of the Carve-Out Trigger Notice (such date, the "Carve-Out Trigger Date"), to the extent allowed by the Court at any time, in an aggregate amount not to exceed $250,000 for Estate Professionals (the amount set forth in this clause (iv) being the "Post-Carve-Out Trigger Notice Cap"); *provided*, *however*, that nothing in the DIP Orders shall be construed as a consent to the allowance of any Estate Professionals' fees or expenses or impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any such Estate Professionals.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent at the direction of the Required Lenders to counsel to the Debtors, the U.S. Trustee, and lead counsel to any Official Committee appointed in these Chapter 11 Cases, which notice may be delivered following the occurrence of a Termination Event and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.<br><br>*Interim Order 29¶* |
| **First Lien Lenders Adequate Protection** | The Debtors shall fund the RBL Facility Reimbursement Account with $150,000, which shall serve as security for any documented reimbursement or indemnity obligations that the Debtors may have to the First Lien Agent and First Lien Lenders under the terms of the First Lien Loan Documents as to which a claim or demand for payment is made in writing within five (5) business days prior to the Discharge Date, *i.e.*, the date that is the first day after the expiration of the Challenge Period without a timely Challenge being brought, or upon the final resolution of a Challenge brought in compliance with the provisions of this Order and applicable law (where such Challenge did not have the effect of successfully impairing any of the First Lien Obligations).<br><br>*Interim Order 9(d)¶* |
| **Second Lien Noteholders'** | Second Lien Noteholder Adequate Protection Liens.    Pursuant to |

| | |
|---|---|
| **Adequate Protection:** | sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, are hereby granted continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP Collateral to the extent of any Diminution in Value of the Second Lien Noteholders' interest in the Prepetition Collateral (the "Second Lien Noteholder Adequate Protection Liens"), which liens will be junior only to the DIP Liens and the Carve-Out, and shall be senior in priority to all other liens, including the Prepetition Liens.  Except for the DIP Liens and the Carve-Out, the Second Lien Noteholder Adequate Protection Liens shall not be made subject to or pari passu with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.  The Second Lien Noteholder Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be pari passu with or senior to the Second Lien Noteholder Adequate Protection Liens. |
| | Second Lien Noteholder Superpriority Claim.  Pursuant to section 507(b) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, are hereby further granted an allowed superpriority administrative expense claim (the "Second Lien Noteholder Superpriority Claim"), which claim shall be junior to the DIP Superiority Claim and the Carve-Out, but shall be senior to and have priority over any other administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents.  The Second Lien Noteholder Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, without limitation, proceeds of claims and causes of action arising under Chapter 5 of the Bankruptcy Code).  Except for the DIP Superiority Claim and the Carve-Out, the Second Lien Noteholder Superpriority Claim shall not be made subject to or pari passu with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against |

|   | the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.<br><br>*Interim Order ¶ 11*<br><br>Professional Fees and Expenses.  Subject to the review procedures set forth in the Orders, the Debtors are obligated to pay the professional fees and expenses of the DIP Agent and DIP Lenders.<br><br>*Interim Order ¶ 12(a)*<br><br>Other Adequate Protection.  In addition, the Debtors shall comply with the Approved Budget, subject to Permitted Variances, and all Budget Variance Reporting requirements set forth herein and in the DIP Loan Documents, and the Debtors shall provide the Prepetition Agents and Prepetition Lenders certain information and access to the Debtors' books and records.<br><br>*Interim Order ¶ 12(b) and (c)* |
|---|---|
| **Budget Covenants:** | Initial Budget and Updated Budget.  The Debtors have prepared and delivered to the DIP Agent and the DIP Lenders, and the DIP Agent and DIP Lenders have approved, a budget, a copy of which is attached to the Interim Order as Exhibit B (including the Professional Fee Schedule attached thereto, the "Initial Budget"), which reflects the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date, together with a certificate of the Debtors' Chief Financial Officer stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Debtors to be reasonable at the time made and from the best information then available to the Debtors.  The Initial Budget (and each subsequent Approved Budget hereunder) shall be deemed the "Approved Budget" for all purposes hereof until superseded by another Approved Budget pursuant to the provisions set forth below.<br><br>Updated Budget.  Commencing with Thursday, January 14, 2016, and every fourth Thursday thereafter, the Debtors shall prepare in good faith and deliver to the DIP Agent and the DIP Lenders an updated cash flow forecast for the subsequent thirteen (13) week-period, consistent with the form and level of detail of the Initial Budget and otherwise in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders) (each such updated forecast, including the "Professional Fee Schedule" attached to the Interim Order as Exhibit C, an "Updated Budget"), reflecting the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the thirteen (13) calendar week period beginning on the Sunday following delivery of the applicable Updated Budget.  Upon (and subject to) the approval of any such Updated Budget by the DIP Agent (as directed by, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld or delayed), such Updated |

Budget shall constitute the then-Approved Budget for purposes of the DIP Orders; *provided, however*, that in the event the DIP Agent and Debtors are unable to reach agreement regarding an Updated Budget, then the Approved Budget most recently in effect shall remain the Approved Budget; *provided, further, however*, that the failure of the Debtors and the DIP Agent (as directed by, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld or delayed), to agree on an Approved Budget within ten (10) calendar days of any date upon which the Debtors are obligated to deliver an Updated Budget shall constitute an Event of Default under the DIP Credit Agreement.

Variance Reporting.  Commencing with Tuesday, December 29, 2015, and each Tuesday thereafter, the Debtors shall deliver to the DIP Agent and the DIP Lenders a weekly variance report, in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders) (each a "Variance Report", and together with the Approved Budget requirements described in the Interim Order, the "Budget and Variance Reporting"), setting forth actual cash receipts and disbursements of the Debtors for the calendar week ended on the immediately preceding Saturday (or, in the case of the first such Variance Report, for the period since the Petition Date), and setting forth all the variances, on a line-item and aggregate basis, as compared to the corresponding amounts set forth in the then-current Approved Budget for such week/period, in each case, on a weekly basis and a cumulative basis from the beginning of the period covered by the then-current Approved Budget, together with a certificate of the Debtors' Chief Financial Officer (x) explaining in reasonable detail all material variances from the then current Approved Budget for such week/period and (y) in the case of a Variance Report immediately following the end of any Testing Period (as defined below), certifying the Debtors' compliance with the Permitted Variances for such Testing Period or identifying and explaining in reasonable detail any non-compliance by the Debtors with the Permitted Variances for such Testing Period.

Permitted Variances. [The Debtors shall ensure that at no time shall (i) disbursements be made by the Debtors during the Testing Period (as defined below) ending on any Testing Date (as defined below) exceed 15% of the applicable amounts set forth in each of the "Total Operating Disbursements" and total "General & Administrative" line items in the then current Approved Budget, in each case, on a cumulative basis for the applicable Testing Period; and (ii) cash receipts deposited by the Debtors during the Testing Period ending on any Testing Date fall below 85% of the applicable amounts set forth in each of the "Total Net Production Receipts", "Total Net Receipts", "Operating Cash Flow", and "Net Cash Flow" line items in the then current Approved Budget, in each case, on a cumulative basis for the applicable Testing Period; *provided, however*, that disbursements to Lender Professionals shall not be included or otherwise considered for such variance testing.][5]  The term "Testing Period" shall refer to (i) the two calendar week period ending

---

[5]    This provision of the Interim Order is subject to discussion by the Debtors and DIP Lenders.

Saturday, January 2, 2016, (ii) the four calendar week period ending Saturday, January 16, 2016, and (iii) thereafter, each rolling four calendar week period ending two weeks after the end of the preceding Testing Period.  The term "<u>Testing Date</u>" shall refer to the Saturday of every second week occurring after the Petition Date, beginning Saturday, January 2, 2016

<u>Capital Expenditures</u>.        (e)    Capital Expenditures.    The Debtors shall be required to obtain the prior written consent of the Required Lenders (as defined below) before incurring, investing, committing to or making (i) any single Capital Expenditure (as defined in the DIP Credit Agreement) or acquisition of ownership interests of the type described in Section 6.3(h) of the DIP Credit Agreement in an amount greater than $350,000 or (ii) any series of Capital Expenditures and/or acquisitions of ownership interests of the type described in such Section 6.3(h) of the DIP Credit Agreement in an aggregate amount (during any rolling four (4) week period) greater than $750,000 (in each case, other than with respect to those projects set forth on Schedule 6.21 to the DIP Credit Agreement to which the Debtors have irrevocably committed prior to the date of the DIP Credit Agreement, subject in each case to the amounts and timeframes set forth on such Schedule 6.21); *provided further*, *however*, that the Debtors shall not make payments to the Estate Professionals for any fees and expenses incurred by such Estate Professionals in any month in excess of the monthly amounts corresponding to each of the respective Estate Professionals listed in the Professional Fee Schedule, as applicable attached to the Approved Budget then in effect; *provided*, *further*, *however*, that each Estate Professional shall be entitled to a cumulative carry-forward and carry-back with respect to any unused amounts in respect of the fees and expenses of each such Estate Professional (and nothing herein shall constitute an allowance or disallowance of any claim for payment pursuant to sections 329 and 330 of the Bankruptcy Code).

<u>Approval Required for Variances</u>.  Variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to written agreement by the Debtors and the Required Lenders, in each case without further notice, motion or application to, order of, or hearing before, the Court.  The Debtors acknowledge and agree that the incurrence or payment by any of the Debtors of expenses (x) other than the itemized amounts set forth in the Approved Budget and (y) in excess of Permitted Variances shall constitute an Event of Default under and as defined in the DIP Credit Agreement; *provided*, *however*, that disbursements to Lender Professionals shall not be included or otherwise considered for such variance testing.

*Interim Order ¶ 15*

| | |
|---|---|
| **Financial, Reporting, and Other Covenants:** | Articles V and VI of the DIP Credit Agreement contains covenants customary and appropriate for DIP financings of this type and substantially similar to covenants set forth in the Prepetition First Lien Obligations, including, but not limited to, (a) provision of and compliance with the Approved Budget, (b) reporting of financial information, (c) operation and maintenance of properties, and (d) |

| | |
|---|---|
| | maintenance of liens on properties. |
| **Termination Date:** | A Termination Date shall occur under the DIP Facility upon one of the following, unless waived in writing by the Required Lenders:<br><br>(a)    the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement;<br><br>(b)    the date of acceleration of the DIP Loans under the DIP Facility in accordance with the DIP Credit Agreement;<br><br>(c)    the Termination Date;<br><br>(d)    the date that is forty-five (45) days after the Petition Date, if the Final Order, in form and substance satisfactory to the DIP Agent and the Required Lenders, has not been entered on or before said date;<br><br>(e)    the Debtors seek any amendment, modification, or extension of the Interim Order without the prior written consent of the Required Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties); or<br><br>(f)    the failure by the Debtors to timely perform any of the terms, provisions, conditions, covenants, or other obligations under the Orders.<br><br>*Interim Order ¶ 22*<br><br>["Termination Date" means (A), for so long as the Backstop Agreement has not been terminated by the Requisite Backstop Parties (as defined in the Backstop Agreement) pursuant to Section 7(c)(viii) of the Backstop Agreement, the earliest to occur of:<br><br>(i) the Maturity Date,<br><br>(ii) the consummation of a sale of all or substantially all of the assets of the Borrowers under Section 363 of the Bankruptcy Code,<br><br>(iii) the date on which the Commitments terminate or the Loans become due and payable in accordance with Section 7.2 of this Agreement,<br><br>(iv) unless waived by the Required Lenders in their sole discretion, the day that is 45 calendar days following the Petition Date, if an order satisfactory to the Administrative Agent and the Required Lenders approving the disclosure statement related to the Plan and related solicitation procedures and materials has not been entered by the Bankruptcy Court by such date,<br><br>(v) unless waived by the Required Lenders in their sole discretion, the day that is 45 calendar days following the Petition Date, if the Final Order has not been entered by the Bankruptcy Court by such date, |

(v) unless waived by the Required Lenders in their sole discretion, the day that is 130 calendar days following the Petition Date, if an order satisfactory to the Administrative Agent and the Required Lenders confirming the Plan has not been entered by the Bankruptcy Court by such date,

(vi) unless waived by the Required Lenders in their sole discretion, the date that is 150 calendar days following the Petition Date, if the effective date of the Plan has not occurred by such date,

(vii) the effective date of the Plan or

(viii) unless waived by the Lenders in their sole discretion, any date on which any of the Obligors files a motion with the Bankruptcy Court for authority to proceed with the sale or liquidation of any of the Obligors (or any material portion of the assets or all of the equity of any of the Obligors) or files a plan of reorganization, in each case, without the prior consent of the Required Lenders; or

(B) if the Backstop Agreement is terminated by the Requisite Backstop Parties pursuant to Section 7(c)(viii of the Backstop Agreement, the earliest to occur of

(a) the Maturity Date,

(b) unless waived by the Required Lenders in their sole discretion, the day that is 75 calendar days following the Petition Date, if an order approving a chapter 11 disclosure statement pursuant to section 1125 of the Bankruptcy Code or bidding procedures pursuant to section 363 of the Bankruptcy Code (in each case, in form and substance acceptable to the Agent, the Required Lenders and the Requisite Ad Hoc Committee Members) has not been entered by the Bankruptcy Court by such date,

(c) unless waived by the Required Lenders in their sole discretion, the day that is 160 days following the Petition Date, if an order confirming a chapter 11 plan pursuant to section 1129 or approving a sale of substantially all assets of the Borrowers pursuant to section 363 of the Bankruptcy Code (in each case, in form and substance acceptable to the Agent, the Required Lenders and the Requisite Ad Hoc Committee Members) has not been entered by the Bankruptcy Court by such date or

(d) unless waived by the Required Lenders in their sole discretion, the date that is 180 days following the Petition Date, if the effective date of a chapter 11 plan has not occurred or a sale under section 363 of the Bankruptcy

| | |
|---|---|
| | Code (in each case, in form and substance, and on terms, acceptable to the Agent, the Required Lenders and the Requisite Ad Hoc Committee Members) has not been consummated by such date.] [6] |
| | *DIP Credit Agreement § 1.1* |
| **Events of Default:** | The DIP Credit Agreement contains customary events of default for commercial lending documents, including, without limitation, customary events of default related to non-payment of obligations, breaches of Warranties, non-performance of covenants and obligations, incurrence of judgments, certain actions under ERISA, change in control, impairment of security, liquidation, dissolution or cessation of business, proceedings against Group Members, Changes in Control, sales of assets, and Material Adverse Effects. |
| | *DIP Credit Agreement § 7.1(a)-(o), (q), (r)* |
| | [In addition, the DIP Credit Agreement has the following Events of Default relating to the Chapter 11 Cases: |
| |       (i)        the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto, in each case, by any Obligor in any Chapter 11 Case, or the entry of any order by the Bankruptcy Court in any Chapter 11 Case: (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or that does not provide for the repayment of all Obligations under this Agreement in full in cash; (x) to grant any Lien other than Liens expressly permitted under this Agreement upon or affecting any Collateral, except as expressly provided in the Final Order; (y) except as provided in the Interim or Final Order, as the case may be, to use cash collateral Section 363(c) of the Bankruptcy Code without the prior written consent of the Agent and the Required Lenders; or (z) that (in the case of any Obligor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Obligor) approves or provides authority to take any other action or actions adverse to the Agent and the Lenders or their rights and remedies hereunder or their interest in the Collateral; |
| |       (ii)       the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Obligor, other than with the approval of the Required Lenders; |
| |       (iii)      the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization, other than the Plan approved by the Required Lenders; |

---

[6]      [NTD:  To conform to final Credit Agreement.]

