IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| NEW GULF RESOURCES, LLC, *et al.* | Case No. 15-12566 (BLS) |
| Debtors.[1] | Joint Administration Pending |
|  | **RE: Docket No. 10** |

# DECLARATION OF GEORGE MACK
# IN SUPPORT OF THE DEBTORS' MOTION TO APPROVE DIP FINANCING

I, George Mack, declare as follows under penalty of perjury:

1. I am a Managing Director in the Restructuring and Finance Group of Barclays Capital Inc. ("Barclays"), an investment banking and financial advisory firm. Barclays has extensive experience in restructuring and providing financial and operational guidance to companies in distressed situations. I have worked on Barclays's restructuring engagement for New Gulf Resources, LLC and its affiliates (collectively, "New Gulf" or the "Debtors") since the middle of 2015. I understand the Debtors will file an application to employ Barclays as their investment banker and financial advisor in these chapter 11 cases.

2. I have been a professional in the restructuring field for fourteen years and have been involved in numerous restructurings on behalf of companies, secured lenders and other constituencies, both in and out of bankruptcy proceedings. I have negotiated debtor-in-possession financing, conducted sales of distressed assets, and participated as an advisor in several chapter 11 transactions involving energy assets. Furthermore, I have testified as an

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: NGR Holding Company LLC (1782); New Gulf Resources, LLC (1365); NGR Finance Corp. (5563); and NGR Texas, LLC (a disregarded entity for tax purposes). The Debtors' mailing address is 10441 S. Regal Boulevard, Suite 210, Tulsa, Oklahoma 74133.

01:18080927.1

expert on numerous occasions in bankruptcy proceedings and have advised clients with respect to their interests in connection with both in and out-of-court restructurings. I graduated in 1993 with a Bachelor's degree from Hamilton College and received an MBA from Columbia University.

3. I submit this declaration (this "Declaration") in support of the Debtors' motion to approve debtor-in-possession financing filed on or around the Petition Date.[2] Except as otherwise noted herein, all statements set forth in this Declaration are based on one or more of: my personal knowledge of the Debtors' operations; finances and assets; my personal knowledge developed over the course of my engagement with the Debtors; my direct participation in negotiating the transactions contemplated by the RSA (defined below); my direct participation in numerous conference calls and meetings with senior management of the Debtors; information supplied to me by other employees at Barclays working on this engagement; information learned from my review of relevant documents; or my opinion based on my professional experience in chapter 11 transactions. If I were called upon to testify, I would and could testify competently to the facts set forth in this Declaration.

## New Gulf's Exploration of Strategic Alternatives

4. The energy industry has been burdened by a dramatic decline in the price of oil and gas. As the value of their enterprises are tied to the price of oil and gas, many E&P companies like the Debtors have been severely impacted, needing to refinance debt, negotiate amendments and waivers, or seek relief under chapter 11. The state of commodity markets and the resulting uncertainty in the energy industry have also made it difficult and expensive for distressed E&P companies to obtain financing.

---

[2] Capitalized terms used but not defined here have the meaning given in the Declaration of Danni Morris in Support of the Debtors First Day Motions (the "First Day Declaration").

01:18080927.1

2

5.      In August of 2015, New Gulf engaged Barclays to help develop strategic alternatives to improve New Gulf's capital structure. Based on financial modeling and other analysis, it appeared New Gulf would face substantial liquidity and covenant constraints by the end of 2015, absent a sudden rebound in commodity prices. By October of 2015, the Debtors determined that even without making an approximately $23 million interest payment on the Second Lien Notes due in November 2015, they would need a source of new financing in order to avoid a severe liquidity shortfall in the first quarter of 2016.