(iv)      the entry of an order amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the Interim Order or the Final Order in any case without the prior written consent of Agent and the Required Lenders;

(v)      the Final Order is not entered on or before the day that is thirty (30) calendar days after the entry of the Interim Order (or such later date as Agent, at the direction of the Required Lenders, may agree to in writing);

(vi)      the payment of, or application by any Obligor for authority to pay, any pre-petition claim without the Required Lenders' prior written consent other than as provided in any "first day order" in form and substance acceptable to Required Lenders and as set forth in the Approved Budget or unless otherwise permitted under this Agreement;

(vii)      the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Obligor, for an order seeking the appointment of, an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in any Chapter 11 Case with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrowers or with the power to conduct an investigation of (or compel discovery from) Agent or Lenders; or the sale without the Required Lenders' consent, of all or substantially all of a Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise;

(viii)      the dismissal of any Chapter 11 Case or the filing by any Obligor of a motion or other pleading seeking the dismissal of any Chapter 11 Case;

(ix)      the conversion of any Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or the filing by any Obligor of a motion or other pleading seeking the conversion of any Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

(x)      the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority;

(xi)      the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments

made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xii)     the failure of any Obligor to perform any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order;

(xiii)     the remittance, use or application of the proceeds of Collateral other than in accordance with cash management procedures and agreements acceptable to the Required Lenders;

(xiv)     the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to Agent, on behalf of itself and Lenders without the consent in writing of Agent and Required Lenders;

(xv)     the filing of a motion by any Obligor requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the Lenders' claims, except as expressly provided in the Interim Order or Final Order;

(xvi)     the entry of an order precluding the Agent to have the right to or be permitted to "credit bid";

(xvii)     the obtaining of additional financing or the granting of Liens not expressly permitted hereunder;

(xviii)     the use of cash collateral without the prior written consent of the Required Lenders (it being understood that the use of cash collateral in accordance with the DIP Budget is consented to by the Required Lenders);

(xix)     any attempt by an Obligor to reduce, set off or subordinate the Obligations or the Liens securing such Obligations to any other Debt;

(xx)     the reversal, vacation or stay of the effectiveness of either the Interim Order or the Final Order;

(xxi)     the payment of or granting adequate protection (except for Adequate Protection Payments) with respect to any Prepetition Indebtedness (other than with respect to payment permitted as set forth in the Interim Order or the Final Order);

(xxii)     an application for any of the orders described in this Section 7.1(q) including, without limitation, clauses [(i), (iii), (iv), (vii), (viii), (ix), (x), (xi), (xiv), (xv), (xvi) or (xx)] shall be made by a Person other than the Agent or the Lenders

| | |
|---|---|
| | and such application is not contested by the Borrowers in good faith or the relief requested is granted in an order that is not stayed pending appeal;<br><br>(xxiii)       the cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or<br><br>(xxiv)       the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Order, DIP Liens and the Collateral.][7]<br><br>*DIP Credit Agreement § 7.1(q)* |
| **Exercise of Remedies** | Any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent, to exercise the following rights and remedies upon the occurrence and during the continuance of any Termination Event and the delivery of written notice (including by e-mail) by the DIP Agent (at the direction of the Required Lenders) to counsel to the Debtors, counsel for the Official Committee, and the United States Trustee of the occurrence of a Termination Event:  (a) immediately terminate the Debtors' use of any Cash Collateral; (b) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Facility, sweep all funds contained in the DIP Collateral Deposit Priority Account); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under this Order, the DIP Loan Documents or applicable law; *provided, however,* that prior to the exercise of any right in clauses (e) or (f) of this paragraph, the DIP Agent shall be required to provide five (5) business days' written notice to counsel to the Debtors, counsel to any Official Committee and the U.S. Trustee of the DIP Agent's intent to exercise its rights and remedies (the "Remedies Notice Period").<br><br>Unless the Court orders during the Remedies Notice Period that a Termination Event has not in fact occurred, the DIP Agent and the DIP Lenders, shall be deemed to have received relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral, collect |

---

[7]    [NTD:  To conform to final Credit Agreement.]

| | |
|---|---|
| | accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise, and the Debtors shall cooperate with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise shall not challenge or raise any objections to the exercise of such rights or remedies other than to challenge the occurrence of a Termination Event; *provided*, that none of the DIP Secured Parties shall object to a request by the Debtors for an expedited hearing before the Court during the Remedies Notice Period to determine whether a Termination Event has in fact occurred.  During the Remedies Notice Period, the Debtors may only use Cash Collateral to pay only the following amounts and expenses solely in accordance with the respective Approved Budget line items:  (i) the Carve-Out; (ii) amounts that the Debtors have determined in good faith are in the ordinary course, necessary expenses and critical to the preservation of the Debtors and their estates; and (ii) such other amounts as have been approved in advance in writing by the Required Lenders.<br><br>*Interim Order ¶ 23* |
| **Indemnification:** | The Debtors are authorized, empowered and directed to jointly and severally indemnify and hold harmless the DIP Agent (solely in its capacity as a DIP Agent), each DIP Lender (solely in its capacity as a DIP Lender) and each other Indemnified Party (as defined in the DIP Credit Agreement) in accordance and subject to the terms and conditions set forth in the DIP Credit Agreement (including, without limitation, section 9.5 of the DIP Credit Agreement)<br><br>*Interim Order ¶ 27 & DIP Credit Agreement § 9.5* |
| **Debtors' Stipulations and Challenge Period:** | Paragraph E of the Interim Order has certain stipulation regarding the extent, validity, enforceability and perfection of the Prepetition Liens and Prepetition Obligations, as well as the absence of any claims against the Prepetition Agents, Prepetition Lenders and Released Parties.<br><br>*Interim Order ¶ E*<br><br>The stipulations made in Paragraph E of the Interim Order are subject to the rights of parties to assert a Challenge, as detailed in paragraph 31(b) of the Interim Order, no later than (A) with respect to any Official Committee, the date that is 30 days after the Official Committee's formation, or (B) with respect to other parties in interest, no later than the date that is 45 days after the entry of the Interim Order, after which they shall be binding upon the Debtors, their estates and any successor thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges as of the Petition Date. |

| | *Interim Order ¶ 31* |
|---|---|
| **Section 552(b) Waiver:** | Upon entry of the Final Order, in partial consideration for, among other things, the Carve Out and the payments made under the Approved Budget to administer the Chapter 11 Cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against any Prepetition Agent or any Prepetition Lenders or any of the Prepetition Obligations or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Prepetition Lenders upon the Prepetition Collateral, as applicable, without the prior express written consent of the affected Prepetition Agent and/or affected Prepetition Lender, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder). <br><br> *Interim Order ¶ 33* |
| **Section 552(b) Waiver:** | Upon entry of the Final Order, the Prepetition Agents and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Agents, the Prepetition Lenders or the Prepetition Obligations. <br><br> *Interim Order ¶ 34* |
| **Marshalling:** | In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Order. In the event that the DIP Obligations are paid full in cash by the Debtors pursuant to the terms of a confirmed chapter 11 plan or from the proceeds of a sale that includes assets of the Debtors, if any, that were not the subject of a valid perfected lien or security interest on the Petition Date, the proceeds of such Unencumbered Assets shall be deemed applied to the DIP Obligations prior to the proceeds of other DIP Collateral <br><br> *Interim Order ¶ 35* |
| **Lien on Avoidance Action Proceeds:** | Upon entry of the Final Order, the DIP Collateral, to which the DIP Liens and Second Lien Noteholder Adequate Protection Liens have recourse, shall include the proceeds of causes of action under chapter 5 of the Bankruptcy Code. <br><br> *Interim Order ¶ 5(a), 6(a), 11(a)* |

**Local Rule 4001-2 Disclosures**

5.      The Debtors believe that the following financing terms are required to be identified pursuant to Local Rule 4001-2 and, as discussed herein, are necessary and justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

   a.   Stipulations to Validity, Perfection, and Amount of Pre-Petition Liens; Waiver of Pre-Petition Claims.   Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation.  The DIP Loan Documents include certain stipulations by the Debtors related to the validity, amount, and perfection of the First Lien Obligations and Second Lien Obligations.  **The proposed Interim Order provides for the earlier to occur of (a) the date that is 45 days after entry of the Interim Order, and (b) the date that is 30 days after the appointment of the official committee, if any, as the challenge period for such stipulations**.  *See* Interim Order ¶¶ E & 31(a).

   b.   Waiver of Section 506(c) Surcharge.   Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  Although the DIP Loan Documents provide for a waiver of rights under section 506(c) with respect to the Prepetition Agents and Prepetition Lenders, the proposed waiver of the estates' rights will be effective only upon entry of the Final Order granting such relief.  See Interim Order ¶ 33.

   c.   Liens on Avoidance Actions.  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.  The DIP Agent, the DIP Lenders, the Second Lien Agent, and the Second Lien Noteholders are not granted liens on Avoidance Actions or their proceeds in the Interim Order, but they will receive liens on the proceeds of Avoidance Actions upon entry of the Final Order.  *See* Interim Order ¶¶ 5(a) & 11(a).

   d.   Payoff of First Lien Obligations.  Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans from a party to repay its own prepetition debt.  The DIP Loan Documents provide for the immediate payment in full of the First Lien Obligations; however, the DIP Agent and DIP Lenders do not hold the Frist Lien Obligations.  *See* Interim Order ¶ 9(c).

   e.   Treatment of Professionals.  Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors.  The Carve-Out being provided for in the Interim Order only applies to professionals for the Debtors and does not include professionals for an Official Committee.  *See*

Interim Order ¶ 29(a).  **The Approved Budget and Carve-Out do not include amounts for professionals for an Official Committee.  In the event that an Official Committee is formed, the Debtors expect that the Approved Budget and Carve-Out will be revised to account for professionals to an Official Committee**.

f.    <u>Priming Liens</u>.  Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder.  The DIP Liens will prime the existing liens of the Second Lien Agent and Second Lien Noteholders.  *See* Interim Order ¶ 6(a)(iii)  As discussed more fully herein, those parties have consented to the DIP Liens priming their existing liens.

g.    <u>Equities of the Case</u>.  Local Rule 4001-2(a)(1)(H) requires disclosure of provisions that seek to affect the Court's power to consider the equities of the case under Section 552(b)(1) of the Bankruptcy Code.  The Interim Order provides that upon entry of the Final Order,  the Prepetition Agents and Prepetition Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Agents, the Prepetition Lenders or the Prepetition Obligations.  *See* Interim Order ¶ 34.

6.    The provisions of the DIP Loan Documents as to which disclosure was required pursuant to Local Rule 4001-2 are all justified under the circumstances of the Chapter 11 Cases because the DIP Lenders would not agree to the DIP Facility and the Second Lien Noteholders would not agree to the use of Cash Collateral or the priming of their liens by the DIP Lenders without the inclusion of such terms.  As demonstrated below, the funds provided under the DIP Facility are needed to allow the Debtors to operate in chapter 11, and the DIP Facility presents the only financing available to the Debtors at this stage.  Given the benefits that the DIP Facility provides overall—most importantly, setting a foundation upon which the Debtors can pursue a value maximizing restructuring under chapter 11—the Debtors submit that the inclusion of the provisions highlighted above in the Interim DIP Order are appropriate under the facts and circumstances.

**Background**

I.      **Introduction and Case Background**

7.      On December 17, 2015 (the "Petition Date"), the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  No trustee, examiner, or creditors' committee has been appointed in the Chapter 11 Cases.  The Debtors are operating as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      For a more detailed description of the Debtors, their business and capital structure, and the events giving rise to the Chapter 11 Cases, please see the First Day Declaration.

II.     **The Debtors' Secured Indebtedness**

9.      ***The First Lien Facility***—Prior to these cases, New Gulf maintained a reserve-based revolving credit facility, allowing New Gulf to finance drilling programs, provide credit support for its hedging program, provide letters of credit, and fund general corporate purposes. On June 12, 2014, New Gulf Resources, as borrower, and MidFirst Bank, a federally chartered savings association, as the administrative agent and L/C issuer, entered into a credit agreement (as amended, the "First Lien Credit Agreement").  New Gulf Resources' obligations under the First Lien Credit Agreement are guaranteed by each of its subsidiary Debtors, and are secured by a first-priority lien on all of the assets acquired in connection with the first closing of the East Texas Acquisition.  MidFirst Bank also is party to an intercreditor agreement with the Second Lien Trustee, as described further below.

10.     As of the Petition Date, there was approximately $38 million of indebtedness outstanding under the First Lien Credit Agreement (the "First Lien Indebtedness"), and the

facility is fully drawn.[8]  The prepetition first lien facility bears interest at a floating rate, and for the six months ending November 30, 2015, the weighted average interest rate was 3.75%.  While the Debtors are current on their obligations under the First Lien Credit Agreement, they are fully drawn and have no additional borrowing availability, and are operating in default and under a forbearance agreement, as more fully described below.

11.    If approved by the Bankruptcy Court, the proceeds of the DIP Facility will be used to repay and satisfy in full all of the Debtors' obligations in respect of the First Lien Indebtedness (as well as provide operational liquidity for the duration of these cases)

12.    ***Second Lien Notes***— On May 9, 2014, in connection with the funding of the East Texas Acquisition,  New Gulf Resources LLC and New Gulf Finance Corp. completed the issuance and sale of $365 million aggregate principal amount of the Senior Secured Notes at a coupon rate of 11.75% with maturity in May 2019 (the "Second Lien Notes").  Bank of New York Mellon Trust Company, N.A. is the trustee and collateral agent (the "Second Lien Trustee") under the indenture governing the Second Lien Notes (the "Second Lien Notes Indenture").  Interest on the Second Lien Notes is payable in cash semi-annually in arrears on May 15 and November 15 of each year.  As of today, the entire $365 million in aggregate principal amount of the Second Lien Notes remains outstanding plus accrued and unpaid interest, as well as approximately $63 million of a prepayment premium arising as a result of the commencement of these cases (the "Second Lien Indebtedness").  Additionally, because the Second Lien Notes have not been registered, Additional Interest (as defined in the Second Lien Notes Indenture) of approximately 1% per annum is accruing.  As further described below, the

---

[8]    The borrowing base under the First Lien Credit Facility is approximately $50 million.  A basket for swap obligations (described below) and certain other functions account for the difference between the fully-drawn indebtedness of $38 million and the borrowing base of $50 million.

Debtors did not make a scheduled interest payment to the Second Lien Noteholders in November 2015.

13.    The Second Lien Indebtedness is secured by a second-priority lien and is guaranteed by NGR Texas, LLC.  As described below, the liens securing the Second Lien Indebtedness (the "Second Liens") are junior and subordinate in right and priority to the liens securing the First Lien Indebtedness (the "First Liens").  Like the First Liens' the Second Lien Indebtedness is secured by validly perfected liens on approximately 80% of the Debtors' assets, excluding only the After-Acquired Leases.  As further described below, the RSA negotiated with the Ad Hoc Committee provides for the Debtors' stipulation to the amount of the Second Lien Indebtedness (including the prepayment premium) and validity, enforceability and perfection of the liens securing such indebtedness as described in this paragraph, subject to a reasonable challenge period for other parties in interest.

14.    Pursuant to the terms of an Intercreditor Agreement, dated as of June 12, 2014, by and between the First Lien Agent and the Second Lien Agent, the Second Lien Obligations are junior and subordinate in right, payment, and priority to the First Lien Obligations.

15.    ***Hedging Arrangements***—To mitigate against fluctuations in commodity prices, from time to time New Gulf Resources, entered into hedging transactions with BP Energy Company (the "Swap Counterparty"), pursuant to a 2002 ISDA Master Agreement, dated May 16, 2014 (with the applicable schedule and as amended, supplemented or modified, the "Swap Agreement").  Relatedly, New Gulf Resources, the Swap Counterparty and MidFirst Bank are parties to an Intercreditor Agreement, dated September 3, 2014 (the "Swap Intercreditor Agreement").  Under the Swap Intercreditor Agreement, (i) the relative priorities of the Swap Counterparty and MidFirst Bank are established with respect to collateral securing New Gulf's

obligations under the Swap Agreement and the First Lien Credit Agreement, and (ii) the Swap Counterparty appointed MidFirst Bank to serve as the collateral agent under the Swap Intercreditor Agreement. Subject to various limitations in the Swap Intercreditor Agreement, New Gulf's obligations under the Swap Agreement are secured, on a *pari passu* basis with the First Lien Indebtedness, up to the amount of $10 million.

16. As of the Petition Date, the Debtors are "in the money" with respect to all of their open positions under the Swap Agreement, and do not currently owe any amounts to the Swap Counterparty. The Debtors anticipate that these positions will close out on or before December 31, 2015 resulting in approximately $1.8 million becoming payable to the Debtors. The Debtors do not anticipate renewing their hedging program during the duration of these bankruptcy cases.

17. As of the Petition Date, the Debtors additionally have $162 million in aggregate principal amount of unsecured Subordinated PIK Notes, plus accrued and unpaid interest, outstanding, and approximately $5 million in trade claims outstanding.

**III.    Downturn in the Oil and Gas Industry and New Gulf's Response**

18. As described in the First Day Declaration, the oil and gas industry is in the midst of a tumultuous period plagued by a prolonged decline and extensive volatility in prices. New Gulf and its management team braced for the down-turn by cutting costs, reducing capital expenditure programs and managing liquidity. But as the down-cycle continued, and even worsened, it became clear that despite management's best efforts, the Company needed a more comprehensive bridge to the other side of this down-turn. New Gulf needed a solution to reduce debt, raise new cash and ultimately preserve the going concern value of the Company.