6.      With the assistance of Barclays, New Gulf considered and explored numerous alternatives to enhance liquidity and right-size the company's debt burden. These alternatives included: potential sale transactions; potential new third-party financing; potential deleveraging measures and exchange transactions; and various bankruptcy-focused alternatives. Notably, New Gulf also commenced a process for the sale of assets in the Kurten and Bedlam fields. More than 200 potential buyers were contacted for each of these fields, and New Gulf received and pursued 2 bids. Ultimately, however, the company was unable to negotiate an acceptable price with any bidder, and no bid would have provided consideration sufficient to resolve the company's impending liquidity and covenant constraints.

**Negotiation of the RSA Transactions with the Ad Hoc Committee**

7.      In the process of exploring strategic alternatives, New Gulf engaged with an ad hoc group of creditors that collectively hold approximately 72% of the Second Lien Notes and 22% of the Subordinated PIK Notes (the "Ad Hoc Committee"). On December 17, 2015, after weeks of extensive negotiations, the Debtors and the Ad Hoc Committee entered into the Restructuring Support Agreement attached to the First Day Declaration (the "RSA"). Having explored alternatives, the Debtors determined in the exercise of their business judgment that the

01:18080927.1

3

RSA presented the most attractive restructuring transaction available to New Gulf and its stakeholders.

8. The process preceding the execution of the RSA was robust. During the month of November, the Debtors first negotiated the underlying economics of the Plan and other material terms of the restructuring with the Ad Hoc Committee via a non-binding term sheet. The Debtors and the Ad Hoc Committee further negotiated the terms of the restructuring in connection with the RSA and other definitive documents, including the Plan, the Disclosure Statement, the DIP Financing Agreement and other DIP Documents, and the Backstop Note Purchase Agreement (the "<u>Definitive Documents</u>"). Through counsel, the Debtors and the Ad Hoc Committee exchanged multiple drafts of the Definitive Documents. In particular, they engaged in iterative negotiations regarding the material economics and fees of the proposed transactions, including: the allocation of equity in the reorganized Debtors among the classes of the Debtors' creditors and equity interest owners under the Plan; the size of DIP financing need to implement the restructuring through chapter 11 cases, and the associated interest and fees; the treatment of the First Lien Lenders, the Debtors' non-participating Second Lien Note holders and unsecured creditors; and the economic and legal terms of the proposed New First Lien Notes. Simultaneously with these negotiations, the Debtors also facilitated due diligence and other information requests from the Ad Hoc Committee.

**The Proposed DIP Facility**

9. As more fully described in the DIP Motion filed by the Debtors, the Debtors seek authority to obtain $75 million of debtor-in-possession financing provided by members of the Ad Hoc Committee (as further described in the DIP Motion, the "<u>DIP Facility</u>"). Approximately half of the proceeds of the DIP Facility will be used to repay in full the First Lien Indebtedness,

with the balance to provide operational liquidity for the duration of these cases. The proposed DIP Facility has a maturity of 12 months, with interest payable monthly in cash at a base rate of LIBOR plus 10% and a LIBOR floor of 1%. Importantly, the comprehensive terms of the prearranged restructuring provide for all claims under the DIP Facility to be exchanged for New First Lien Notes on the Debtors' emergence from chapter 11, which significantly reduces the financing needed upon exit and avoids the need to engage in another significant capital raise during a tumultuous time in the oil and gas industry.

10.     While negotiating the terms of the proposed DIP Financing with the Ad Hoc Committee, the Debtors also solicited and explored potential DIP financing from third parties. Barclays contacted approximately 10 potential lenders with experience in the E&P industry and with providing debtor-in-possession financing, inquiring as to whether they were interested in exploring a potential transaction. The Debtors subsequently entered into a non-disclosure agreement with 3 of these parties, which parties then received a confidential information memorandum regarding the Debtors, their business and assets, and the indicative terms of potential debtor-in-possession financing. Barclays received informal, non-binding proposals from one of these parties regarding the material economic terms of the potential DIP financing, including the proposed amount of principal, the rate of interest, fees and maturity. Barclays also proposed DIP terms and engaged in discussions with the First Lien Agent regarding potential DIP financing.