19. By mid-2015, faced with a heavy debt burden, declining revenues and a commodity price environment poised to remain depressed for a sustained period of time, New Gulf engaged restructuring advisors and began to proactively explore strategic alternatives to

improve its capital structure.  In light of oil prices and related financial modeling, it appeared the company's liquidity would become materially constrained by early 2016 and that the company would not be in compliance with its financial covenants to the First Lien Agent.

20.    With the input and assistance of its restructuring advisors, including Barclays Capital and Baker Botts L.L.P., New Gulf marketed certain assets, considered potential sale transactions, evaluated potential new financing, explored deleveraging measures, and considered various bankruptcy-focused alternatives.  In addition to this exploration of strategic alternatives, New Gulf engaged in discussions with an ad committee of creditors who held in the aggregate 72% of the Second Lien Notes and approximately 22% of the Subordinated PIK Notes (the "Ad Hoc Committee").  These discussions with the Ad Hoc Committee explored available options to enhance liquidity, right-size the company's debt burden, navigate the down-cycle and bridge to a recovery in commodity prices.

21.    One alternative that New Gulf extensively explored was an out of court up-tier transaction, whereby holders of the Second Lien Notes and Subordinated PIK Notes would exchange their lower priority notes for a reduced position higher in the company's capital structure, as well as make a new-money contribution.  As modeled, an up-tier transaction of this nature had substantial benefits for New Gulf and its noteholders.  It ultimately, however, proved infeasible.  The debt exchange pricing and the ratios of participating noteholders necessary to provide an adequate recapitalization were not economically viable given the then-current price of oil and gas.

22.    New Gulf also thoroughly explored various sale transactions so as to enhance liquidity and achieve covenant compliance.  In particular, New Gulf and its advisors commenced a process for the sale of New Gulf's assets in the Kurten and Bedlam fields.  More than 200

potential buyers were contacted for each of these fields, and New Gulf received and pursued multiple bids.  Ultimately, however, New Gulf was unable to negotiate a price with any bidder that would have provided consideration sufficient to resolve the company's impending liquidity and covenant constraints.

**IV.    Recent Events of Default under the First Lien Credit Agreement and Second Lien Notes Indenture**

23.    Having determined that a more fundamental and comprehensive restructuring of the Debtors' capital structure would be necessary, and to preserve dwindling liquidity, the Debtors elected to forgo making a scheduled interest payment on the Second Lien Notes in the approximate amount of $23 million in November 2015.  This nonpayment of the November interest payment constituted a default that, if not cured within thirty days, would become an event of default giving rise to the potential acceleration of the Second Lien Indebtedness and the commencement of the enforcement of remedies.  Moreover, under the cross-default provision of the First Lien Credit Agreement, the non-payment of interest on the Second Lien Notes was an *immediate* event of default under the First Lien Agreement.  This gave rise to the need for a forbearance agreement and hastened negotiations with the Ad Hoc Committee.

24.    To provide certainty during the negotiating and documenting of a restructuring transaction with the Ad Hoc Committee, on November 24, 2015, New Gulf and the First Lien Agent entered into a forbearance agreement (the "Forbearance Agreement").  Under this agreement, the First Lien Agent agreed to forbear from exercising any remedies through February 1, 2016, with respect to certain specified defaults under the First Lien Credit Agreement.  Such defaults include (but are not limited to) the Debtors' failure to (i) make a semi-annual interest payment on the Second Lien Notes in November 2015, and (ii) comply with certain financial and reporting covenants under the First Lien Credit Agreement.  Finally, the

First Lien Agent also reaffirmed the amount of the borrowing base and its commitments under the First Lien Credit Agreement. In consideration for the First Lien Agent's agreement to forbear, the Debtors paid the First Lien Agent a $95,000 fee, half of which will be refunded to New Gulf if the First Lien Obligations are repaid in full or assigned to third-parties by December 31, 2015.

## V.    Negotiation of the Restructuring Support Agreement and DIP Facility

25.    To achieve the Debtors' desired goal for a bridge across the downturn in their industry, and in light of the Debtors' imminent liquidity shortfall at the end of 2015, the Debtors engaged with the Ad Hoc Committee on a comprehensive restructuring strategy. The result of those negotiations was entry into the RSA which achieves the Debtors' desired results by providing (i) immediate financing through the DIP Facility, (ii) a pathway for a prompt exit from Chapter 11, through the consensual  conversion of secured Second Lien Notes obligations to equity in the reorganized Debtors, and (iii) the Ad Hoc Committee's agreement—subject to a 30-day diligence contingency (the "Diligence Out")[9]—to backstop a $50 million rights offering and exchanging the principal amount of loans under the DIP Facility into convertible PIK debt issued by the reorganized Debtors pursuant to the Plan. The DIP Facility is a critical element of the transactions that are being implemented through the RSA.

26.    While the Debtors were negotiating the RSA, they also negotiated the terms of the DIP Facility with the Ad Hoc Committee, through their legal and financial advisors. In addition to their negotiations with the Ad Hoc Committee, the Debtors, through their investment banker, contacted 10 potential financing sources, ultimately receiving one non-binding proposal regarding the material economic terms for post-petition financing, and contacted the First Lien

---

[9]    In the event the Ad Hoc Committee exercises the Diligence Out, all milestones under the DIP Credit Agreement are automatically extended, giving the company a total of 180 days from the Petition Date to formulate and implement an alternative exit strategy.

Agent to explore its interest in providing post-petition financing.  Neither of these parties offered economic terms that were materially better than the DIP Financing and financing from those parties lacked certain other elements that make the DIP Facility superior on whole.

27.    As an initial matter, the Debtors were able to negotiate fair, reasonable and market terms for the DIP Facility, including the maturity, interest, fee and expense provisions. In addition, the DIP Facility will grant priming liens to the DIP Agent and DIP Lenders on a *consensual basis*; priming liens were a condition imposed by any potential lender,[10] but a result that the Debtors *could only consensually achieve* with the financing offered by the Ad Hoc Committee, which included the requirement to refinance the First Lien Obligations with the DIP Facility.  Obtaining post-petition financing from other parties (who likely could not deliver the Second Lien Noteholders' consent) would have required a priming fight—a fight whose cost (both in terms of money and disruption to the Debtors' restructuring) would likely be high but whose outcome would be far from certain given the Debtors' financial condition.  Further, the DIP Facility is coupled with an agreement (embodied in the Plan) from the Ad Hoc Committee, who are the DIP Lenders, to roll over the principal amount of the DIP Loans into New First Lien Notes[11] under the Plan and on its effective date.

28.    Further, the DIP Facility provides the Debtors needed and adequate liquidity.  The initial borrowings under the DIP Facility will allow the Debtors to pay off the First Lien Obligations—which are fully-drawn and in default and are required by the Ad Hoc Committee to be paid in full as a part of the DIP Facility—and provide the Debtors with the capital needed to fund their operations through the end of January.  Absent this financing, the Debtors' businesses would be substantially disrupted and the Debtors' interests in their oil and gas leases and joint

---

[10]    To that end, no party was willing to provide unsecured or junior secured financing. *See* Mack Declaration ¶ 11.

[11]    On the other hand, the Debtors retain the flexibility to satisfy the DIP Obligations in cash should they pursue an alternative restructuring to the Plan.

operating agreements—which represent substantially all of the Debtors' revenue producing assets—may be placed in jeopardy. As a result, the Interim Financing of $55 million is necessary to avoid any immediate and irreparable harm to the Debtors and their estates. In addition, as demonstrated by the Approved Budget attached to the Interim Order, the full amount of the DIP Facility is necessary to ensure that the Debtors have adequate liquidity to continue their businesses during the Chapter 11 Cases.

**Basis for Relief Requested**

29.    As set forth above and in the First Day Declaration and Mack Declaration, the Debtors believe that the DIP Facility is the best financing available under the circumstances and will enable the Debtors to pursue a necessary deleveraging of their balance sheet, including through the restructuring transactions set forth in the RSA. For the reasons stated herein, the Debtors submit that they have satisfied the requirements to obtain postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code. Importantly, over 75% of the Second Lien Noteholders have consented to the terms of the DIP Facility and, therefore, the Second Lien Noteholders have consented to the priming of the Second Liens by the DIP Liens and usage of Cash Collateral.

30.    Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security. If a debtor-in-possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (x) entitled to super-priority, administrative-expense status or (y) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both. Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to

authorize a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.[12]

31.    As further discussed herein, the DIP Facility is secured by substantially all of the assets of the Debtors' estates through super-priority claims, security interests, and secured liens pursuant to section 364.  The circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

## I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Under Section 364(c) of the Bankruptcy Code.

32.    Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a super-priority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already encumbered assets.[13]  Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.[14]

33.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.    The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

b.    The credit transaction is necessary to preserve the assets of the estate; and

---

[12]    11 U.S.C. §§ 364(c), (d).

[13]    11 U.S.C. § 364(c).

[14]    *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-29 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

c.    The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.[15]

34.    The Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, among other things, super-priority claims, security interests, and liens pursuant to sections 364(c)(1)—(3) and section 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

### A.    The Debtors Could Not Obtain Unsecured Financing.

35.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.[16]  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."[17]  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."[18]  As set forth above and in the Mack Declaration, unsecured post-petition financing was simply not available to the Debtors.  This is unsurprising given, among other things, the substantial level of secured debt the Debtors already have and the state of the Debtors' industry.   Accordingly, the Debtors have satisfied the requirement of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

---

[15]    *In re Ames Dep't Stores*, 115 B.R. at 37-39.

[16]    *Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

[17]    *Id.*, *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

[18]    *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Snowshoe Co.*, 789 F.2d 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

**B.**     **Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.**

36.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.[19]  Courts grant a debtor considerable deference in acting in accordance with its sound business judgment.[20]  Further, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."[21]

37.     The Debtors' decision to enter into the proposed DIP Facility is an exercise of their sound judgment that warrants approval by the Court.  The Debtors are at a point where they do not have adequate liquidity to fund their go-forward operations.  The Debtors' management, board, and professionals have reviewed their restructuring alternatives in detail over the past several months and have explored alternative sources of capital and financing as part of this process, including sale transactions and an out-of-court exchange transaction.  None of those alternatives yielded a result that would allow the Debtors to continue to operate outside of chapter 11.  Therefore, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility.  The DIP Facility will provide immediate access to capital, on terms that, collectively, are the best and most favorable terms available to the Debtors, that will be used to pay the Debtors' ongoing operating expenses

---

[19]  *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y.  Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

[20]  *See, e.g., Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest.").

[21]  *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

while preserving value and allowing the Debtors the run-way needed to effectuate a deleveraging transaction during chapter 11.

38.     Without the DIP Facility, the Debtors would be unable to satisfy their current and ongoing operating expenses, including postpetition wages and salaries, taxes, vendor costs, and, importantly, their obligations under their oil and gas leases and joint operating agreements. Absent the financing provided under the DIP Facility, the Debtors' operations would likely come to an immediate halt, resulting in irreparable harm to their businesses, their going concern value, and seriously jeopardizing their ability to reorganize and maximize the value of their assets for their primary stakeholders.   Critically, if the Debtors cannot continue to meet their financial obligations as an operator or working interest owner under their various joint operating agreements, oil and gas leases, and similar and related documents, they are at risk that counterparties will seek to terminate the Debtors' rights, thereby severely imperiling the Debtors' revenue producing capabilities.   With the DIP Facility, the Debtors will be in a position to continue operations, thereby preserving the value of their assets for the benefit of all creditors, and will be provided an opportunity to pursue the transactions embodied in the RSA.

### C.     The Terms of the DIP Facility Are Fair and Reasonable Under the Circumstances.

39.     In determining whether the terms of postpetition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.[22]   Judged from that perspective, the terms of the DIP Facility are fair and reasonable.

40.     First and foremost, the Debtors believe that the DIP Facility, along with the coupled consent to use cash collateral, provides them with sufficient liquidity to continue their

---

[22]    *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

operations in the near term while they seek to substantially reduce their funded indebtedness and debt service obligations through the plan proposed under the RSA.  Second, the financial terms of the DIP Facility, including the 3% discount paid as premium for the Commitments under the DIP Facility, are consistent with market rate terms for such financing in this economic environment and the Debtors' industry.  And there is, in fact, no proposal with materially superior economic terms.  Third, the non-economic terms of the DIP Facility—notably the consensual priming and (subject to the Diligence Out) the ability to roll over the DIP Obligations into exit-financing at emergence—make the DIP Facility superior to any other facility with comparable terms.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.

41.     Likewise, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve-Out Expenses for certain administrative and professional fees.  Carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate is adequately assisted by counsel and other professionals.[23]

42.     For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases, and the Debtors could not obtain postpetition financing from any other lending source.

---

[23]   *See In re Ames*, 115 B.R. at 38.

**D.      The Satisfaction of the First Lien Obligations is Necessary and Appropriate**

43.      Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval. It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.[24]  The business judgment rule shields a debtor's management from judicial second-guessing.[25]

44.      The Debtors submit that the satisfaction of the First Lien Obligations is appropriate in these cases.  The terms of the DIP Facility contemplate and provide for the satisfaction of the First Lien Obligations, and this pay down is part of the overall package presented to the Debtors by the DIP Agent and DIP Lenders, a package that the Debtors believe is fair and reasonable under the circumstances, as well as the only option that the Debtors believe is available and feasible.  The Debtors do not believe that the DIP Lenders would have agreed to the DIP Facility absent the satisfaction of the First Lien Obligations.  In addition, by satisfying the First Lien Obligations, the Debtors (and the DIP Agent and DIP Lenders) avoid having to seek the consent of the First Lien Agent and First Lien Lenders, and possibly pursue litigation, to obtain priming liens that are senior to $38 million of First Lien Obligations held by the First Lien Agent and First Lien Lenders.

**II.      A Priming Lien Should be Approved under Section 364(d)**

45.      If a debtor is unable to obtain credit under the provisions of section 364(c) alone, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is

---

[24]      *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).

[25]      *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

already subject to a lien, commonly referred to as a "priming lien."[26]  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

    a.    The trustee is unable to obtain credit otherwise; and

    b.    There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.[27]

46.    To justify a priming lien, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.[28]  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.[29]  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."[30]  However, consent by a secured creditor to priming obviates the need to show adequate protection.[31]

47.    As demonstrated above, the Debtors believe that the DIP Facility is the only likely source of postpetition financing under the circumstances of the Chapter 11 Cases.  In accordance with section 364(d)(1)(B) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Second Lien

---

[26]  11 U.S.C. § 364(d).

[27]  *Id.*

[28]  *See In re Snowshoe Co.*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

[29]  *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

[30]  *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

[31]  *See Anchor Savs. Bank FSB v*, 99 B.R. at 122 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

Noteholders with adequate protection as described above.[32]   In addition, the Second Lien Noteholders have affirmatively consented to the priming of their liens; which otherwise obviates the need to show adequate protection.[33]   Thus, both the First Lien Lenders and the Second Lien Noteholders have consented to the priming of their liens provided that the relief requested herein is granted, including the grant of the adequate protection as set forth in the Interim Order.

### III.    <u>Use of Cash Collateral</u>

48.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.   Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.[34]

Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.   Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

a.    Each entity that has an interest in such collateral consents; or

b.    The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.[35]

---

[32]    While the amounts owed to the First Lien Lenders are being satisfied in full, the Interim Order proposes to provide adequate protection to the First Lien Agent and First Lien Lenders in the form of an escrow of $150,000, which will serve as security for any documented reimbursement or indemnity obligations that the Debtors may have to the First Lien Agent and First Lien Lenders under the terms of the First Lien Loan Documents.

[33]    *Id.*

[34]    11 U.S.C. § 363(c)(1).

[35]    11 U.S.C. § 363(c)(2).

49.     During the ordinary course of operations, the Debtors generate cash from the use of the DIP Collateral.  As of the Petition Date, the Debtors held only a *de minimis* amount of unrestricted cash.  The Debtors need the proposed DIP Facility and the use of Cash Collateral in order to fund their ordinary course of business operations and administer the Chapter 11 Cases while they pursue prompt confirmation of a chapter 11 plan as contemplated by the RSA.  As the DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion.  Accordingly, to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

50.     The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  The parties with the material interest in the Cash Collateral—namely the Second Lien Noteholders—consent to the use of Cash Collateral provided that the relief requested herein is granted.  Absent such authority, the Debtors would not have access to any additional liquidity, which would imperil their ability to continue operations and could substantially impair the value of their assets as they attempt to deleverage their balance sheet during the Chapter 11 Cases.  On the other hand, allowing the Debtors to use Cash Collateral and, by extension, sustain their business operations will permit the Debtors to implement a restructuring strategy that will preserve and maintain value and yield the highest recovery for their estates and their creditors.   Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

IV.     **Interim Approval Should Be Granted**

51.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.