11.     None of the parties Barclays contacted were willing to provide DIP financing on terms that were cumulatively more favorable to the Debtors than the Ad Hoc Committee's proposal. Of paramount importance is that no lender was willing to provide unsecured DIP financing or secured post-petition financing that would be junior to the Debtors' prepetition

secured debt. While other potential lenders were willing to refinance the First Lien Indebtedness, to obtain adequate operational liquidity for the duration of these cases, the Debtors still would have needed to prime the Second Lien Indebtedness. The Debtors concluded that a non-consensual priming DIP financing was not worth pursuing due to the overleveraged nature of the Debtors' capital structure and the risk and cost of a contested priming fight, particularly at a crucial stage in the Debtors' efforts to restructure. Finally, no other potential lender proposed a DIP loan that would convert to exit financing.

12. Based on Barclays's discussions with alternate sources of potential DIP financing, as well as my familiarity with the current market for DIP and other financing in the energy and commodities space, I believe the proposed DIP Financing with the Ad Hoc Committee presents the best and most favorable financing available to the Debtors under the circumstances. None of the indicative terms New Gulf received from other potential lenders were materially better than the economics of the Ad Hoc Committee's DIP Financing.

13. In my opinion, the Ad Hoc Committee's proposed DIP Financing is of greater benefit to the Debtors, relative to the potential alternative financing sources, because the Ad Hoc proposal *also* provides the opportunity for a confirmable chapter 11 plan and committed source of exit financing. Given their holdings in the Second Lien Notes, the Ad Hoc Committee is uniquely positioned to deliver on terms for a comprehensive restructuring, making their offer superior to comparably priced DIP financing. Because of their holdings in the Second Lien Notes, the Ad Hoc Committee is able, under the terms of the Second Lien Indenture, to consent at the threshold necessary for a subordination of the Second Liens to the liens securing the DIP Facility, avoiding the need for a contested priming fight. The size of the DIP Facility, the refinancing of the First Lien Credit Agreement, and the DIP Lenders' commitment, subject to a

30-day diligence contingency provided to the Ad Hoc Committee under the backstop purchase agreement (the "Diligence Out"), to exchange 100% of their DIP Facility claims into New First Lien Notes substantially improves the Debtors' near and longer term liquidity situation. The DIP Lenders' conditional agreement to exchange their DIP Facility claims for New First Lien Notes is of critical significance for the Debtors, as it allowed them to enter chapter 11 with greater certainty of having both operational liquidity and the ability to exit chapter 11 on a timely and efficient basis. Moreover, in the event the Ad Hoc Committee exercises the Diligence Out, all milestones under the DIP Credit Agreement are automatically extended, giving the company a total of 180 days to formulate and implement a revised exit strategy.

14. In my opinion, there are other sound business reasons and compelling circumstances justifying the Debtors' entry into the DIP Facility, in addition to the factors above. The DIP Financing includes other terms that suggest the reasonableness of the DIP Financing, including attainable and negotiated milestones and a budget consistent with the relief requested in the Debtors' First-Day motions.

15. The DIP fee of 3% of the DIP Facility and the Debtors' agreement to pay the reasonable fees and expenses of the DIP Lenders and DIP Agent are market terms, and were necessary to induce the Ad Hoc Committee to provide the DIP Financing.

16. The Debtors and Ad Hoc Committee negotiated the DIP Facility and other Definitive Documents in good faith and from arm's-length bargaining positions, with the advice of sophisticated counsel and financial advisors.

17. Based on the state of the Debtors' industry and the current market for financing of distressed E&P companies, I believe the terms of the DIP Facility are fair, reasonable, and in the best interest of the Debtors and their stakeholders.

Pursuant to 28 U.S.C. § 1746, the undersigned makes the forgoing declaration as of the date of its filing under penalty of perjury.

*/s/ George Mack*
George Mack
Managing Director
Barclays Capital Inc.