52.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility as provided therein.  This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

**Final Hearing**

53.     The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon: (a) the U.S. Trustee; (b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (e) Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the Second Lien Ad Hoc Committee; (f) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (g) all financial institutions at which the Debtors maintain deposit accounts; and (h) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to

receive notice prior to the date hereof.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

### <u>Notice</u>

54.    Notice of this Motion will be provided to:  (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (v) Stroock, as counsel to the DIP Agent and the DIP Lenders; (vi) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (vii) all financial institutions at which the Debtors maintain deposit accounts; (viii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.

**WHEREFORE**, the Debtors respectfully request that the Court enter (i) the Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the Final Order following a Final Hearing, and (iv) grant such other relief as is just and proper.

Dated:    December 17, 2015                YOUNG CONAWAY STARGATT & TAYLOR, LLP
          Wilmington, Delaware

                                          */s/ M. Blake Cleary*
                                          M. Blake Cleary (No. 3614)
                                          Ryan M. Bartley (No. 4985)
                                          Justin Duda (No. 5478)
                                          1000 N. King Street
                                          Rodney Square
                                          Wilmington, Delaware 19801
                                          Telephone:  (302) 571-6600
                                          mbcleary@ycst.com
                                          rbartley@ycst.com
                                          jduda@ycst.com

                                                  - and -

                                          BAKER BOTTS L.L.P.
                                          C. Luckey McDowell (*pro hac vice* pending)
                                          Ian E. Roberts (*pro hac vice* pending)
                                          Meggie S. Gilstrap (*pro hac vice* pending)
                                          2001 Ross Avenue
                                          Dallas, Texas 75201
                                          Telephone: (214) 953-6500
                                          luckey.mcdowell@bakerbotts.com
                                          ian.roberts@bakerbotts.com
                                          meggie.gilstrap@bakerbotts.com

                                          *Proposed Counsel for Debtors*
                                          *and Debtors in Possession*

**EXHIBIT I**

**Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | Chapter 11 |
| In re: | ) | |
| | ) | |
| NEW GULF RESOURCES, LLC, *et al.* | ) | Case No. 15-12566 (____) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |
| | ) | **Docker Ref No. ____** |

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING THE AUTOMATIC STAY, (6) SCHEDULING A FINAL HEARING, AND (7) GRANTING RELATED RELIEF

Upon the motion dated December 17, 2015 (the "DIP Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") seeking, *inter alia*, entry of this Order (this "Order"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  NGR Holding Company LLC (1782), New Gulf Resources, LLC (1365); NGR Finance Corp. (5563) and NGR Texas, LLC (a disregarded entity for tax purposes).  The Debtors' mailing address is 10441 S. Regal Boulevard, Suite 210, Tulsa, Oklahoma 74133.

[2]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable DIP Loan Documents (as defined herein).

(1)      authorizing the Debtors to obtain senior secured postpetition financing on a priming, superpriority basis (the "<u>DIP Facility</u>"; the loans under the DIP Facility, the "<u>DIP Loans</u>") pursuant to the terms and conditions of this Order and that certain Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement substantially in the form attached hereto as <u>Exhibit D</u> (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>", and together with all agreements, documents, instruments and certificates executed, delivered or filed in connection therewith, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, collectively, the "<u>DIP Loan Documents</u>"), by and among each of Debtors, as borrowers (collectively, the "<u>DIP Loan Parties</u>"), U.S. Bank, National Association, as administrative agent and collateral agent (in such capacities, the "<u>DIP Agent</u>"), and the lenders party thereto from time to time (collectively, the "<u>DIP Lenders</u>", and together with the DIP Agent, the "<u>DIP Secured Parties</u>"), providing for, *inter alia*, (i) a new money, senior secured priming superpriority multiple draw term loan facility, providing for the borrowing of term loans in an aggregate maximum principal amount not to exceed $75,000,000, of which, an aggregate principal amount of $55,000,000 shall be available to and shall be drawn in a single draw by the Debtors on the Closing Date (as defined in the DIP Credit Agreement), and (ii) following entry of the Final Order, up to two (2) additional drawings of the DIP Facility in an aggregate principal amount of $20,000,000;

(2)      authorizing the Debtors to execute, deliver to the DIP Secured Parties, and perform under the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Loan Documents;

(3)      authorizing and directing the Debtors to incur and pay all DIP Obligations (as defined below), including the fees specified in that certain fee letter dated as of December 15, 2015, between the Debtors and the DIP Agent (the "<u>Agent Fee Letter</u>");

(4)      providing for the indefeasible payment in full of the First Lien Obligations (as defined below) due in respect of the First Lien Credit Agreement (as defined below), subject to the terms hereof; and

(5)      granting to the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral (as defined below), including, without limitation, all Cash Collateral (as defined below) to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth herein;

(6)      granting to the DIP Secured Parties allowed superpriority administrative expense claims in respect of all DIP Obligations, as set forth herein;

(7)      authorizing the Debtors' use of the proceeds of the DIP Facility and Cash Collateral pursuant to the Approved Budget (as defined below), this Order and the DIP Loan Documents;

(8)    providing adequate protection to the Second Lien Agent (as defined below) and the Second Lien Noteholders (as defined below) for any Diminution in Value (as defined below) of their interests in the Prepetition Second Lien Collateral (as defined below), including Cash Collateral;

(9)    vacating and modifying the automatic stay imposed by section 362 to the extent necessary to implement and effectuate the terms and provisions of this Order and the DIP Loan Documents, and providing for the immediate effectiveness of this Order; and

(10)    scheduling a final hearing (the "Final Hearing") to consider entry of a final order authorizing the relief requested in the DIP Motion on a final basis, and approving the form of notice with respect to the Final Hearing, which order shall be in form and substance and on terms satisfactory in all respects to the DIP Agent and the DIP Lenders (the "Final Order");

and the Court having considered the DIP Motion, the DIP Loan Documents on file with the Court, the Declaration of Danni Morris in Support of the Debtors' First Day Motions and any exhibits thereto, the Declaration of George Mack in support of the DIP Motion, the pleadings filed with the Court, and the evidence proffered or adduced at the interim hearing held on December __, 2015 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; and upon the record of these Chapter 11 Cases; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND
CONCLUSIONS OF LAW:[3]

A.    *Petition Date*.  On December 15, 2015 (the "Petition Date"), each of the Debtors
filed a separate voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the
United States Bankruptcy Court for the District of Delaware (this "Court") commencing these
Chapter 11 Cases.

B.    *Debtors-in-Possession*.  The Debtors continue to manage and operate their
businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the
Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.    *Committee Formation*.  As of the date hereof, the United States Trustee (the "U.S.
Trustee") has not yet appointed an official committee of unsecured creditors in these Chapter 11
Cases (the "Official Committee").

D.    *Jurisdiction and Venue*.  The Court has jurisdiction, pursuant to 28 U.S.C.
§§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.
Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  The
statutory predicates for the relief set forth herein are sections 105, 361, 362, 363, 364 and 507 of
the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.  Venue for these
Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C.
§§ 1408 and 1409.

E.    *Debtors' Stipulations*.  In requesting the DIP Facility, and in exchange for and as
a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange

---

[3]    Where appropriate in this Order, findings of fact shall be construed as conclusions of law and conclusions
of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

for and in recognition of the priming of the Prepetition Second Lien Note Liens (as defined below), subject to paragraph 31 hereof, the Debtors hereby admit, stipulate, acknowledge and agree that:

(i) *First Lien RBL Facility*. (a) Pursuant to the Credit Agreement dated as of June 12, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "First Lien Credit Agreement", and together with all other all agreements, documents, instruments and certificates executed or delivered in connection therewith, including the First Lien Guaranty (as defined below) and the Intercreditor Agreement (as defined below), collectively, the "First Lien Loan Documents"), among New Gulf, as borrower (the "First Lien Obligor"), MidFirst Bank, as administrative agent and issuer of letters of credit (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), the First Lien Lenders provided a revolving credit facility (the "First Lien RBL Facility"); and (b) pursuant to the Guaranty Agreement dated as of June 12, 2015 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "First Lien Guaranty"), NGR Texas (the "First Lien Guarantor", and together with the First Lien Obligor, the "First Lien Loan Parties") agreed to guarantee the "Obligations" as defined in the First Lien Credit Agreement.

(ii) *First Lien Obligations*. As of the Petition Date, without defense, counterclaim, or offset of any kind, the First Lien Loan Parties were jointly and severally indebted to the First Lien Agent and the First Lien Lenders in the aggregate amount of approximately $38,073,109.14, in each case, to the extent provided in the First Lien Loan Documents (collectively, the "First Lien Obligations").

(iii) *First Lien Collateral*. To secure the First Lien Obligations, the First Lien Loan Parties granted to the First Lien Agent, for the benefit of itself and the First Lien Lenders, first-priority liens on and security interests in (collectively, the "Prepetition RBL Liens") all "Collateral" as defined in the First Lien Credit Agreement (collectively, the "Prepetition First Lien Collateral").

(iv) *Second Lien Notes*. Pursuant to the Indenture dated as of May 9, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Second Lien Note Indenture", and together with all other all agreements, documents, instruments and certificates executed or delivered in connection therewith, including, *inter alia*, (1) the Second Lien Guaranty (as defined below), (2) the Intercreditor Agreement (as defined below), and (3) the Agreement and Plan of Merger, dated as of December 14, 2015 by and among New Gulf, NGR Holding Company, LLC ("HoldCo"), and NGRHC Acquisition LLC (the "Merger Agreement"), collectively, the "Second Lien Note Documents", and together with the First Lien Loan Documents, the "Prepetition Loan Documents"), among New Gulf and NGR Finance, as co-issuers (the "Second Lien Note Issuers"), The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent (the "Second Lien Agent", and together with the First Lien Agent, the "Prepetition Agents"), and the guarantors party thereto (including HoldCo, as guarantor of the Second Lien Notes, the "Second Lien Guarantors", and together with the Second Lien Note Issuers, collectively, the "Second Lien Note Parties", and together with the First Lien Loan Parties, collectively, the "Prepetition Loan Parties"), the Second Lien Issuers

issued the 11.75% Senior Secured Notes due 2019 (the "Second Lien Notes"; the holders of such Second Lien Notes, the "Second Lien Noteholders", and together with the First Lien Lenders, collectively, the "Prepetition Lenders"), and the Second Lien Guarantors guaranteed the "Guaranteed Obligations" as defined in the Second Lien Note Indenture.

(v) *Second Lien Obligations*.  As of the Petition Date, without defense, counterclaim, or offset of any kind, the Second Lien Note Parties were jointly and severally indebted to the Second Lien Agent and the Second Lien Noteholders in the aggregate principal amount of at least approximately $365 million in Second Lien Notes, *plus* the Applicable Premium (as referred to in the Second Lien Note Indenture) in the amount of not less than $63 million, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Second Lien Note Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, including all "Guaranteed Obligations" as defined in the Second Lien Note Indenture (collectively, the "Second Lien Obligations", and together with the First Lien Obligations, collectively, the "Prepetition Obligations").

(vi) *Prepetition Second Lien Collateral*.  To secure the Second Lien Obligations, the Second Lien Note Parties granted to the Second Lien Agent, for the benefit of itself and the Second Lien Noteholders, first-priority liens on and security interests in (collectively, the "Prepetition Second Lien Note Liens", and together with the Prepetition RBL Liens, the "Prepetition Liens") all "Collateral" as defined in the Second Lien Note Indenture (collectively, the "Prepetition Second Lien Collateral", and together with the Prepetition First Lien Collateral, the "Prepetition Collateral"), subject to the terms of the Intercreditor Agreement dated as of June 12, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Intercreditor Agreement"), by and between each of the First Lien Agent and the Second Lien Agent, which governs the relative rights and priorities of the First Lien Agent (on behalf of itself and the First Lien Lenders) and the Second Lien Agent (on behalf of itself and the Second Lien Noteholders) with respect to their shared interests in the Prepetition Collateral.

(vii) *Validity of Prepetition Liens and Prepetition Obligations*.  (a) The Prepetition Liens are valid, binding, enforceable, non-avoidable and perfected liens, with priority over any and all other liens (other than liens expressly permitted under the First Lien Credit Agreement and Second Lien Note Indenture, solely to the extent such permitted liens were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens")), subject to the terms of the Intercreditor Agreement; (b) the First Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the First Lien Loan Parties, enforceable in accordance with the terms of the First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (c) the Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Second Lien Note Parties, enforceable in accordance with the terms of the Second Lien Note

Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (d) the Debtors and their estates hold no valid or enforceable claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind, and have waived, discharged and released any right they may have to (A) challenge the validity, enforceability, priority, security and perfection of any of the Prepetition Obligations, the Prepetition Loan Documents or the Prepetition Liens, respectively, (B) assert any and all, claims (as defined in the Bankruptcy Code), against the Prepetition Agents or the Prepetition Lenders, and each of their respective officers, directors, equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultant, agents, and other representatives (collectively, the "Released Parties"), whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, in each case, arising out of, based upon or related to the Prepetition Loan Documents, the Prepetition Liens or the Prepetition Obligations, as applicable.

(viii)    *Cash Collateral*.  All of the Debtors' cash, whether existing on the Petition Date or thereafter, including, without limitation, any cash in deposit accounts of the Debtors, or wherever located, constitutes cash collateral of the Prepetition Agents and the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(ix)    *Default*.  The Prepetition Loan Parties are in default of certain terms and provisions of the Prepetition Loan Documents as of the Petition Date.

(x)    Nothing in the Debtors' stipulations contained in this paragraph E shall constitute a stipulation, admission or waiver by the Debtors with respect to the validity, enforceability, perfection,  priority or voidability of any liens or security interests in real property interests acquired by the Debtors after May 9, 2014 or the identifiable post-petition proceeds (if any) thereof to the extent such liens or security interests did not attach and/or were not validly perfected as of the Petition Date.

F.    *Findings Regarding Postpetition Financing*.

(i)    *Request for Postpetition Financing*.  The Debtors seek authority to

(a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, and

(b) use Cash Collateral on the terms described herein to administer the Chapter 11 Cases and

fund the operation of their businesses.  At the Final Hearing, the Debtors will seek final approval

of the DIP Loan Documents and the proposed postpetition financing arrangements and use of

Cash Collateral arrangements pursuant to the Final Order, and notice of the Final Hearing and

Final Order will be provided in accordance with this Order.  Good cause has been shown for the entry of this Order.

(ii)     *Priming of Prepetition Second Lien Note Liens.*  The priming of the Prepetition Second Lien Note Liens on the Prepetition Second Lien Collateral under section 364(d)(1) of the Bankruptcy Code, as contemplated by this Order and the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and stakeholders.  However, the Second Lien Agent and the Second Lien Noteholders are entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Second Lien Collateral (including Cash Collateral) in exchange for the Debtors' use of such Prepetition Second Lien Collateral (including Cash Collateral), solely to the extent of the diminution in value, if any, of the Prepetition Second Lien Collateral (including Cash Collateral) resulting from (a) the use, sale or lease by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Second Lien Collateral, (b) the imposition of the DIP Liens (as defined below) and the priming of the Prepetition Second Lien Note Liens, and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Diminution in Value"), as more fully set forth herein.

(iii)     *Need for Postpetition Financing and Use of Cash Collateral.*  The Debtors' need to use Cash Collateral on an interim basis and to obtain credit pursuant to the DIP Facility as provided for herein on an interim basis is urgent and necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their estates.  The ability of the Debtors to finance their operations, maintain business relationships

with their vendors, suppliers and customers, pay their employees and otherwise finance their

operations requires the availability of working capital from the DIP Facility and the use of Cash

Collateral. Without the ability to access the Interim Financing (as defined below) and the DIP

Facility and the authority to use Cash Collateral, the Debtors, their estates and their creditors

would suffer immediate and irreparable harm, and the Debtors' chances for a successful exit and

reorganization from the Cases would be jeopardized. The Debtors do not have sufficient

available sources of working capital and financing to operate their businesses or maintain their

properties in the ordinary course of business without the DIP Facility and authorized use of

Cash Collateral.

(iv)    *No Credit on More Favorable Terms.* Given their current financial

condition, financing arrangements and capital structure, and the present state of the industry

within which the Debtors operate, the Debtors are unable to obtain financing from sources other

than the DIP Lenders on terms more favorable than those provided under the DIP Facility and

the DIP Loan Documents. The Debtors have been unable to obtain unsecured credit allowable as

an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors also

have been unable to obtain sufficient credit (a) having priority over administrative expenses of

the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a

lien on property of the Debtors and their estates that is not otherwise subject to a lien, or

(c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a

lien. Postpetition financing is not otherwise available without granting the DIP Agent, for the

benefit of itself and the DIP Lenders: (1) perfected priming security interests in and liens on

(each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities

set forth herein; (2) superpriority claims and liens; and (3) the other protections set forth in this

Order.  After considering all alternatives, the Debtors have concluded, in the exercise of their

sound business judgment, that the DIP Facility represents the best financing available to them at

this time, and is in the best interests of all of their stakeholders.

(v)     *Use of Proceeds of the DIP Facility.*  As a condition to entry into the DIP

Credit Agreement, the extension of credit under the DIP Facility and the authorization to use

Cash Collateral (including, without limitation, the proceeds of the DIP Facility), the DIP Agent

and the DIP Lenders require, and the Debtors have agreed, that the proceeds of the DIP Facility

shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan

Documents and in accordance with the Approved Budget (as defined below), solely (a) to

provide working capital for the Debtors in the ordinary course of business, (b) to pay costs and

expenses of administration of the Chapter 11 Cases, (c) to indefeasibly pay in full the First Lien

Obligations, (d) to pay fees and expenses related to the DIP Facility, including, without

limitation, as set forth in that certain Commitment Letter, dated December [16], 2015 from the

DIP Lenders or their affiliates to New Gulf Resources, LLC (the "DIP Commitment Letter") and

the Agent Fee Letter, and (e) to make the adequate protection payments provided for in this

Order.

G.     *Adequate Protection*.  The Second Lien Agent and the Second Lien Noteholders

are each entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive

adequate protection against the risk of Diminution in Value of their respective interests in the

Prepetition Second Lien Collateral, including, among other things, adequate protection liens and

claims, the payment of the reasonable fees, costs and expenses, including, without limitation,

legal and other professionals' fees and expenses, of the Second Lien Agent and the Ad Hoc

Committee (as defined below), compliance with the Approved Budget (as defined below),

subject to Permitted Variances (as defined below), Budget and Variance Reporting (as defined below) and certain other forms of adequate protection, as set forth in more detail herein.

H.    _New Loan_.  The DIP Facility (including the Interim Financing) constitutes new loans and financial accommodations from the DIP Lenders to the Debtors, separate and distinct from the loans and financial accommodations provided prior to the Petition Date under the Prepetition Loan Documents, and the proceeds of the DIP Facility may only be borrowed and such proceeds and the use of Cash Collateral may only be used in compliance with the Approved Budget (as defined below) and the DIP Loan Documents.

I.    _Sections 506(c) and 552(b)_.  As a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out (as defined below), and (b) the Prepetition Agents' and the Prepetition Lenders' agreement to (i) subordinate their Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens to the DIP Liens and the Carve-Out, and (ii) consent to the use of Cash Collateral in accordance with and subject to the Approved Budget (as defined below) and the terms of this Order, each of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders are entitled to receive, subject to entry of the Final Order, (1) a waiver of any "equities of the case" exceptions or claims under section 552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the DIP Agent and the DIP Lenders that section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to section 364 of the Bankruptcy Code).

J.    *Good Faith of the DIP Agent and the DIP Lenders*.

(i)    *Willingness to Provide Financing*.  The DIP Lenders have indicated a willingness to provide financing to the Debtors subject to:  (a) the entry by the Court of this Order and the Final Order; (b) approval by the Court of the terms and conditions of the DIP Facility and the DIP Loan Documents; and (c) entry of findings by the Court that such financing is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are extending postpetition credit to the Debtors pursuant to the DIP Loan Documents and this Order in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Order and the DIP Loan Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Order or any other order.

(ii)    *Business Judgment and Good Faith Pursuant to Section 364(e)*.  The extension of credit under the DIP Facility, governed by the terms and conditions of the DIP Loan Documents, the fees paid and to be paid thereunder, and this Order as it relates to the Interim Financing:  (a) are fair and reasonable; (b) are the best available to the Debtors under the circumstances; (c) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties; and (d) are supported by reasonably equivalent value and fair consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtors, the DIP Agent and the DIP Lenders.  The use of Cash Collateral and credit to be extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used and/or extended in good faith, and for valid business purposes and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and

12

the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Order.

K.      *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties-in-interest, including:  (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (v) Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the DIP Agent and the DIP Lenders; (vi) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (vii) all financial institutions at which the Debtors maintain deposit accounts; (viii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Order.

L.      *Immediate Entry*.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  The Court concludes that entry of this Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

13

Based upon the foregoing findings and conclusions, the DIP Motion and the record made before the Court with respect to the DIP Motion at the Interim Hearing and otherwise, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, THAT:

1.      <u>DIP Motion Approved</u>.  The DIP Motion is hereby granted on an interim basis in accordance with and subject to the terms and conditions set forth in this Order and the DIP Loan Documents.  All objections to the interim relief sought in the DIP Motion to the extent not withdrawn or resolved are hereby overruled on the merits.

2.      <u>Authorization of the DIP Facility</u>.

(a)      The DIP Facility is hereby approved.  The Debtors are hereby expressly and immediately authorized and empowered to establish the DIP Facility, to execute, deliver and perform under the DIP Loan Documents, and to incur and perform the DIP Obligations (as defined below), in each case, in accordance with and subject to the terms of this Order, the Approved Budget (as defined below) and the DIP Loan Documents, and to execute, deliver and perform under any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined below).  The Debtors are hereby authorized, empowered and directed to pay, in accordance with this Order, the principal, interest, fees, expenses, legal fees and other amounts described in each of the DIP Loan Documents as such become due, including, without limitation, closing fees, commitment fees, servicing fees, audit fees, facility fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's and the DIP Lenders' attorneys, advisors, financial advisors, accountants, and other consultants, in each case, to the extent provided in the DIP Loan

Documents, which amounts, subject only to paragraph 26 hereof, shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect. Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates, and the DIP Obligations shall be due and payable, in each case, in accordance with the terms of this Order and the DIP Loan Documents.

(b)     For purposes hereof, the term "DIP Obligations" means all amounts and other obligations and liabilities owing to the DIP Secured Parties under the Agent Fee Letter, the DIP Credit Agreement and the other DIP Loan Documents (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement), and shall include, without limitation, the principal, interest, fees, commitment fees, administrative agent fees, audit fees, the Agent Expenses (as defined in the DIP Credit Agreement), costs, expenses, charges (including, without limitation, the reasonable and documented fees and disbursements of the DIP Secured Parties, including the reasonable and documented fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, or any other amounts that are or may become due under the DIP Loan Documents.

(c)     The DIP Loans to be made on the Closing Date shall be funded by the DIP Lenders net of a discount equal to $2,250,000, which discount shall be allocated *pro rata* among the DIP Lenders based on their respective Commitments.  The full principal amount of the DIP Loans made on the Closing Date (adding back such discount) shall be deemed the aggregate principal amount of such DIP Loans and shall be deemed outstanding on and after the Closing Date and the DIP Loan Parties shall be obligated to repay 100% of the principal amount of such

DIP Loans as provided hereunder and the DIP Loan Documents.  For the avoidance of doubt, immediately following the making of the DIP Loans on the Closing Date, the total principal amount outstanding under the DIP Facility shall be $55 million.

3.        <u>Authorization of the Interim Financing</u>.    The Interim Financing is hereby approved.  To prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby immediately authorized to draw upon the DIP Facility and borrow from the DIP Lenders in an aggregate principal amount of $55,000,000 (the "<u>Interim Financing</u>"), subject to the terms and conditions set forth in this Order and the DIP Loan Documents.

4.        <u>DIP Obligations</u>.  The DIP Loan Documents shall evidence the DIP Obligations, which DIP Obligations, shall be valid, binding and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Order and the DIP Loan Documents.  No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counter-claim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

    5.    <u>DIP Liens</u>.

    (a)    As security for the DIP Obligations, effective immediately upon entry of this Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, subject to the Carve-Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "<u>DIP Liens</u>") on all DIP Collateral (as defined below) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise of the DIP Obligations).  The term "DIP Collateral" means all assets and properties (real and personal) of the Debtors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation:  (i) all Prepetition Collateral; (ii) all Oil and Gas Properties (as defined in the Second Lien Note Indenture); (iii) all cash and cash equivalents; (iv) all funds in the DIP Priority Account (as defined below) or any other deposit account, securities account or other account of the Debtors and all cash and other property deposited therein or credited thereto from time to time; (v) all accounts and other receivables; (vi) all contract rights; (vii) all instruments, documents and chattel paper; (viii) all securities (whether or not marketable); (ix) all goods, as-extracted collateral, equipment, inventory and fixtures; (x) all real property interests; (xi) all interests in leaseholds, (xii) all franchise rights; (xiii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xiv) all general intangibles; (xv) all capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations; (xviii) all letters of credit and letter of credit rights;

(xix) all commercial tort claims; (xx) all other claims and causes of action and the proceeds thereof (including, upon entry of the Final Order, the proceeds of all claims and causes of action arising under chapter 5 of the Bankruptcy Code); (xxi) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxii) to the extent not covered by the foregoing, all other assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxiii) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; *provided*, *however*, that the DIP Collateral shall <u>not</u> include Excluded Property (as defined below); *provided*, *further*, *however*, that the DIP Collateral shall include all proceeds and products of Excluded Collateral.

(b)    For purposes hereof, the term "Excluded Collateral" means (a) any Excluded Deposit Account (as defined in the DIP Credit Agreement); and (b) any Voting Stock (as defined in the DIP Credit Agreement) in a CFC (as defined in the DIP Credit Agreement) in excess of 65% of the outstanding Voting Stock of such CFC.  To the fullest extent permitted by applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP

18

Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the

DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Order or

in favor of the Prepetition Agents and the Prepetition Lenders in accordance with this Order.

6.     <u>Priority of DIP Liens</u>.

(a)     To secure the DIP Obligations, the DIP Agent, for the benefit of itself and the DIP

Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and

automatically and properly perfected DIP Liens in the DIP Collateral as follows:

(i)     pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date, including all funds in the DIP Priority Account or any other account of the Debtors, subject only to the Carve-Out;

(ii)     pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out; and

(iii)     pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all Prepetition Collateral securing the Prepetition Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Agent shall be senior to the Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens (as defined below) granted hereunder, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out.

(b)     Except as expressly set forth herein, the DIP Liens and the DIP Superpriority

Claim (as defined below):  (i) shall not be made subject to or *pari passu* with (A) any lien,

security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any

Successor Cases and shall be valid and enforceable against the Debtors, their estates, any trustee

or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor

Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any

lien that is avoided and preserved for the benefit of the Debtors and their estates under section

551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim;

and (ii) shall not be subject to sections 506(c) (upon entry of the Final Order), 510, 549, 550 or 551 of the Bankruptcy Code.

7.      <u>Superpriority DIP Claim</u>.  Effective immediately upon entry of this Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "<u>Superpriority DIP Claim</u>"), for all of the DIP Obligations, (a) with priority over any and all administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents, and (iii) the Second Lien Noteholders' Adequate Protection Claim (as defined below), and (b) which shall at all times be senior to the rights of the Debtors or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law.  The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, without limitation, proceeds of claims and causes of action arising under Chapter 5 of the Bankruptcy Code).

Notwithstanding the foregoing, the DIP Superpriority Claim shall be subject only to the Carve-Out.

8.      No Obligation to Extend Credit.  The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance under the DIP Loan Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Order have been satisfied in full or waived by the Required Lenders (as defined in the DIP Credit Agreement).

9.      Establishment of DIP Priority Account; Use of DIP Facility Proceeds.

(a)      *DIP Priority Account*.  The proceeds of any borrowing under the DIP Facility shall be deposited into a segregated account of the Debtors (the "DIP Collateral Deposit Priority Account"), the contents of which shall be invested at all times in cash and Cash Equivalents (as defined in the DIP Loan Documents).  The DIP Collateral Priority Account shall be held at the DIP Agent or shall be subject to a control agreement with a securities intermediary acceptable to the DIP Agent, in form and substance satisfactory to the DIP Agent, which establishes "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the DIP Agent for the benefit of the DIP Lenders, and withdrawals from such account shall only be used for the purposes permitted hereunder and the under the DIP Loan Documents.  Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the DIP Collateral Deposit Priority Account or the proceeds thereof held therein or credited thereto be used other than as expressly permitted hereunder or in the DIP Loan Documents.  The DIP Agent and the DIP Lenders are hereby authorized, but not required, to take possession of or control over (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York), or take any

other action in order to validate and perfect the security interests granted to them in the DIP

Collateral Deposit Priority Account hereunder.

(b)  *Use of DIP Facility Proceeds and Cash Collateral.*  From and after the

Closing Date, the Debtors shall be permitted to make withdrawals from the DIP Collateral

Deposit Priority Account, and the proceeds of the DIP Facility and Cash Collateral shall be only

for the following purposes, in each case, solely in accordance with and subject to this Order and

the Approved Budget (as defined below) subject to Permitted Variances (as defined below):

(i) for the indefeasible payment in full of the First Lien Obligations; (ii) for the payment of

prepetition amounts acceptable to the DIP Lenders as authorized by the Court pursuant to orders

approving the first day motions filed by the Debtors; (iii) in accordance with the terms of the DIP

Loan Documents and this Order and/or the Final Order (as applicable), (A) for the payment of

working capital and other general corporate needs of the Debtors in the ordinary course of

business, and (B) for the payment of expenses incurred in connection with the Chapter 11 Cases;

(iv) to make the adequate protection payments required by paragraph 12 hereof; and (v) to pay

the fees and expenses related to the DIP Facility.  For the avoidance of doubt, none of the

Debtors will use any proceeds of the DIP Facility or the Cash Collateral in a manner or for a

purpose other than those consistent with the Approved Budget (as defined below) and this Order.

(c)  *Payoff of First Lien Obligations and Automatic Termination of RBL Liens.*

Immediately upon entry of this Order, the Debtors are authorized to draw on the DIP Facility to

pay in full the First Lien Obligations (including, without limitation, accrued and unpaid interest

(at the non-default rate), fees, expenses, legal fees, disbursements and other amounts properly

chargeable thereunder).  The repayment of the First Lien Obligations provided for herein shall be

subject to the reservation of rights of parties-in-interest set forth in paragraph 31 hereof, and

upon expiration of the Challenge Period (as defined below).  The Prepetition RBL Liens on the

Prepetition RBL Collateral shall automatically and irrevocably terminate, and all First Lien

Obligations shall be deemed indefeasibly paid in full and irrevocably released and discharged,

upon the date (the "Discharge Date") that is the first day after the expiration of the Challenge

Period without a timely Challenge (as defined below) being brought, or upon the final resolution

of a Challenge brought in compliance with the provisions of this Order and applicable law

(where such Challenge did not have the effect of successfully impairing any of the First Lien

Obligations).

> (d)    *Adequate Protection of Contingent First Lien Obligations*. Until the

Discharge Date, and as adequate protection against the post-petition diminution in value of any

contingent obligations that may be owed to the First Lien Agent or First Lien Lenders, the

Debtors shall establish an account (the "RBL Facility Reimbursement Account") into which the

sum of $150,000 shall be deposited as collateral security for any documented reimbursement or

indemnity obligations that the Debtors may have to the First Lien Agent and First Lien Lenders

under the terms of the First Lien Loan Documents as to which a claim or demand for payment is

made in writing (upon five (5) business days' notice to the DIP Agent and the DIP Lenders) prior

to the Discharge Date.  The First Lien Agent (for itself and the First Lien Lenders) shall have a

first-priority lien (the "RBL Facility Reimbursement Account Liens") on the RBL Facility

Reimbursement Account and all amounts held therein.  Upon the Discharge Date, the RBL

Facility Reimbursement Account Liens shall automatically terminate and cease to exist, and all

remaining amounts held in the RBL Facility Reimbursement Account or credited thereto, after

reserve for or satisfaction of any reimbursement obligations that are incurred prior to the

Discharge Date and are due and payable, shall be released to the Debtors by wire transfer, in

immediately available funds, to the DIP Collateral Deposit Priority Account as soon as possible, in any event no later than the date that is five (5) business days after the Discharge Date.

**Authorization to Use Cash Collateral and Adequate Protection**

10.    <u>Authorization to Use Cash Collateral</u>.  The Debtors are authorized to use the Cash Collateral in accordance with and subject to the terms and conditions of the Approved Budget (as defined below), the DIP Loan Documents and this Order.  Nothing in this Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Order and the DIP Loan Documents and in accordance with the Approved Budget (as defined below).

11.    <u>Adequate Protection</u>.  In consideration for the Debtors' use of the Prepetition Collateral (including Cash Collateral), and to protect the Second Lien Agent and the Second Lien Noteholders against the risk of Diminution in Value of their interests in the Prepetition Second Lien Collateral, the Second Lien Agent and the Second Lien Noteholders shall receive, solely to the extent of an such Diminution in Value, the following adequate protection:

(a)    *Second Lien Noteholder Adequate Protection Liens*.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, are hereby granted continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP Collateral to the extent of any Diminution in Value of the Second Lien Noteholders' interest in the Prepetition Collateral (the "<u>Second Lien Noteholder Adequate Protection Liens</u>"), which liens will be junior only to the DIP Liens and the Carve-Out, and shall be senior in priority to all other liens, including the Prepetition Liens.  Except for the DIP Liens and the Carve-Out, the Second Lien Noteholder Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter

24

granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.  The Second Lien Noteholder Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Second Lien Noteholder Adequate Protection Liens.

(b)      *Second Lien Noteholder Superpriority Claim.*  Pursuant to section 507(b) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, are hereby further granted an allowed superpriority administrative expense claim (the "Second Lien Noteholder Superpriority Claim"), which claim shall be junior to the DIP Superiority Claim and the Carve-Out, but shall be senior to and have priority over any other administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents.  The Second Lien Noteholder Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy

25

Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, without limitation, proceeds of claims and causes of action arising under Chapter 5 of the Bankruptcy Code).  Except for the DIP Superiority Claim and the Carve-Out, the Second Lien Noteholder Superpriority Claim shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full.

12.    Additional Adequate Protection.  As further adequate protection for the Second Lien Agent and the Second Lien Noteholders, the Debtors are authorized and directed as follows:

(a)    The Debtors are authorized and directed to pay all prepetition and postpetition fees, costs and expenses of (i) the Second Lien Agent (including all reasonable fees, costs, disbursements and expenses of one outside counsel and one local counsel), and (ii) the members of the ad hoc committee of certain Second Lien Noteholders (the "Ad Hoc Committee"), including all reasonable and documented fees, expenses and disbursements of (A)  Stroock, (B) PJT Partners LP ("PJT"), pursuant to that certain letter of engagement dated as of October 6, 2015 by and among Stroock, PJT and certain of the Debtors, (C)  Haynes & Boone LLP ("H&B"), as Texas counsel, (D) Richards Layton & Finger, PA ("RLF"), as Delaware counsel, (E) DeGolyer and MacNaughton Canada Limited ("D&M"), pursuant to that certain letter of engagement dated as of November 13, 2015 by and among Stroock, D&M and certain of the Debtors, and (F) such other production or reserve engineers, consultants, or other professionals as may be retained by the Ad Hoc Committee (collectively, together with Stroock,

PJT, H&B and RLF, the "Lender Professionals").  The invoices for such fees and expenses shall

not be required to comply with the U.S. Trustee guidelines, may be in summary form only, and

shall be provided to counsel to the Debtors, with a copy to the U.S. Trustee and counsel to any

Official Committee (collectively, the "Fee Notice Parties").  If no objection to payment of the

requested fees and expenses are made, in writing by any of the Fee Notice Parties within ten (10)

calendar days after delivery of such invoices (the "Fee Objection Period"), then, without further

order of, or application to, the Court or notice to any other party, such fees and expenses shall be

promptly paid by the Debtors.  If an objection (solely as to reasonableness) is made by any of the

Fee Notice Parties within the Fee Objection Period to payment of the requested fees and

expenses, then only the disputed portion of such fees and expenses shall not be paid until the

objection is resolved by the applicable parties in good faith or by order of the Court, and the

undisputed portion shall be promptly paid by the Debtors.

      (b)    *Budget Compliance*.  The Debtors shall comply with the Approved Budget

(as defined below), subject to Permitted Variances (as defined below), and all Budget Variance

Reporting (as defined below) requirements set forth herein and in the DIP Loan Documents.

      (c)    *Information; Access to Books and Records*.  The Debtors will provide to

the DIP Agent and the DIP Lenders (subject to the execution of appropriate confidentiality

agreements), such reports and information required to be delivered pursuant to the DIP Credit

Agreement (including without limitation, pursuant to section 5.1 of the DIP Credit Agreement),

and such other reports and information as may be reasonably requested by the DIP Agent or the

DIP Lenders.  In addition, without limiting the rights of access and information afforded the Pre-

Petition Agents, the Pre-Petition Lenders, the DIP Agent and the DIP Lenders under this Order

and/or the DIP Loan Documents (including, such access and information required under section

5.2 of the DIP Credit Agreement), the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent reasonable access to the Debtors' premises and their books and records in accordance with this Order and/or the DIP Loan Documents and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the Debtors authorize their independent certified public accountants, financial advisors, investment bankers, and consultants to cooperate, consult with, and provide to the DIP Agent and each of the DIP Lenders (subject to execution of appropriate confidentiality agreement) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of any of the Debtors.

13.    <u>Adequate Protection Reservation</u>.  The receipt by the Second Lien Agent and the Second Lien Noteholders of the adequate protection provided pursuant to paragraphs 11 and 12 of this Order shall not be deemed an admission that the interests of the Second Lien Agent and the Second Lien Noteholders are indeed adequately protected.  Further, this Order shall not prejudice or limit the rights of the Second Lien Agent and the Second Lien Noteholders to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection; provided that any such additional or alternative adequate protection approved by the Court shall at all times be subordinate and junior to the DIP Obligations and the DIP Liens granted under this Order and the DIP Loan Documents and the Carve-Out.  Without limiting the foregoing, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided hereunder is insufficient to compensate for any Diminution in Value during any of the Chapter 11 Cases subject to the Carve-Out.

**Provisions Common to DIP Financing and
Use of Cash Collateral Authorization**

14.  <u>Amendments</u>.  The Debtors, the DIP Agent and the DIP Lenders are hereby authorized and empowered to enter into the DIP Credit Agreement, implement, in accordance with the terms of the DIP Loan Documents, any nonmaterial modifications (including, without limitation, nonmaterial amendments, supplements, or waivers) of the DIP Loan Documents without further notice and hearing or approval of this Court.  No waiver, modification, or amendment of any of the provisions hereof or of the DIP Loan Documents shall be effective unless set forth in writing, signed by the Debtors and the DIP Agent (after having obtained the approval of the Required Lenders).  Notice of any proposed material amendment to the DIP Loan Documents shall be provided to counsel to the Official Committee and the United States Trustee, each of whom shall have five (5) business days from the date of such notice within which to object in writing to such amendment.  If no objections are timely received during such five (5) business day notice period, the Debtors, the DIP Agent and the DIP Lenders are authorized and empowered to implement, in accordance with the terms of the DIP Loan Documents, such material amendment, without further notice, hearing or approval of this Court.  Any proposed material amendment to the DIP Loan Documents that is subject to a timely filed objection in accordance with this paragraph shall be subject to further order of this Court.

15.  *Budget Covenants.*

(a)  *Initial Budget and Updated Budget.*  The Debtors have prepared and delivered to the DIP Agent and the DIP Lenders, and the DIP Agent and DIP Lenders have approved, a budget, a copy of which is attached hereto as Exhibit A (including the "Professional Fee Schedule" attached hereto as Exhibit B, the "<u>Initial Budget</u>"), which reflects the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each

29

calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date, together with a certificate of the Debtors' Chief Financial Officer stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Debtors to be reasonable at the time made and from the best information then available to the Debtors. The Initial Budget (and each subsequent Approved Budget hereunder) shall be deemed the "Approved Budget" for all purposes hereof until superseded by another Approved Budget pursuant to the provisions set forth below.

(b)  *Updated Budget*.  Commencing with Thursday, January 14, 2016, and every fourth Thursday thereafter, the Debtors shall prepare in good faith and deliver to the DIP Agent and the DIP Lenders an updated cash flow forecast for the subsequent thirteen (13) week-period, consistent with the form and level of detail of the Initial Budget and otherwise in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders (as defined below)) (each such updated forecast, including the "Professional Fee Schedule" attached hereto as Exhibit B, an "Updated Budget"), reflecting the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the thirteen (13) calendar week period beginning on the Sunday following delivery of the applicable Updated Budget.  Upon (and subject to) the approval of any such Updated Budget by the DIP Agent (as directed by, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld or delayed), such Updated Budget shall constitute the then-Approved Budget for purposes hereof; *provided, however*, that in the event the DIP Agent and Debtors are unable to reach agreement regarding an Updated Budget, then the Approved Budget most recently in effect shall remain the Approved Budget; *provided, further, however*, that the failure

30

of the Debtors and the DIP Agent (as directed by, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld or delayed), to agree on an Approved Budget within ten (10) calendar days of any date upon which the Debtors are obligated to deliver an Updated Budget shall constitute an Event of Default under the DIP Credit Agreement.

(c)     *Variance Reporting*.    Commencing with Tuesday, December 29, 2015, and each Tuesday thereafter, the Debtors shall deliver to the DIP Agent and the DIP Lenders a weekly variance report, in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders) (each a "Variance Report", and together with the Approved Budget requirements described herein, the "Budget and Variance Reporting"), setting forth actual cash receipts and disbursements of the Debtors for the calendar week ended on the immediately preceding Saturday (or, in the case of the first such Variance report, for the period since the Petition Date), and setting forth all the variances, on a line-item and aggregate basis, as compared to the corresponding amounts set forth in the then-current Approved Budget for such week/period, in each case, on a weekly basis and a cumulative basis from the beginning of the period covered by the then-current Approved Budget, together with a certificate of the Debtors' Chief Financial Officer (x) explaining in reasonable detail all material variances from the then current Approved Budget for such week/period and (y) in the case of a Variance Report immediately following the end of any Testing Period (as defined below), certifying the Debtors' compliance with the Permitted Variances for such Testing Period or identifying and explaining in reasonable detail any non-compliance by the Debtors with the Permitted Variances for such Testing Period.

(d)     [*Permitted Variances*.    The Debtors shall ensure that at no time shall (i) disbursements be made by the Debtors during the Testing Period (as defined below) ending

on any Testing Date (as defined below) exceed 15% of the applicable amounts set forth in each of the "Total Operating Disbursements" and total "General & Administrative" line items in the then current Approved Budget, in each case, on a cumulative basis for the applicable Testing Period; and (ii) cash receipts deposited by the Debtors during the Testing Period ending on any Testing Date fall below 85% of the applicable amounts set forth in each of the "Total Net Production Receipts", "Total Net Receipts", "Operating Cash Flow", and "Net Cash Flow" line items in the then current Approved Budget, in each case, on a cumulative basis for the applicable Testing Period; *provided*, *however*, that disbursements to Lender Professionals shall not be included or otherwise considered for such variance testing.] [**TBD**]  The term "Testing Period" shall refer to (i) the two calendar week period ending Saturday, January 2, 2016, (ii) the four calendar week period ending Saturday, January 16, 2016, and (iii) thereafter, each rolling four calendar week period ending two weeks after the end of the preceding Testing Period.  The term "Testing Date" shall refer to the Saturday of every second week occurring after the Petition Date, beginning Saturday, January 2, 2016.

(e)     *Capital Expenditures*.  The Debtors shall be required to obtain the prior written consent of the Required Lenders (as defined below) before incurring, investing, committing to or making (i) any single Capital Expenditure (as defined in the DIP Credit Agreement) or acquisition of ownership interests of the type described in Section 6.3(h) of the DIP Credit Agreement in an amount greater than $350,000 or (ii) any series of Capital Expenditures and/or acquisitions of ownership interests of the type described in such Section 6.3(h) of the DIP Credit Agreement in an aggregate amount (during any rolling four (4) week period) greater than $750,000 (in each case, other than with respect to those projects set forth on Schedule 6.21 to the DIP Credit Agreement to which the Debtors have irrevocably committed

prior to the date of the DIP Credit Agreement, subject in each case to the amounts and timeframes set forth on such Schedule 6.21); *provided further, however*, that the Debtors shall not make payments to the Estate Professionals for any fees and expenses incurred by such Estate Professionals in any month in excess of the monthly amounts corresponding to each of the respective Estate Professionals listed in the Professional Fee Schedule, as applicable attached to the Approved Budget then in effect; *provided, further, however*, that each Estate Professional shall be entitled to a cumulative carry-forward and carry-back with respect to any unused amounts in respect of the fees and expenses of each such Estate Professional (and nothing herein shall constitute an allowance or disallowance of any claim for payment pursuant to sections 329 and 330 of the Bankruptcy Code).

(f)    *Approval Required for Variances.*   Variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to written agreement by the Debtors and the Required Lenders, in each case without further notice, motion or application to, order of, or hearing before, the Court.   The Debtors acknowledge and agree that the incurrence or payment by any of the Debtors of expenses (x) other than the itemized amounts set forth in the Approved Budget and (y) in excess of Permitted Variances shall constitute an Event of Default under and as defined in the DIP Credit Agreement; *provided*, *however*, that disbursements to Lender Professionals shall not be included or otherwise considered for such variance testing.

16.    <u>Modification of Automatic Stay</u>.   The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit:   (a) the Debtors to grant the DIP Liens and the Superpriority DIP Claim, and to perform such acts as the DIP Agent may request, either in its sole discretion or at the direction of the Required Lenders, to assure the

33

perfection and priority of the DIP Liens; (b) the Debtors to take all appropriate action to grant the

Second Lien Noteholder Adequate Protection Liens and the Second Lien Noteholder

Superpriority Claims set forth herein, and to take all appropriate action to ensure that the Second

Lien Noteholder Adequate Protection Liens granted thereunder are perfected and maintain the

priority set forth herein; (c) the Debtors to incur all liabilities and obligations, including all the

DIP Obligations, to the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP

Lenders as contemplated under this Order and the DIP Loan Documents; (d) the Debtors to pay

all amounts referred to, required under, in accordance with, and subject to the DIP Loan

Documents, the DIP Commitment Letter, the Agent Fee Letter and this Order; (e) the DIP

Secured Parties and the Prepetition Agents and the Prepetition Lenders to retain and apply

payments made in accordance with the DIP Loan Documents and this Order; (f) subject to

paragraph 23 hereof, the DIP Agent and the DIP Lenders to exercise, upon the occurrence and

during the continuance of any Event of Default under the DIP Loan Documents, all rights and

remedies provided for in the DIP Loan Documents and take any or all actions provided therein;

and (g) the implementation of all of the terms, rights, benefits, privileges, remedies and

provisions of this Order and the DIP Loan Documents, in each case, without further notice,

motion or application to, or order of, or hearing before, this Court.

   17. <u>Perfection of DIP Liens and Postpetition Liens</u>.  This Order shall be sufficient and

conclusive evidence of the validity, perfection and priority of all liens granted herein, including,

without limitation, the DIP Liens and the Second Lien Noteholder Adequate Protection Liens,

without the necessity of execution, filing or recording any financing statement, mortgage, notice

or other instrument or document that may otherwise be required under the law or regulation of

any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering

into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Prepetition Agents, the Prepetition Lenders, the DIP Agent or the DIP Lenders to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Agents, without any further consent of any party, is authorized to execute, file or record, and the DIP Agent may require the execution, filing or recording, as each, in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to enable the DIP Agent and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the DIP Liens and/or Second Lien Noteholder Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Second Lien Noteholder Adequate Protection Liens.  The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent or the Prepetition Agents all such financing statements, mortgages, notices, and other documents as the DIP Agent or the Prepetition Agents may reasonably request.  The DIP Agent or the Prepetition Agents, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

      18.   <u>Protection of DIP Lenders' Rights and Adequate Protection Liens</u>.  So long as there are any DIP Obligations outstanding under the DIP Credit Agreement, the Prepetition Agents and the Prepetition Lenders shall (a) have no right to, and take no action to, foreclose

upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan Documents or Second Lien Noteholder Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the Prepetition Loan Documents), (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (c) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the DIP Loan Documents and/or this Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing, and (d) deliver or cause to be delivered, at the Debtors' costs and expense (for which the Prepetition Lenders shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP Agent and the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of Second Lien Noteholder Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

19.    <u>Proceeds of Subsequent Financing</u>.  Without limiting the provisions of the immediately preceding paragraph, if the Debtors, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the

Bankruptcy Code in violation of this Order or the DIP Loan Documents at any time prior to the indefeasible payment in full in cash of all of the Prepetition Obligations and the indefeasible payment in full in cash of all of the DIP Obligations, the satisfaction of the Superpriority DIP Claim, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility and this Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then unless otherwise agreed by the DIP Agent (at the direction of the Required Lenders) in its sole discretion, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations.

20.    <u>Maintenance of DIP Collateral</u>.  The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents.  The Debtors shall provide the DIP Agent and its counsel (for distribution to the DIP Lenders) with evidence of such insurance within five (5) calendar days after entry of this Order. Upon entry of this Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.  The Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Order and any order that may be entered by the Court in accordance with this Order which has first been agreed to by the DIP Agent or as otherwise required by the DIP Loan Documents.

21.    <u>Disposition of or New Liens on DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) other than in the ordinary course of business without the prior

written consent of the DIP Agent (at the direction of the Required Lenders) (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent), except as otherwise provided for in the DIP Loan Documents or otherwise ordered by the Court.

22.    <u>DIP Termination Date</u>.  Each of the following shall constitute a termination event under this Order and the DIP Loan Documents (each a "<u>Termination Event</u>", and the date upon which such Termination Event occurs, the "<u>DIP Termination Date</u>"), unless waived in writing by the Required Lenders:

(a)    the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement;

(b)    the date of acceleration of the DIP Loans under the DIP Facility in accordance with the DIP Credit Agreement;

(c)    the Termination Date (as defined in the DIP Credit Agreement).

(d)    the date that is forty-five (45) calendar days after the Petition Date, if the Final Order, in form and substance satisfactory to the DIP Agent and the Required Lenders, has not been entered on or before said date;

(e)    the Debtors seek any amendment, modification, or extension of this Order without the prior written consent of the Required Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties); or

(f)    the failure by the Debtors to timely perform any of the terms, provisions, conditions, covenants, or other obligations under this Order.

23.    <u>Rights and Remedies Upon Termination Event</u>.  Any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order

38

from this Court, to the extent necessary to permit the DIP Agent, to exercise the following rights

and remedies upon the occurrence and during the continuance of any Termination Event and the

delivery of written notice (including by e-mail) by the DIP Agent (at the direction of the

Required Lenders) to counsel to the Debtors, counsel for the Official Committee, and the United

States Trustee of the occurrence of a Termination Event:  (a) immediately terminate the Debtors'

use of any Cash Collateral; (b) terminate the DIP Facility and any DIP Loan Document as to any

future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP

Obligations or the DIP Liens securing the DIP Obligations; (c) declare all DIP Obligations to be

immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with

respect to the DIP Facility, sweep all funds contained in the DIP Collateral Deposit Priority

Account); (e) immediately set-off any and all amounts in accounts maintained by the Debtors

with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any

and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders,

including, without limitation, disposition of the DIP Collateral solely for application towards the

DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted

under this Order, the DIP Loan Documents or applicable law; provided, however, that prior to

the exercise of any right in clauses (e) or (f) of this paragraph, the DIP Agent shall be required to

provide five (5) business days' written notice to counsel to the Debtors, counsel to any Official

Committee and the U.S. Trustee of the DIP Agent's intent to exercise its rights and remedies (the

"Remedies Notice Period").  Unless the Court orders during the Remedies Notice Period that a

Termination Event has not in fact occurred, the DIP Agent and the DIP Lenders, shall be deemed

to have received relief from the automatic stay and may foreclose on all or any portion of the

DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP

Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise, and the Debtors shall cooperate with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise shall not challenge or raise any objections to the exercise of such rights or remedies other than to challenge the occurrence of a Termination Event; *provided*, that none of the DIP Secured Parties shall object to a request by the Debtors for an expedited hearing before the Court during the Remedies Notice Period to determine whether a Termination Event has in fact occurred.  During the Remedies Notice Period, the Debtors may only use Cash Collateral to pay only the following amounts and expenses solely in accordance with the respective Approved Budget line items: (i) the Carve-Out; (ii) amounts that the Debtors have determined in good faith are in the ordinary course, necessary expenses and critical to the preservation of the Debtors and their estates; and (ii) such other amounts as have been approved in advance in writing by the Required Lenders.

24.    <u>Landlord Agreements; Access</u>.  Subject to entry of the Final Order, without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon three business days' written notice to counsel to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property, that a Termination Event has occurred and is continuing, the DIP Agent, (i) may, unless otherwise expressly provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent or Second Lien Agent, as applicable (the terms of which shall be

reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the

Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon

and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the

applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents,

or any other similar assets of the Debtors, which are owned by or subject to a lien of any third

party and which are used by Debtors in their businesses, in either the case of subparagraph (i) or

(ii) of this paragraph 24 without interference from lienholders or licensors thereunder, subject to

such lienholders' or licensors' rights under applicable law; *provided*, *however*, that the DIP Agent

(on behalf of the DIP Secured Parties) shall pay only rent and additional rent, fees, royalties, or

other monetary obligations of the Debtors that first arise after the written notice referenced above

from the DIP Agent and that accrue during the period of such occupancy or use by DIP Agent

calculated on a per diem basis.  Nothing herein shall require the Debtors, the DIP Agent or the

other DIP Secured Parties, to assume any lease or license under Bankruptcy Code section 365(a)

as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in

this paragraph 24.

25.    Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or

Stay of this Order.  The DIP Agent and the DIP Lenders have acted in good faith in connection

with the DIP Facility, the Interim Financing, and with this Order, and their reliance on this Order

is in good faith.  Based on the findings set forth in this Order and the record made during the

Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any

or all of the provisions of this Order are hereafter modified, reversed, amended or vacated by a

subsequent order of the Court or any other court, the DIP Agent, the DIP Lenders, the Prepetition

Agents and the Prepetition Lenders are entitled to the protections provided in section 364(e) of

the Bankruptcy Code.  Any such modification, reversal, amendment or vacatur shall not affect

the validity and enforceability of any advances previously made or made hereunder, or lien,

claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Agent and

the DIP Lenders arising prior to the effective date of any such modification, reversal, amendment

or vacatur of this Order shall be governed in all respects by the original provisions of this Order,

including entitlement to all rights, remedies, privileges and benefits granted herein.

26.    <u>DIP and Other Expenses</u>.  The Debtors are authorized and directed to pay, in cash

and on a current basis, all reasonable and documented out-of-pocket fees, costs, disbursements

and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP

Loan Documents and this Order, including, without limitation, legal fees and expenses,

accounting fees and expenses, collateral examination and monitoring fees and expenses,

financial advisory fees and expenses, fees and expenses of other consultants and indemnification

and reimbursement of fees and expenses (including, for the avoidance of doubt, all reasonable

and documented fees, expenses and disbursements of the Lender Professionals) as set forth in the

DIP Loan Documents and the Agent Fee Letter.  The invoices for such fees and expenses shall

not be required to comply with the U.S. Trustee guidelines, may be in summary form only, and

shall be provided to the Fee Notice Parties.  If no objection to payment of the requested fees and

expenses are made, in writing by any of the Fee Notice Parties within the Fee Objection Period,

then, without further order of, or application to, the Court or notice to any other party, such fees

and expenses shall be promptly paid by the Debtors.  If an objection (solely as to reasonableness)

is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the

requested fees and expenses, then only the disputed portion of such fees and expenses shall not

be paid until the objection is resolved by the applicable parties in good faith or by order of the

Court, and the undisputed portion shall be promptly paid by the Debtors. Such fees and expenses shall not be subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature whatsoever.

27.    Indemnification.  The Debtors are authorized, empowered and directed to jointly and severally indemnify and hold harmless the DIP Agent (solely in its capacity as a DIP Agent), each DIP Lender (solely in its capacity as a DIP Lender) and each other Indemnified Party (as defined in the DIP Credit Agreement) in accordance and subject to the terms and conditions set forth in the DIP Credit Agreement (including, without limitation, section 9.5 of the DIP Credit Agreement).

28.    Proofs of Claim.  The DIP Agent, the DIP Lenders, the Second Lien Agent and the Second Lien Noteholders shall not be required to file proofs of claim in any of the Chapter 11 Cases for any claim allowed herein.  Any proof of claim filed by the DIP Agent, the DIP Lenders, the Second Lien Agent or the Second Lien Noteholders shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons. Any order entered by the Court in relation to the establishment of a bar date in any of the Cases shall not apply to the DIP Agent, the DIP Lenders, the Second Lien Agent or the Second Lien Noteholders.

29.    Carve-Out; Payment of Estate Professionals.

(a)    *Carve-Out*.  For the purposes of this Order, the term "Carve-Out" shall mean the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; (iii) to the extent allowed by the Court, all

43

accrued and unpaid fees, disbursements, costs and expenses incurred on or prior to the delivery

of a Carve-Out Trigger Notice (as defined below) by professionals or professional firms retained

by the Debtors (the "Estate Professionals"), pursuant to a final order of the Court (which order

has not been vacated or stayed) under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code,

whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, in the case

of each Estate Professional, as calculated pursuant to the professional fee schedule attached

hereto as Exhibit C (the "Professional Fee Schedule"); and (iv) all unpaid fees, disbursements,

costs and expenses incurred after the date of the delivery by the DIP Agent, at the direction of

the Required Lenders, of the Carve-Out Trigger Notice (such date, the "Carve-Out Trigger

Date"), to the extent allowed by the Court at any time, in an aggregate amount not to exceed

$250,000 for Estate Professionals (the amount set forth in this clause (iv) being the "Post-Carve-

Out Trigger Notice Cap"); *provided*, *however*, that nothing herein shall be construed as a consent

to the allowance of any Estate Professionals' fees or expenses or impair the ability of any party

to object to any fees, expenses, reimbursements or compensation sought by any such Estate

Professionals.  For purposes of the foregoing, "Carve-Out Trigger Notice" shall mean a written

notice delivered by the DIP Agent at the direction of the Required Lenders to counsel to the

Debtors, the U.S. Trustee, and lead counsel to any Official Committee appointed in these

Chapter 11 Cases, which notice may be delivered following the occurrence of a Termination

Event and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

        (b)      For the avoidance of doubt, the Carve-Out shall be senior to all liens and

claims (including, without limitation, administrative and superpriority claims) securing the DIP

Obligations and the Prepetition Obligations, including Second Lien Noteholder Adequate

Protection Liens and any and all other forms of adequate protection, liens, security interests and

other claims granted herein to the Prepetition Agents, the Prepetition Lenders, the DIP Agent or the DIP Lenders.

(c)      Prior to the occurrence of the Carve-Out Trigger Date, the Debtors are authorized to pay compensation and reimbursement of fees and expenses that are authorized to be paid under sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Court, as the same may be due and payable subject to the Professional Fee Schedule, and such payments shall not reduce the Carve-Out.  Upon the receipt of the Carve-Out Trigger Notice, the Debtors shall provide immediate notice to all Estate Professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve-Out.  Any payment or reimbursement made on or after the date and time of the Carve-Out Trigger Date to an Estate Professional shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  To the extent that any payment to an Estate Professional is subsequently disallowed and/or disgorged, the proceeds of any claim against the Estate Professional for amounts so disallowed or disgorged shall constitute DIP Collateral and as such, shall be subject to DIP Liens and DIP Superpriority Claims hereunder.  Any funding of the Carve-Out by the DIP Lenders shall be added to and made part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(d)      None of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases under any chapter of the Bankruptcy Code.

30.     <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the</u>

<u>Carve-Out</u>.  No DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of

any of the foregoing, any portion of the Carve-Out or any other amounts may be used directly or

indirectly by any of the Debtors, the Official Committee, if any, or any trustee or other estate

representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or

entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection

therewith):  (a) to prevent, hinder, or delay the DIP Agent's, the DIP Lenders', the Prepetition

Agents' or the Prepetition Lenders' enforcement or realization upon any of the DIP Collateral

once a Termination Event occurs (other than with respect to rights otherwise granted herein with

respect to the Remedies Notice Period); (b) to use or seek to use Cash Collateral or, except to the

extent expressly permitted by the terms of the DIP Loan Documents, selling or otherwise

disposing of DIP Collateral, in each case, without the consent of the DIP Agent and the Required

Lenders; (c) to seek authorization to obtain liens or security interests that are senior to, or on a

parity with, the DIP Liens or the Superpriority DIP Claim; or (d) to investigate (including by

way of examinations or discovery proceedings), prepare, assert, join, commence, support or

prosecute any action for any claim, counter-claim, action, proceeding, application, motion,

objection, defense, or other contested matter seeking any order, judgment, determination or

similar relief against, or adverse to the interests of, in any capacity, against any of the Released

Parties with respect to any transaction, occurrence, omission, action or other matter (including

formal discovery proceedings in anticipation thereof), including, without limitation, (A) any

claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called

"lender liability" claims and causes of action, (C) any action with respect to the validity,

enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP

Obligations, the Superpriority DIP Claim, the DIP Liens, the DIP Loan Documents, the First

Lien Loan Documents, the First Lien Obligations, the Second Lien Note Documents or the

Second Lien Obligations, (D) any action seeking to invalidate, modify, set aside, avoid or

subordinate, in whole or in part, the DIP Obligations, the First Lien Obligations or the Second

Lien Obligations, (E) any action seeking to modify any of the rights, remedies, priorities,

privileges, protections and benefits granted to either the DIP Agent or the DIP Lenders hereunder

or under any of the DIP Loan Documents, the First Lien Agent or the First Lien Lenders under

any of the First Lien Loan Documents or the Second Lien Agent or the Second Lien Noteholders

under any of the Second Lien Note Documents (in each case, including, without limitation,

claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the

DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral

in accordance with the applicable DIP Loan Documents and this Order and/or the Final Order (as

applicable)), (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the

DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of

Default (as defined in the DIP Credit Agreement) has occurred; *provided*, *however*, that no more

than $25,000 in the aggregate of the DIP Collateral, the Carve-Out, proceeds from the

borrowings under the DIP Facility or any other amounts, may be used by any Official Committee

to investigate claims and/or liens of the First Lien Agent and the First Lien Lenders under the

First Lien Loan Documents and the Second Lien Agent and the Second Lien Noteholders under

the Second Lien Note Documents.

      31.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

      (a)    Subject to paragraph 31(b) hereof, each stipulation, admission, and

agreement contained in this Order including, without limitation, the Debtors' stipulations, shall

be binding upon the applicable Debtors, their estates and any successor thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.

(b)     Nothing in this Order shall prejudice the rights of any Official Committee or any other party in interest, if granted requisite standing by the Court within the Challenge Period (as defined below), to seek, solely in accordance with the provisions of this paragraph 31(b), to assert claims against the Released Parties (or their successors or assigns), on behalf of the Debtors or the Debtors' creditors or to otherwise challenge the Debtors' stipulations, including, but not limited to those in relation to (i) the validity, extent, priority, or perfection of the mortgages, security interests, and Prepetition Liens of the Prepetition Agents or any Prepetition Lenders (or their successors or assigns), (ii) the validity, allowability, priority, or amount of the Prepetition Obligations, or (iii) any liability of either the Prepetition Agents and/or any Prepetition Lenders (or their successors or assigns) with respect to anything arising from the Prepetition Loan Documents.  Any Official Committee or any other party in interest must, after obtaining requisite standing approved by the Court, commence a contested matter or adversary proceeding raising such claim, objection, or challenge, including, without limitation, any claim or cause of action against the Released Parties (each, a "Challenge") no later than (A) with respect to any Official Committee, the date that is thirty (30) days after the Official Committee's formation, or (B) with respect to other parties in interest, no later than the date that is forty-five (45) days after the entry of this Order (such time period shall be referred to as the "Challenge Period").  The Challenge Period may only be extended with the written consent of the First Lien Agent or the Requisite Supporting Noteholders, as applicable, prior to the

48

expiration of the Challenge Period, or by further order of the Court for good cause shown.  Only those parties in interest who properly commence a Challenge within the Challenge Period may prosecute such Challenge.  As to (x) any parties in interest, including any Official Committee, who fail to file a Challenge within the Challenge Period, or if any such Challenge is filed and overruled, or (y) any and all matters that are not expressly the subject of a timely Challenge: (1) any and all such Challenges by any party (including, without limitation, any Official Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Chapter 11 Cases, or any chapter 7 trustee, any examiner or any other estate representative appointed in any Successor Cases), shall be deemed to be forever waived and barred, (2) all of the findings, Debtors' stipulations, waivers, releases, affirmations and other stipulations hereunder as to the priority, extent, allowability, validity and perfection as to the Prepetition Liens, the Prepetition Obligations or the Prepetition Loan Documents shall be of full force and effect and forever binding upon the applicable Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases, and (3) any and all claims or causes of action against the Prepetition Agents or the Prepetition Lenders shall be released by the Debtors' estates, all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases.

       (c)     Nothing in this Order vests or confers on any person (as defined in the Bankruptcy Code), including any Official Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

49

32.    <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

33.    <u>Section 506(c)</u>.  Upon entry of the Final Order, in partial consideration for, among other things, the Carve Out and the payments made under the Approved Budget to administer the Chapter 11 Cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against any Prepetition Agent or any Prepetition Lenders or any of the Prepetition Obligations or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Prepetition Lenders upon the Prepetition Collateral, as applicable, without the prior express written consent of the affected Prepetition Agent and/or affected Prepetition Lender, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

34.    <u>Section 552(b)</u>.  Upon entry of the Final Order, the Prepetition Agents and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Agents, the Prepetition Lenders or the Prepetition Obligations.

35.    <u>No Marshaling/Application of Proceeds</u>.  In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this

Order.  In the event that the DIP Obligations are paid full in cash by the Debtors pursuant to the terms of a confirmed chapter 11 plan or from the proceeds of a sale that includes assets of the Debtors, if any, that were not the subject of a valid perfected lien or security interest on the Petition Date ("Unencumbered Assets"), the proceeds of such Unencumbered Assets shall be deemed applied to the DIP Obligations prior to the proceeds of other DIP Collateral.

36.    Right to Credit Bid.  Each of the DIP Agent (at the direction of the Required Lenders) and, subject to entry of the Final Order, the Second Lien Agent (at the direction of the Requisite Supporting Noteholders) shall have the unqualified right to "credit bid" up to  the full amount of the DIP Obligations or the Second Lien Obligations, respectively, in connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Second Lien Note Collateral, respectively, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.  The DIP Agent (at the direction of the Required Lenders) has the absolute right to assign, transfer, sell or otherwise dispose of its rights to credit bid, except as prohibited by the DIP Loan Documents.

37.    Discharge Waiver/Release.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been

indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Agent and the DIP Lenders has otherwise agreed. None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash on or prior to the earlier to occur of the effective date of such plan of reorganization or sale, without the consent of the DIP Agent and the DIP Lenders.

38. <u>Rights Preserved</u>. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders under the DIP Loan Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Cases to a case under chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Order.

39.    <u>Joint and Several Liability</u>.  Nothing in this Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Order.

40.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders to seek relief or otherwise exercise their rights and remedies under this Order, the DIP Loan Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.

41.    <u>Binding Effect of this Order</u>.  Immediately upon entry by the Court, this Order shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Pre-Petition Lenders, and it shall become valid and binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, any and all other creditors of the Debtors, any Official Committee or other committee appointed in the Chapter 11 Cases, any and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases, or upon dismissal of any of the Chapter 11 Cases.  Further, upon entry of this Order, the Debtors' stipulations contained herein shall be binding on the Debtors, and the DIP Obligations shall constitute allowed claims for all purposes in each of the Chapter 11 Cases.

42.    <u>No Modification to Interim Order</u>.  Until and unless the DIP Obligations and the Prepetition Obligations evidenced by the Prepetition Revolving Credit Documents have been indefeasibly paid in full in cash (or the DIP Agent, at the direction of the Required Lenders

otherwise agrees in writing), the Debtors irrevocably waive the right to seek and shall not seek or

consent to, directly or indirectly:  (a) without the prior written consent of the DIP Agent (at the

direction of the Required Lenders), (i) any modification, stay, vacatur or amendment to this

Order; or (ii) a priority claim for any administrative expense or unsecured claim against the

Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without

limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or

507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP

Superpriority Claim, other than the Carve Out; (b)  without the prior written consent of the DIP

Agent (at the direction of the Required Lenders), any lien on any of the DIP Collateral with

priority equal or superior to the DIP Liens, except as specifically provided in the DIP Loan

Documents; or (c) without the prior written consent of the Second Lien Agent, any lien on any of

the DIP Collateral with priority equal or superior to the Prepetition Second Lien Note Liens or

the Second Lien Noteholder Adequate Protection Liens.  The Debtors irrevocably waives any

right to seek any amendment, modification or extension of this Order without the prior written

consent, as provided in the foregoing, of the DIP Agent (at the direction of the Required

Lenders) and the Second Lien Agent and no such consent shall be implied by any other action,

inaction or acquiescence of the DIP Agent, the Required Lenders or the Second Lien Agent.

43.     Order Controls.  In the event of any inconsistency between the terms and

conditions of the DIP Loan Documents, any other document or any other order of the Court and

of this Order, the provisions of this Order shall govern and control.

44.     Limits on Lender Liability.  Nothing in this Order or in any of the DIP Loan

Documents, the Prepetition Loan Documents or any other documents related to this transaction

shall in any way be construed or interpreted to impose or allow the imposition upon the DIP

Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders of any liability for any claims arising from any and all activities by the Debtors in the operation of their businesses in connection with the Debtors' postpetition restructuring efforts.

45.    <u>Survival</u>.  The provisions of this Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by, entry of any order that may be entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases, (b) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (c) dismissing any or all of the Chapter 11 Cases, or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases.  The terms and provisions of this Order, including the claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders pursuant to this Order, notwithstanding the entry of any such order, shall continue in any of the Chapter 11 Cases, following dismissal of any of the Chapter 11 Cases, or any Successor Cases, and shall maintain their priority as provided by this Order.  The DIP Protections, as well as the terms and provisions concerning the indemnification of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, shall continue in any of the Chapter 11 Cases following dismissal of any of the Chapter 11 Cases, termination of the provisions of this Order, and/or the indefeasible payment in full of the DIP Obligations.

46.    <u>Dismissal</u>.  If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) the rights, privileges, benefits and protections afforded herein and in the DIP Loan Documents, including the DIP Liens and the DIP Superpriority Claim (collectively, the "<u>DIP Protections</u>"), shall continue in

full force and effect and shall maintain their priorities as provided in this Order until all DIP

Obligations have been paid in full, the Second Lien Obligations have been paid in full (and that

all DIP Protections and the Prepetition Secured Parties' Adequate Protection shall,

notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall

retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP

Protections and the Prepetition Secured Parties' Adequate Protection.

47.    Entry of this Order/Waiver of Applicable Stay.  The Clerk of the Court is hereby

directed to forthwith enter this Order on the docket of the Court maintained in regard to the

Chapter 11 Cases.  This Order shall be effective upon its entry and not subject to any stay (all of

which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy

Rule 4001(a)(3).

48.    Notice of Entry of this Order.  The Debtors' counsel shall serve a copy of this

Order or a suitable notice respecting same on all of the following parties:  (a) the U.S. Trustee;

(b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the parties

included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors;

(e) Stroock, as counsel to the Second Lien Ad Hoc Group; (f) all other known parties with liens

of record on assets of the Debtors as of the Petition Date; (g) all financial institutions at which

the Debtors maintain deposit accounts; and (h) all other parties required to receive notice

pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date

hereof.

49.    Final Hearing.  The Final Hearing shall take place on January [__], 2015 at

[_____] [a.m./p.m.], and parties shall have until January [__], 2015 at [_____] [a.m./p.m.] to

file an objection if necessary and serve such objection on proposed counsel for the Debtors,

Baker Botts L.L.P., 2001 Ross Avenue, Dallas, Texas 75201-2980, Attn:  C. Luckey McDowell, and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn:  M. Blake Cleary; and counsel for the Second Lien Ad Hoc Group, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038-4982, Attn:  Kristopher M. Hansen and Erez E. Gilad and Richards Layton & Finger, PA, One Rodney Square, 920 North King Street, Wilmington Delaware 19801, Attn:  Daniel J. DeFranceschi.  Any objections by creditors or any other party-in-interest to the DIP Motion or any of the provisions of this Order shall be deemed waived unless filed and received in accordance with the foregoing on or before the close of business on such date.  In the event the Court modifies any of the provisions of this Order or other documents following the Final Hearing, such modifications shall not affect the rights and priorities of the DIP Agent and the DIP Lenders pursuant to this Order with respect to the DIP Collateral and any portion of the DIP Facility that arises, or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Order shall remain in full force and effect except as specifically modified pursuant to the Final Hearing.

50.     Effect of this Order.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

51.    <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Order.

Dated:  December __, 2015
       Wilmington, Delaware

_____
      United States Bankruptcy Judge

**New Gulf Resources**
**Exhibit A: DIP 13-Week Cash Flow Forecast**
*$ in thousands*

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week beginning | 17-Dec-15 | 21-Dec-15 | 28-Dec-15 | 4-Jan-16 | 11-Jan-16 | 18-Jan-16 | 25-Jan-16 | 1-Feb-16 | 8-Feb-16 | 15-Feb-16 | 22-Feb-16 | 29-Feb-16 | 7-Mar-16 |
| Week ending | 20-Dec-15 | 27-Dec-15 | 3-Jan-16 | 10-Jan-16 | 17-Jan-16 | 24-Jan-16 | 31-Jan-16 | 7-Feb-16 | 14-Feb-16 | 21-Feb-16 | 28-Feb-16 | 6-Mar-16 | 13-Mar-16 |
| **Receipts** | | | | | | | | | | | | | |
| Production Receipts | - | 3,610.1 | 539.4 | - | - | 3,465.5 | 517.8 | - | - | - | 3,267.6 | - | - |
| Royalty Payments | - | (1,315.7) | - | - | - | - | (1,123.8) | - | - | - | (1,123.8) | - | - |
| Total Net Production Receipts | - | 2,294.4 | 539.4 | - | - | 3,465.5 | (606.0) | - | - | - | 2,143.8 | - | - |
| Derivative Settlements | - | - | 1,060.4 | - | - | - | 1,229.8 | - | - | - | - | - | - |
| Release of Well Connects | - | - | - | - | - | - | - | - | 1,000.0 | 1,000.0 | 1,000.0 | - | - |
| **TOTAL NET RECEIPTS** | - | 2,294.4 | 1,599.8 | - | - | 3,465.5 | 623.8 | - | 1,000.0 | 1,000.0 | 3,143.8 | - | - |
| **DISBURSEMENTS** | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | |
| Operating Expenses | - | (42.4) | (152.1) | (187.7) | (144.4) | (495.5) | (1,502.9) | (337.8) | (258.3) | (258.3) | (286.2) | (216.9) | (274.8) |
| Capital Investment / Infrastructure | - | (151.5) | (281.9) | (745.6) | (954.0) | (1,052.1) | (907.0) | (1,375.8) | (1,108.1) | (1,241.4) | (1,685.6) | (787.5) | (787.5) |
| Leasehold - Extension / Acquisitions and Other | - | (422.8) | (813.7) | - | (2,102.2) | (1,353.7) | - | - | (107.7) | - | - | - | (383.4) |
| Total Operating Disbursements | - | (616.7) | (1,247.7) | (933.2) | (3,200.5) | (2,901.3) | (2,409.9) | (1,713.7) | (1,474.1) | (1,499.7) | (1,971.8) | (1,004.4) | (1,445.7) |
| *General & Administrative* | | | | | | | | | | | | | |
| Payroll | - | - | (253.1) | - | (253.1) | - | (253.1) | - | (253.1) | - | (253.1) | - | (253.1) |
| Other G&A | - | (213.0) | (5.0) | (250.2) | (5.0) | (78.2) | (198.7) | (5.0) | (5.0) | (48.8) | (190.5) | (5.0) | (5.0) |
| Total G&A Disbursements | - | (213.0) | (258.1) | (250.2) | (258.1) | (78.2) | (451.8) | (5.0) | (258.1) | (48.8) | (443.6) | (5.0) | (258.1) |
| **TOTAL DISBURSEMENTS** | - | (829.7) | (1,505.7) | (1,183.4) | (3,458.6) | (2,979.5) | (2,861.8) | (1,718.7) | (1,732.2) | (1,548.4) | (2,415.4) | (1,009.4) | (1,703.7) |
| **OPERATING CASH FLOW** | - | 1,464.8 | 94.1 | (1,183.4) | (3,458.6) | 486.0 | (2,238.0) | (1,718.7) | (732.2) | (548.4) | 728.4 | (1,009.4) | (1,703.7) |
| **Restructuring and Other One-Time** | | | | | | | | | | | | | |
| Professional Fees – Debtor | - | - | - | - | (460.0) | - | - | - | (964.0) | - | - | - | (944.0) |
| Professional Fees - 2nd Lien | - | - | - | (250.0) | - | - | - | - | (610.0) | - | - | - | (610.0) |
| DIP Loan Fees and Upfronts | (2,250.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| Utility Deposits | - | - | (15.0) | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL RESTRUCTURING** | (2,250.0) | - | (15.0) | (250.0) | (460.0) | - | - | - | (1,574.0) | - | - | - | (1,554.0) |
| **Interest Payments** | | | | | | | | | | | | | |
| Mid-First RBL Interest | (51.3) | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Term Loan Interest | - | - | - | - | - | - | (793.7) | - | - | - | (687.5) | - | - |
| **TOTAL DEBT SERVICE** | (51.3) | - | - | - | - | - | (793.7) | - | - | - | (687.5) | - | - |
| **NET CASH FLOW** | (2,301.3) | 1,464.8 | 79.1 | (1,433.4) | (3,918.6) | 486.0 | (3,031.6) | (1,718.7) | (2,306.2) | (548.4) | 40.9 | (1,009.4) | (3,257.7) |
| **Balances and Liquidity** | | | | | | | | | | | | | |
| Net Cash Flow | (2,301.3) | 1,464.8 | 79.1 | (1,433.4) | (3,918.6) | 486.0 | (3,031.6) | (1,718.7) | (2,306.2) | (548.4) | 40.9 | (1,009.4) | (3,257.7) |
| RBL Draw / (Paydown) | (37,900.0) | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Term Loan Draw | 55,000.0 | - | - | - | - | - | 20,000.0 | - | - | - | - | - | - |
| RBL Availability ($38 million) | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cash Balance | 16,976.0 | 18,440.8 | 18,519.9 | 17,086.5 | 13,167.8 | 13,653.9 | 30,622.2 | 28,903.6 | 26,597.4 | 26,049.0 | 26,089.9 | 25,080.4 | 21,822.7 |
| Ending Liquidity | 16,976.0 | 18,440.8 | 18,519.9 | 17,086.5 | 13,167.8 | 13,653.9 | 30,622.2 | 28,903.6 | 26,597.4 | 26,049.0 | 26,089.9 | 25,080.4 | 21,822.7 |

# New Gulf Resources
Exhibit B: Restructuring Professional Fee Schedule
*$ in thousands*

| | December (Post-Petition) | January | February | March | April |
|---|---|---|---|---|---|
| **NEW GULF RESOURCES ADVISORS** | | | | | |
| Zolfo Cooper - Restructuring Advisor | (150.0) | (325.0) | (325.0) | (325.0) | (325.0) |
| Barclays - Investment Bank/FA | - | (100.0) | (100.0) | (100.0) | (100.0) |
| BakerBotts - Counsel | (300.0) | (600.0) | (600.0) | (600.0) | (600.0) |
| Young Conaway - Counsel (Delaware) | (75.0) | (150.0) | (125.0) | (125.0) | (125.0) |
| Prime Clerk | (50.0) | (30.0) | (30.0) | (30.0) | (30.0) |
| **TOTAL DEBTOR ADVISORS** | (575.0) | (1,205.0) | (1,180.0) | (1,180.0) | (1,180.0) |
| | | | | | |
| **ADHOC GROUP ADVISORS** | | | | | |
| Stroock & Stroock & Lavan LLP | (200.0) | (400.0) | (400.0) | (400.0) | (400.0) |
| PJT Partners | - | (150.0) | (150.0) | (150.0) | (150.0) |
| Richards, Layton & Finger (DE Counsel) | (10.0) | (15.0) | (15.0) | (15.0) | (15.0) |
| Hayes and Boone (TX Counsel) | (30.0) | (30.0) | (30.0) | (30.0) | (30.0) |
| Lowenstein Sandler | (10.0) | (15.0) | (15.0) | (15.0) | (15.0) |
| DMCL (Reserve Engineers) | - | - | - | - | - |
| **TOTAL 2ND LIEN HOLDERS** | (250.0) | (610.0) | (610.0) | (610.0) | (610.0) |
| | | | | | |
| **TOTAL(S)** | (825.0) | (1,815.0) | (1,790.0) | (1,790.0) | (1,790.0) |

## Exhibit C – Professional Fee Schedule

The amount of the Carve-Out Set forth in clause (iii) of paragraph 29(a) for each of the Estate Professionals identified below shall be equal to (i) the monthly amount listed opposite the respective Estate Professional **multiplied by** (ii) the number of months plus any pro-rated portion of a month elapsing between the Petition Date and the Carve-Out Trigger Date (*i.e.*, if the Petition Date is December 15, 2015 and the Carve-Out Trigger Date occurs on June 25, 2016 the multiplier determined under clause (ii) would be 6.33, or 6 full months and 10/30ths of a month).

| Estate Professional | Monthly Amount |
| --- | --- |
| Baker Botts L.L.P. | $600,000 |
| Young Conaway Stargat & Taylor, LLP | $175,000 |
| Barclays Capital Inc. | $100,000 |
| Zolfo Cooper, LLC | $325,000 |
| Prime Clerk | $30,000 |

**<u>Exhibit D</u>**

**DIP Credit Agreement**

[OMITTED FROM FILING VERSION]