## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEW GULF RESOURCES, LLC, *et al.* | ) | Case No. 15-12566 |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |
| | ) | Docker Ref No. |

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (4) GRANTING ADEQUATE PROTECTION, (5) MODIFYING THE AUTOMATIC STAY, (6) SCHEDULING A FINAL HEARING, AND (7) GRANTING RELATED RELIEF**

Upon the motion dated December 17, 2015 (the "DIP Motion"),[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1(b), 4001-2, 9006-1 and 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") seeking, *inter alia*, entry of this Order (this "Order"):

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  NGR Holding Company LLC (1782), New Gulf Resources, LLC (1365); NGR Finance Corp. (5563) and NGR Texas, LLC (a disregarded entity for tax purposes).  The Debtors' mailing address is 10441 S. Regal Boulevard, Suite 210, Tulsa, Oklahoma 74133.

[2]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the applicable DIP Loan Documents (as defined herein).

(1)     authorizing the Debtors to obtain senior secured postpetition financing on a priming, superpriority basis (the "<u>DIP Facility</u>"; the loans under the DIP Facility, the "<u>DIP Loans</u>") pursuant to the terms and conditions of this Order and that certain Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement substantially in the form attached hereto as <u>Exhibit D</u> (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "<u>DIP Credit Agreement</u>", and together with all agreements, documents, instruments and certificates executed, delivered or filed in connection therewith, as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, collectively, the "<u>DIP Loan Documents</u>"), by and among each of Debtors, as borrowers (collectively, the "<u>DIP Loan Parties</u>"), U.S. Bank, National Association, as administrative agent and collateral agent (in such capacities, the "<u>DIP Agent</u>"), and the lenders party thereto from time to time (collectively, the "<u>DIP Lenders</u>", and together with the DIP Agent, the "<u>DIP Secured Parties</u>"), providing for, *inter alia*, (i) a new money, senior secured priming superpriority multiple draw term loan facility, providing for the borrowing of term loans in an aggregate maximum principal amount not to exceed $75,000,000, of which, an aggregate principal amount of $55,000,000 shall be available to and shall be drawn in a single draw by the Debtors on the Closing Date (as defined in the DIP Credit Agreement), and (ii) following entry of the Final Order, up to two (2) additional drawings of the DIP Facility in an aggregate principal amount of $20,000,000;

(2)     authorizing the Debtors to execute, deliver to the DIP Secured Parties, and perform under the DIP Credit Agreement and the other DIP Loan Documents and to perform such other and further acts as may be necessary or desirable in connection with the DIP Loan Documents;

(3)     authorizing and directing the Debtors to incur and pay all DIP Obligations (as defined below), including the fees specified in that certain fee letter dated as of December 15, 2015, between the Debtors and the DIP Agent (the "<u>Agent Fee Letter</u>");

(4)     providing for the indefeasible payment in full of the First Lien Obligations (as defined below) due in respect of the First Lien Credit Agreement (as defined below), subject to the terms hereof; and

(5)     granting to the DIP Secured Parties valid, enforceable, non-avoidable, automatically and fully perfected liens on and security interests in all DIP Collateral (as defined below), including, without limitation, all Cash Collateral (as defined below) to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth herein;

(6)     granting to the DIP Secured Parties allowed superpriority administrative expense claims in respect of all DIP Obligations, as set forth herein;

(7)     authorizing the Debtors' use of the proceeds of the DIP Facility and Cash Collateral pursuant to the Approved Budget (as defined below), this Order and the DIP Loan Documents;

(8)    providing adequate protection to the Second Lien Agent (as defined below) and the Second Lien Noteholders (as defined below) for any Diminution in Value (as defined below) of their interests in the Prepetition Second Lien Collateral (as defined below), including Cash Collateral;

(9)    vacating and modifying the automatic stay imposed by section 362 to the extent necessary to implement and effectuate the terms and provisions of this Order and the DIP Loan Documents, and providing for the immediate effectiveness of this Order; and

(10)    scheduling a final hearing (the "Final Hearing") to consider entry of a final order authorizing the relief requested in the DIP Motion on a final basis, and approving the form of notice with respect to the Final Hearing, which order shall be in form and substance and on terms satisfactory in all respects to the DIP Agent and the DIP Lenders (the "Final Order");

and the Court having considered the DIP Motion, the DIP Loan Documents on file with the Court, the Declaration of Danni Morris in Support of the Debtors' First Day Motions and any exhibits thereto, the Declaration of George Mack in support of the DIP Motion, the pleadings filed with the Court, and the evidence proffered or adduced at the interim hearing held on December _18_, 2015 (the "Interim Hearing"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and the Local Rules; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is essential for the continued operation of the Debtors' businesses; and upon the record of these Chapter 11 Cases; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND

CONCLUSIONS OF LAW:[3]

A.    *Petition Date*.  On December 15, 2015 (the "Petition Date"), each of the Debtors

filed a separate voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the

United States Bankruptcy Court for the District of Delaware (this "Court") commencing these

Chapter 11 Cases.

B.    *Debtors-in-Possession*.  The Debtors continue to manage and operate their

businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.    *Committee Formation*.  As of the date hereof, the United States Trustee (the "U.S.

Trustee") has not yet appointed an official committee of unsecured creditors in these Chapter 11

Cases (the "Official Committee").

D.    *Jurisdiction and Venue*.  The Court has jurisdiction, pursuant to 28 U.S.C.

§§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.

Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  The

statutory predicates for the relief set forth herein are sections 105, 361, 362, 363, 364 and 507 of

the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Bankruptcy Rules.  Venue for these

Chapter 11 Cases and proceedings on the Motion is proper in this district pursuant to 28 U.S.C.

§§ 1408 and 1409.

E.    *Debtors' Stipulations*.  In requesting the DIP Facility, and in exchange for and as

a material inducement to the DIP Lenders to agree to provide the DIP Facility, and in exchange

---

[3]       Where appropriate in this Order, findings of fact shall be construed as conclusions of law and conclusions
of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052.

for and in recognition of the priming of the Prepetition Second Lien Note Liens (as defined below), subject to paragraph 31 hereof, the Debtors hereby admit, stipulate, acknowledge and agree that:

(i)    *First Lien RBL Facility.*  (a) Pursuant to the Credit Agreement dated as of June 12, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "First Lien Credit Agreement", and together with all other all agreements, documents, instruments and certificates executed or delivered in connection therewith, including the First Lien Guaranty (as defined below) and the Intercreditor Agreement (as defined below), collectively, the "First Lien Loan Documents"), among New Gulf, as borrower (the "First Lien Obligor"), MidFirst Bank, as administrative agent and issuer of letters of credit (the "First Lien Agent"), and the lenders party thereto (collectively, the "First Lien Lenders"), the First Lien Lenders provided a revolving credit facility (the "First Lien RBL Facility"); and (b) pursuant to the Guaranty Agreement dated as of June 12, 2015 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "First Lien Guaranty"), NGR Texas (the "First Lien Guarantor", and together with the First Lien Obligor, the "First Lien Loan Parties") agreed to guarantee the "Obligations" as defined in the First Lien Credit Agreement.

(ii)    *First Lien Obligations.*  As of the Petition Date, without defense, counterclaim, or offset of any kind, the First Lien Loan Parties were jointly and severally indebted to the First Lien Agent and the First Lien Lenders in the aggregate amount of approximately $38,073,109.14, in each case, to the extent provided in the First Lien Loan Documents (collectively, the "First Lien Obligations").

(iii)    *First Lien Collateral.*  To secure the First Lien Obligations, the First Lien Loan Parties granted to the First Lien Agent, for the benefit of itself and the First Lien Lenders, first-priority liens on and security interests in (collectively, the "Prepetition RBL Liens") all "Collateral" as defined in the First Lien Credit Agreement (collectively, the "Prepetition First Lien Collateral").

(iv)    *Second Lien Notes.*  Pursuant to the Indenture dated as of May 9, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Second Lien Note Indenture", and together with all other all agreements, documents, instruments and certificates executed or delivered in connection therewith, including, *inter alia*, (1) the Second Lien Guaranty (as defined below), (2) the Intercreditor Agreement (as defined below), and (3) the Agreement and Plan of Merger, dated as of December 14, 2015 by and among New Gulf, NGR Holding Company, LLC ("HoldCo"), and NGRHC Acquisition LLC (the "Merger Agreement"), collectively, the "Second Lien Note Documents", and together with the First Lien Loan Documents, the "Prepetition Loan Documents"), among New Gulf and NGR Finance, as co-issuers (the "Second Lien Note Issuers"), The Bank of New York Mellon Trust Company, N.A., as indenture trustee and collateral agent (the "Second Lien Agent", and together with the First Lien Agent, the "Prepetition Agents"), and the guarantors party thereto (including HoldCo, as guarantor of the Second Lien Notes, the "Second Lien Guarantors", and together with the Second Lien Note Issuers, collectively, the "Second Lien Note Parties", and together with the First Lien Loan Parties, collectively, the "Prepetition Loan Parties"), the Second Lien Issuers

issued the 11.75% Senior Secured Notes due 2019 (the "Second Lien Notes"; the holders of such Second Lien Notes, the "Second Lien Noteholders", and together with the First Lien Lenders, collectively, the "Prepetition Lenders"), and the Second Lien Guarantors guaranteed the "Guaranteed Obligations" as defined in the Second Lien Note Indenture.

(v)    *Second Lien Obligations*. As of the Petition Date, without defense, counterclaim, or offset of any kind, the Second Lien Note Parties were jointly and severally indebted to the Second Lien Agent and the Second Lien Noteholders in the aggregate principal amount of least approximately $365 million in Second Lien Notes, *plus* the Applicable Premium (as referred to in the Second Lien Note Indenture) in the amount of not less than $63 million, *plus* accrued but unpaid interest, *plus* any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Second Lien Note Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, any reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, including all "Guaranteed Obligations" as defined in the Second Lien Note Indenture (collectively, the "Second Lien Obligations", and together with the First Lien Obligations, collectively, the "Prepetition Obligations").

(vi)    *Prepetition Second Lien Collateral*. To secure the Second Lien Obligations, the Second Lien Note Parties granted to the Second Lien Agent, for the benefit of itself and the Second Lien Noteholders, first-priority liens on and security interests in (collectively, the "Prepetition Second Lien Note Liens", and together with the Prepetition RBL Liens, the "Prepetition Liens") all "Collateral" as defined in the Second Lien Note Indenture (collectively, the "Prepetition Second Lien Collateral", and together with the Prepetition First Lien Collateral, the "Prepetition Collateral"), subject to the terms of the Intercreditor Agreement dated as of June 12, 2014 (as amended, supplemented, restated or otherwise modified prior to the Petition Date, the "Intercreditor Agreement"), by and between each of the First Lien Agent and the Second Lien Agent, which governs the relative rights and priorities of the First Lien Agent (on behalf of itself and the First Lien Lenders) and the Second Lien Agent (on behalf of itself and the Second Lien Noteholders) with respect to their shared interests in the Prepetition Collateral.

(vii)    *Validity of Prepetition Liens and Prepetition Obligations*. (a) The Prepetition Liens are valid, binding, enforceable, non-avoidable and perfected liens, with priority over any and all other liens (other than liens expressly permitted to be senior to all the Prepetition Liens under the First Lien Credit Agreement and Second Lien Note Indenture, solely to the extent such permitted liens were existing, valid, enforceable, properly perfected and non-avoidable as of the Petition Date or that is perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "Permitted Prior Liens")), subject to the terms of the Intercreditor Agreement; (b) the First Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the First Lien Loan Parties, enforceable in accordance with the terms of the First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (c) the Second Lien Obligations constitute legal, valid, binding and non-avoidable obligations of the Second Lien Note Parties, enforceable in

accordance with the terms of the Second Lien Note Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (d) the Debtors and their estates hold no valid or enforceable claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind, and have waived, discharged and released any right they may have to (A) challenge the validity, enforceability, priority, security and perfection of any of the Prepetition Obligations, the Prepetition Loan Documents or the Prepetition Liens, respectively, (B) assert any and all, claims (as defined in the Bankruptcy Code), against the Prepetition Agents or the Prepetition Lenders, and each of their respective officers, directors, equityholders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultant, agents, and other representatives (collectively, the "Released Parties"), whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, in each case, arising out of, based upon or related to the Prepetition Loan Documents, the Prepetition Liens or the Prepetition Obligations, as applicable.

(viii)    *Cash Collateral.*  All of the Debtors' cash, whether existing on the Petition Date or thereafter, including, without limitation, any cash in deposit accounts of the Debtors, or wherever located, constitutes cash collateral of the Prepetition Agents and the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(ix)    *Default.*  The Prepetition Loan Parties are in default of certain terms and provisions of the Prepetition Loan Documents as of the Petition Date.

(x)    Nothing in the Debtors' stipulations contained in this paragraph E shall constitute a stipulation, admission or waiver by the Debtors with respect to the validity, enforceability, perfection,  priority or voidability of any liens or security interests in real property interests acquired by the Debtors after May 9, 2014 or the identifiable post-petition proceeds (if any) thereof to the extent such liens or security interests did not attach and/or were not validly perfected as of the Petition Date.

F.    *Findings Regarding Postpetition Financing.*

(i)    *Request for Postpetition Financing.*  The Debtors seek authority to

(a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, and

(b) use Cash Collateral on the terms described herein to administer the Chapter 11 Cases and

fund the operation of their businesses.  At the Final Hearing, the Debtors will seek final approval

of the DIP Loan Documents and the proposed postpetition financing arrangements and use of

Cash Collateral arrangements pursuant to the Final Order, and notice of the Final Hearing and

Final Order will be provided in accordance with this Order. Good cause has been shown for the entry of this Order.

        (ii)    *Priming of Prepetition Second Lien Note Liens.* The priming of the Prepetition Second Lien Note Liens on the Prepetition Second Lien Collateral under section 364(d)(1) of the Bankruptcy Code, as contemplated by this Order and the DIP Facility and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses for the benefit of their estates and stakeholders. However, the Second Lien Agent and the Second Lien Noteholders are entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to adequate protection of their respective interests in the Prepetition Second Lien Collateral (including Cash Collateral) in exchange for the Debtors' use of such Prepetition Second Lien Collateral (including Cash Collateral), solely to the extent of the diminution in value, if any, of the Prepetition Second Lien Collateral (including Cash Collateral) resulting from (a) the use, sale or lease by the Debtors (or other decline in value) of Cash Collateral and any other Prepetition Second Lien Collateral, (b) the imposition of the DIP Liens (as defined below) and the priming of the Prepetition Second Lien Note Liens, and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Diminution in Value"), as more fully set forth herein.

        (iii)    *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors' need to use Cash Collateral on an interim basis and to obtain credit pursuant to the DIP Facility as provided for herein on an interim basis is urgent and necessary to avoid immediate and irreparable harm to the Debtors, their estates, their creditors and other parties-in-interest, and to enable the Debtors to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations, maintain business relationships

with their vendors, suppliers and customers, pay their employees and otherwise finance their

operations requires the availability of working capital from the DIP Facility and the use of Cash

Collateral. Without the ability to access the Interim Financing (as defined below) and the DIP

Facility and the authority to use Cash Collateral, the Debtors, their estates and their creditors

would suffer immediate and irreparable harm, and the Debtors' chances for a successful exit and

reorganization from the Cases would be jeopardized. The Debtors do not have sufficient

available sources of working capital and financing to operate their businesses or maintain their

properties in the ordinary course of business without the DIP Facility and authorized use of

Cash Collateral.

(iv)    *No Credit on More Favorable Terms.*  Given their current financial

condition, financing arrangements and capital structure, and the present state of the industry

within which the Debtors operate, the Debtors are unable to obtain financing from sources other

than the DIP Lenders on terms more favorable than those provided under the DIP Facility and

the DIP Loan Documents. The Debtors have been unable to obtain unsecured credit allowable as

an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors also

have been unable to obtain sufficient credit (a) having priority over administrative expenses of

the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code, (b) secured by a

lien on property of the Debtors and their estates that is not otherwise subject to a lien, or

(c) secured solely by a junior lien on property of the Debtors and their estates that is subject to a

lien. Postpetition financing is not otherwise available without granting the DIP Agent, for the

benefit of itself and the DIP Lenders:  (1) perfected priming security interests in and liens on

(each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities

set forth herein; (2) superpriority claims and liens; and (3) the other protections set forth in this

Order. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and is in the best interests of all of their stakeholders.

(v)    *Use of Proceeds of the DIP Facility.* As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility and the authorization to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), the DIP Agent and the DIP Lenders require, and the Debtors have agreed, that the proceeds of the DIP Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the Approved Budget (as defined below), solely (a) to provide working capital for the Debtors in the ordinary course of business, (b) to pay costs and expenses of administration of the Chapter 11 Cases, (c) to indefeasibly pay in full the First Lien Obligations, (d) to pay fees and expenses related to the DIP Facility, including, without limitation, as set forth in that certain Commitment Letter, dated December [16], 2015 from the DIP Lenders or their affiliates to New Gulf Resources, LLC (the "DIP Commitment Letter") and the Agent Fee Letter, and (e) to make the adequate protection payments provided for in this Order.

G.    *Adequate Protection.* The Second Lien Agent and the Second Lien Noteholders are each entitled, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, to receive adequate protection against the risk of Diminution in Value of their respective interests in the Prepetition Second Lien Collateral, including, among other things, adequate protection liens and claims, the payment of the reasonable fees, costs and expenses, including, without limitation, legal and other professionals' fees and expenses, of the Second Lien Agent and the Ad Hoc Committee (as defined below), compliance with the Approved Budget (as defined below),

subject to Permitted Variances (as defined below), Budget and Variance Reporting (as defined below) and certain other forms of adequate protection, as set forth in more detail herein.

H.    *New Loan*.  The DIP Facility (including the Interim Financing) constitutes new loans and financial accommodations from the DIP Lenders to the Debtors, separate and distinct from the loans and financial accommodations provided prior to the Petition Date under the Prepetition Loan Documents, and the proceeds of the DIP Facility may only be borrowed and such proceeds and the use of Cash Collateral may only be used in compliance with the Approved Budget (as defined below) and the DIP Loan Documents.

I.    *Sections 506(c) and 552(b)*.  As a material inducement to the DIP Secured Parties to agree to provide the DIP Facility, and in exchange for (a) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out (as defined below), and (b) the Prepetition Agents' and the Prepetition Lenders' agreement to (i) subordinate their Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens to the DIP Liens and the Carve-Out, and (ii) consent to the use of Cash Collateral in accordance with and subject to the Approved Budget (as defined below) and the terms of this Order, each of the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders are entitled to receive, subject to entry of the Final Order, (1) a waiver of any "equities of the case" exceptions or claims under section 552(b) of the Bankruptcy Code, and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code (which waiver shall be without prejudice to the contention of the DIP Agent and the DIP Lenders that section 506(c) of the Bankruptcy Code does not apply to secured claims incurred pursuant to section 364 of the Bankruptcy Code).

J.    _Good Faith of the DIP Agent and the DIP Lenders_.

(i)    _Willingness to Provide Financing_.  The DIP Lenders have indicated a

willingness to provide financing to the Debtors subject to:  (a) the entry by the Court of this

Order and the Final Order; (b) approval by the Court of the terms and conditions of the DIP

Facility and the DIP Loan Documents; and (c) entry of findings by the Court that such financing

is essential to the Debtors' estates, that the DIP Agent and the DIP Lenders are extending

postpetition credit to the Debtors pursuant to the DIP Loan Documents and this Order in good

faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests

and liens and other protections granted pursuant to this Order and the DIP Loan Documents will

have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected

by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of

this Order or any other order.

(ii)    _Business Judgment and Good Faith Pursuant to Section 364(e)_.  The

extension of credit under the DIP Facility, governed by the terms and conditions of the DIP Loan

Documents, the fees paid and to be paid thereunder, and this Order as it relates to the Interim

Financing:  (a) are fair and reasonable; (b) are the best available to the Debtors under the

circumstances; (c) reflect the Debtors' exercise of prudent business judgment consistent with

their fiduciary duties; and (d) are supported by reasonably equivalent value and fair

consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and

at arms' length among the Debtors, the DIP Agent and the DIP Lenders.  The use of Cash

Collateral and credit to be extended under the DIP Facility shall be deemed to have been so

allowed, advanced, made, used and/or extended in good faith, and for valid business purposes

and uses, within the meaning of section 364(e) of the Bankruptcy Code, and the DIP Agent and

the DIP Lenders are therefore entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Order.

K.    *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier or hand delivery, to certain parties-in-interest, including:  (i) the U.S. Trustee; (ii) the Securities and Exchange Commission; (iii) the Internal Revenue Service; (iv) the parties included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors; (v) Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the DIP Agent and the DIP Lenders; (vi) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (vii) all financial institutions at which the Debtors maintain deposit accounts; (viii) the landlords for all non-residential real properties occupied by the Debtors as of the Petition Date; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Order.

L.    *Immediate Entry*.  The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  The Court concludes that entry of this Order is in the best interest of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' prospects for successful reorganization.

Based upon the foregoing findings and conclusions, the DIP Motion and the record made before the Court with respect to the DIP Motion at the Interim Hearing and otherwise, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED, THAT:

1.      <u>DIP Motion Approved</u>.  The DIP Motion is hereby granted on an interim basis in accordance with and subject to the terms and conditions set forth in this Order and the DIP Loan Documents.  All objections to the interim relief sought in the DIP Motion to the extent not withdrawn or resolved are hereby overruled on the merits.

2.      <u>Authorization of the DIP Facility</u>.

(a)      The DIP Facility is hereby approved.  The Debtors are hereby expressly and immediately authorized and empowered to establish the DIP Facility, to execute, deliver and perform under the DIP Loan Documents, and to incur and perform the DIP Obligations (as defined below), in each case, in accordance with and subject to the terms of this Order, the Approved Budget (as defined below) and the DIP Loan Documents, and to execute, deliver and perform under any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Facility and the creation and perfection of the DIP Liens (as defined below).  The Debtors are hereby authorized and empowered ~~and directed~~ to pay, in accordance with this Order, the principal, interest, fees, expenses, legal fees and other amounts described in each of the DIP Loan Documents as such become due, including, without limitation, closing fees, commitment fees, servicing fees, audit fees, facility fees, administrative agent's fees, the reasonable fees and disbursements of the DIP Agent's and the DIP Lenders' attorneys, advisors, financial advisors, accountants, and other consultants, in each case, to the extent provided in the DIP Loan

Documents, which amounts, subject only to paragraph 26 hereof, shall not be subject to further approval of this Court and shall be non-refundable and not subject to challenge in any respect. Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates, and the DIP Obligations shall be due and payable, in each case, in accordance with the terms of this Order and the DIP Loan Documents.

(b)    For purposes hereof, the term "DIP Obligations" means all amounts and other obligations and liabilities owing to the DIP Secured Parties under the Agent Fee Letter, the DIP Credit Agreement and the other DIP Loan Documents (including, without limitation, all "Obligations" as defined in the DIP Credit Agreement), and shall include, without limitation, the principal, interest, fees, commitment fees, administrative agent fees, audit fees, the Agent Expenses (as defined in the DIP Credit Agreement), costs, expenses, charges (including, without limitation, the reasonable and documented fees and disbursements of the DIP Secured Parties, including the reasonable and documented fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, or any other amounts that are or may become due under the DIP Loan Documents.

(c)    The DIP Loans to be made on the Closing Date shall be funded by the DIP Lenders net of a discount equal to $2,250,000, which discount shall be allocated *pro rata* among the DIP Lenders based on their respective Commitments.  The full principal amount of the DIP Loans made on the Closing Date (adding back such discount) shall be deemed the aggregate principal amount of such DIP Loans and shall be deemed outstanding on and after the Closing Date and the DIP Loan Parties shall be obligated to repay 100% of the principal amount of such

DIP Loans as provided hereunder and the DIP Loan Documents. For the avoidance of doubt, immediately following the making of the DIP Loans on the Closing Date, the total principal amount outstanding under the DIP Facility shall be $55 million.

3.      Authorization of the Interim Financing.    The Interim Financing is hereby approved. To prevent immediate and irreparable harm to the Debtors' estates, the Debtors are hereby immediately authorized to draw upon the DIP Facility and borrow from the DIP Lenders in an aggregate principal amount of $55,000,000 (the "Interim Financing"), subject to the terms and conditions set forth in this Order and the DIP Loan Documents.

4.      DIP Obligations. The DIP Loan Documents shall evidence the DIP Obligations, which DIP Obligations, shall be valid, binding and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "Successor Cases"), and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Order and the DIP Loan Documents. No obligation, payment, transfer, or grant of security hereunder or under the DIP Loan Documents shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544 and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counter-claim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.    <u>DIP Liens.</u>

(a)    As security for the DIP Obligations, effective immediately upon entry of this Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, subject to the Carve-Out, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "<u>DIP Liens</u>") on all DIP Collateral (as defined below) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise of the DIP Obligations).  The term "DIP Collateral" means all assets and properties (real and personal) of the Debtors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation:  (i) all Prepetition Collateral; (ii) all Oil and Gas Properties (as defined in the Second Lien Note Indenture); (iii) all cash and cash equivalents; (iv) all funds in the DIP Priority Account (as defined below) or any other deposit account, securities account or other account of the Debtors and all cash and other property deposited therein or credited thereto from time to time; (v) all accounts and other receivables; (vi) all contract rights; (vii) all instruments, documents and chattel paper; (viii) all securities (whether or not marketable); (ix) all goods, as-extracted collateral, equipment, inventory and fixtures; (x) all real property interests; (xi) all interests in leaseholds, (xii) all franchise rights; (xiii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xiv) all general intangibles; (xv) all capital stock, limited liability company interests, partnership interests and financial assets; (xvi) all investment property; (xvii) all supporting obligations; (xviii) all letters of credit and letter of credit rights;

(xix) all commercial tort claims; (xx) all other claims and causes of action and the proceeds thereof (including, upon entry of the Final Order, the proceeds of all claims and causes of action arising under chapter 5 of the Bankruptcy Code); (xxi) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxii) to the extent not covered by the foregoing, all other assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxiii) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; *provided, however*, that the DIP Collateral shall not include Excluded Property (as defined below); *provided, further, however*, that the DIP Collateral shall include all proceeds and products of Excluded Collateral.

(b)    For purposes hereof, the term "Excluded Collateral" means (a) any Excluded Deposit Account (as defined in the DIP Credit Agreement); and (b) any Voting Stock (as defined in the DIP Credit Agreement) in a CFC (as defined in the DIP Credit Agreement) in excess of 65% of the outstanding Voting Stock of such CFC. To the fullest extent permitted by applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any governmental entity or non-governmental entity in order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP

Case 15-12566-BLS    Doc 41    Filed 12/18/15    Page 19 of 59

Collateral or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the

DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Order or

in favor of the Prepetition Agents and the Prepetition Lenders in accordance with this Order.

     6.    <u>Priority of DIP Liens</u>.

     (a)    To secure the DIP Obligations, the DIP Agent, for the benefit of itself and the DIP

Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and

automatically and properly perfected DIP Liens in the DIP Collateral as follows:

     (i)    pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date, including all funds in the DIP Priority Account or any other account of the Debtors, subject only to the Carve-Out;

     (ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out; and

     (iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all Prepetition Collateral securing the Prepetition Obligations, wherever located, which senior priming liens and security interests in favor of the DIP Agent shall be senior to the Prepetition Liens and the Second Lien Noteholder Adequate Protection Liens (as defined below) granted hereunder, subject only to (x) Permitted Prior Liens, and (y) the Carve-Out.

     (b)    Except as expressly set forth herein, the DIP Liens and the DIP Superpriority

Claim (as defined below):  (i) shall not be made subject to or *pari passu* with (A) any lien,

security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any

Successor Cases and shall be valid and enforceable against the Debtors, their estates, any trustee

or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor

Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any

lien that is avoided and preserved for the benefit of the Debtors and their estates under section

551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim;

01:18081190.2

19

and (ii) shall not be subject to sections 506(c) (upon entry of the Final Order), 510, 549, 550 or 551 of the Bankruptcy Code.

7.    Superpriority DIP Claim. Effective immediately upon entry of this Order, the DIP Agent and the DIP Lenders are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the Chapter 11 Cases or any Successor Cases (the "Superpriority DIP Claim"), for all of the DIP Obligations, (a) with priority over any and all administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents, and (iii) the Second Lien Noteholders' Adequate Protection Claim (as defined below), and (b) which shall at all times be senior to the rights of the Debtors or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law. The DIP Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral (including, without limitation, proceeds of claims and causes of action arising under Chapter 5 of the Bankruptcy Code).

Notwithstanding the foregoing, the DIP Superpriority Claim shall be subject only to the Carve-Out.

8.    No Obligation to Extend Credit. The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance under the DIP Loan Documents, unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Order have been satisfied in full or waived by the Required Lenders (as defined in the DIP Credit Agreement).

9.    Establishment of DIP Priority Account; Use of DIP Facility Proceeds.

(a)    *DIP Priority Account.* The proceeds of any borrowing under the DIP Facility shall be deposited into a segregated account of the Debtors (the "DIP Collateral Deposit Priority Account"), the contents of which shall be invested at all times in cash and Cash Equivalents (as defined in the DIP Loan Documents). The DIP Collateral Priority Account shall be held at the DIP Agent or shall be subject to a control agreement with a securities intermediary acceptable to the DIP Agent, in form and substance satisfactory to the DIP Agent, which establishes "control" (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York) in favor of the DIP Agent for the benefit of the DIP Lenders, and withdrawals from such account shall only be used for the purposes permitted hereunder and the under the DIP Loan Documents. Under no circumstances may any cash, funds, securities, financial assets or other property held in or credited to the DIP Collateral Deposit Priority Account or the proceeds thereof held therein or credited thereto be used other than as expressly permitted hereunder or in the DIP Loan Documents. The DIP Agent and the DIP Lenders are hereby authorized, but not required, to take possession of or control over (as defined in the Uniform Commercial Code as in effect from time to time in the State of New York), or take any

other action in order to validate and perfect the security interests granted to them in the DIP

Collateral Deposit Priority Account hereunder.

(b)    *Use of DIP Facility Proceeds and Cash Collateral.*  From and after the

Closing Date, the Debtors shall be permitted to make withdrawals from the DIP Collateral

Deposit Priority Account, and the proceeds of the DIP Facility and Cash Collateral shall be only

for the following purposes, in each case, solely in accordance with and subject to this Order and

the Approved Budget (as defined below) subject to Permitted Variances (as defined below):

(i) for the indefeasible payment in full of the First Lien Obligations; (ii) for the payment of

prepetition amounts acceptable to the DIP Lenders as authorized by the Court pursuant to orders

approving the first day motions filed by the Debtors; (iii) in accordance with the terms of the DIP

Loan Documents and this Order and/or the Final Order (as applicable), (A) for the payment of

working capital and other general corporate needs of the Debtors in the ordinary course of

business, and (B) for the payment of expenses incurred in connection with the Chapter 11 Cases;

(iv) to make the adequate protection payments required by paragraph 12 hereof; and (v) to pay

the fees and expenses related to the DIP Facility.  For the avoidance of doubt, none of the

Debtors will use any proceeds of the DIP Facility or the Cash Collateral in a manner or for a

purpose other than those consistent with the Approved Budget (as defined below) and this Order.

(c)    *Payoff of First Lien Obligations and Automatic Termination of RBL Liens.*

Immediately upon entry of this Order, the Debtors are authorized to draw on the DIP Facility to

pay in full the First Lien Obligations (including, without limitation, accrued and unpaid interest

(at the non-default rate), fees, expenses, legal fees, disbursements and other amounts properly

chargeable thereunder).  The repayment of the First Lien Obligations provided for herein shall be

subject to the reservation of rights of parties-in-interest set forth in paragraph 31 hereof and if a

successful Challenge is brought, such repayment shall be subject to disgorgement in accordance with the Court's ruling on such Challenge. The Prepetition RBL Liens on the Prepetition RBL Collateral shall automatically and irrevocably terminate, and all First Lien Obligations shall be deemed indefeasibly paid in full and irrevocably released and discharged, upon the date (the "Discharge Date") that is the first day after the expiration of the Challenge Period without a timely Challenge (as defined below) being brought, or upon the final resolution of a Challenge brought in compliance with the provisions of this Order and applicable law (where such Challenge did not have the effect of successfully impairing any of the First Lien Obligations).

(d)    *Adequate Protection of Contingent First Lien Obligations.* Until the Discharge Date, and as adequate protection against the post-petition diminution in value of any contingent obligations that may be owed to the First Lien Agent or First Lien Lenders, the Debtors shall establish an account (the "RBL Facility Reimbursement Account") into which the sum of $150,000 shall be deposited as collateral security for any documented reimbursement or indemnity obligations that the Debtors may have to the First Lien Agent and First Lien Lenders under the terms of the First Lien Loan Documents as to which a claim or demand for payment is made in writing (upon five (5) business days' notice to the DIP Agent and the DIP Lenders) prior to the Discharge Date. The First Lien Agent (for itself and the First Lien Lenders) shall have a first-priority lien (the "RBL Facility Reimbursement Account Liens") on the RBL Facility Reimbursement Account and all amounts held therein. Upon the Discharge Date, the RBL Facility Reimbursement Account Liens shall automatically terminate and cease to exist, and all remaining amounts held in the RBL Facility Reimbursement Account or credited thereto, after reserve for or satisfaction of any reimbursement obligations that are incurred prior to the Discharge Date and are due and payable, shall be released to the Debtors by wire transfer, in

immediately available funds, to the DIP Collateral Deposit Priority Account as soon as possible, in any event no later than the date that is five (5) business days after the Discharge Date.

<u>**Authorization to Use Cash Collateral and Adequate Protection**</u>

10.    <u>Authorization to Use Cash Collateral</u>.  The Debtors are authorized to use the Cash Collateral in accordance with and subject to the terms and conditions of the Approved Budget (as defined below), the DIP Loan Documents and this Order.  Nothing in this Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any Cash Collateral or other proceeds resulting therefrom, except as expressly permitted in this Order and the DIP Loan Documents and in accordance with the Approved Budget (as defined below).

11.    <u>Adequate Protection</u>.  In consideration for the Debtors' use of the Prepetition Collateral (including Cash Collateral), and to protect the Second Lien Agent and the Second Lien Noteholders against the risk of Diminution in Value of their interests in the Prepetition Second Lien Collateral, the Second Lien Agent and the Second Lien Noteholders shall receive, solely to the extent of an such Diminution in Value, the following adequate protection:

(a)    *Second Lien Noteholder Adequate Protection Liens*.  Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, are hereby granted continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP Collateral to the extent of any Diminution in Value of the Second Lien Noteholders' interest in the Prepetition Collateral (the "<u>Second Lien Noteholder Adequate Protection Liens</u>"), which liens will be junior only to the DIP Liens and the Carve-Out, and shall be senior in priority to all other liens, including the Prepetition Liens.  Except for the DIP Liens and the Carve-Out, the Second Lien Noteholder Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter

24

granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien Obligations owed under the Second Lien Note Documents are paid in full. The Second Lien Noteholder Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Second Lien Noteholder Adequate Protection Liens.

(b)    *Second Lien Noteholder Superpriority Claim.* Pursuant to section 507(b) of the Bankruptcy Code, the Second Lien Agent and the Second Lien Noteholders, are hereby further granted an allowed superpriority administrative expense claim (the "Second Lien Noteholder Superpriority Claim"), which claim shall be junior to the DIP Superiority Claim and the Carve-Out, but shall be senior to and have priority over any other administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, (i) administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment, or (ii) any claims allowed pursuant to the obligations under the Prepetition Loan Documents. The Second Lien Noteholder Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy

Code, shall be against each Debtor on a joint and several basis, and shall be payable from and

have recourse to all DIP Collateral (including, without limitation, proceeds of claims and causes

of action arising under Chapter 5 of the Bankruptcy Code).  Except for the DIP Superiority

Claim and the Carve-Out, the Second Lien Noteholder Superpriority Claim shall not be made

subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the

Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors,

their estates and any successors thereto, including, without limitation, any trustee appointed in

any of the Chapter 11 Cases or any Successor Cases until such time as the Second Lien

Obligations owed under the Second Lien Note Documents are paid in full.

12.   Additional Adequate Protection.  As further adequate protection for the Second

Lien Agent and the Second Lien Noteholders, the Debtors are authorized and directed as follows:

(a)      The Debtors are authorized ~~and directed~~ to pay all prepetition and

postpetition fees, costs and expenses of (i) the Second Lien Agent (including all reasonable fees,

costs, disbursements and expenses of one outside counsel and one local counsel), and (ii) the

members of the ad hoc committee of certain Second Lien Noteholders (the "Ad Hoc

Committee"), including all reasonable and documented fees, expenses and disbursements of

(A)  Stroock, (B) PJT Partners LP ("PJT"), pursuant to that certain letter of engagement dated as

of October 6, 2015 by and among Stroock, PJT and certain of the Debtors, (C)  Haynes & Boone

LLP ("H&B"), as Texas counsel, (D) Richards Layton & Finger, PA ("RLF"), as Delaware

counsel, (E) DeGolyer and MacNaughton Canada Limited ("D&M"), pursuant to that certain

letter of engagement dated as of November 13, 2015 by and among Stroock, D&M and certain of

the Debtors, and (F) such other production or reserve engineers, consultants, or other

professionals as may be retained by the Ad Hoc Committee (collectively, together with Stroock,

PJT, H&B and RLF, the "Lender Professionals"). The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines and shall be provided to counsel to the Debtors, with a copy to the U.S. Trustee and counsel to any Official Committee (collectively, the "Fee Notice Parties"). If no objection to payment of the requested fees and expenses are made, in writing by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "Fee Objection Period"), then, without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors. If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and expenses, then only the disputed portion of such fees and expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.

(b)     *Budget Compliance.*  The Debtors shall comply with the Approved Budget (as defined below), subject to Permitted Variances (as defined below), and all Budget Variance Reporting (as defined below) requirements set forth herein and in the DIP Loan Documents.

(c)     *Information; Access to Books and Records.*  The Debtors will provide to the DIP Agent and the DIP Lenders (subject to the execution of appropriate confidentiality agreements), such reports and information required to be delivered pursuant to the DIP Credit Agreement (including without limitation, pursuant to section 5.1 of the DIP Credit Agreement), and such other reports and information as may be reasonably requested by the DIP Agent or the DIP Lenders.  In addition, without limiting the rights of access and information afforded the Pre-Petition Agents, the Pre-Petition Lenders, the DIP Agent and the DIP Lenders under this Order and/or the DIP Loan Documents (including, such access and information required under section

27

5.2 of the DIP Credit Agreement), the Debtors shall be, and hereby are, required to afford

representatives, agents and/or employees of the DIP Agent reasonable access to the Debtors'

premises and their books and records in accordance with this Order and/or the DIP Loan

Documents and shall reasonably cooperate, consult with, and provide to such persons all such

information as may be reasonably requested.  In addition, the Debtors authorize their

independent certified public accountants, financial advisors, investment bankers, and consultants

to cooperate, consult with, and provide to the DIP Agent and each of the DIP Lenders (subject to

execution of appropriate confidentiality agreement) all such information as may be reasonably

requested with respect to the business, results of operations and financial condition of any of the

Debtors.

13.    Adequate Protection Reservation.  The receipt by the Second Lien Agent and the

Second Lien Noteholders of the adequate protection provided pursuant to paragraphs 11 and 12

of this Order shall not be deemed an admission that the interests of the Second Lien Agent and

the Second Lien Noteholders are indeed adequately protected.  Further, this Order shall not

prejudice or limit the rights of the Second Lien Agent and the Second Lien Noteholders to seek

additional relief with respect to the use of Cash Collateral or for additional adequate protection;

provided that any such additional or alternative adequate protection approved by the Court shall

at all times be subordinate and junior to the DIP Obligations and the DIP Liens granted under

this Order and the DIP Loan Documents and the Carve-Out.  Without limiting the foregoing,

nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code

in the event that the adequate protection provided hereunder is insufficient to compensate for any

Diminution in Value during any of the Chapter 11 Cases subject to the Carve-Out.

**Provisions Common to DIP Financing and**
**Use of Cash Collateral Authorization**

14.     <u>Amendments</u>.  The Debtors, the DIP Agent and the DIP Lenders are hereby

authorized and empowered to enter into the DIP Credit Agreement, implement, in accordance

with the terms of the DIP Loan Documents, any nonmaterial modifications (including, without

limitation, nonmaterial amendments, supplements, or waivers) of the DIP Loan Documents

without further notice and hearing or approval of this Court.  No waiver, modification, or

amendment of any of the provisions hereof or of the DIP Loan Documents shall be effective

unless set forth in writing, signed by the Debtors and the DIP Agent (after having obtained the

approval of the Required Lenders).  Notice of any proposed material amendment to the DIP Loan

Documents shall be provided to counsel to the Official Committee and the United States Trustee,

each of whom shall have five (5) business days from the date of such notice within which to

object in writing to such amendment.  If no objections are timely received during such five (5)

business day notice period, the Debtors, the DIP Agent and the DIP Lenders are authorized and

empowered to implement, in accordance with the terms of the DIP Loan Documents, such

material amendment, without further notice, hearing or approval of this Court. Any proposed *after which such amendment*

material amendment to the DIP Loan Documents that is subject to a timely filed objection in *shall be filed with*

accordance with this paragraph shall be subject to further order of this Court. *this Court*

15.     *Budget Covenants.*

(a)     *Initial Budget and Updated Budget.*  The Debtors have prepared and

delivered to the DIP Agent and the DIP Lenders, and the DIP Agent and DIP Lenders have

approved, a budget, a copy of which is attached hereto as Exhibit A (including the "Professional

Fee Schedule" attached hereto as Exhibit B, the "<u>Initial Budget</u>"), which reflects the Debtors'

anticipated cash receipts and all anticipated necessary and required disbursements for each

Case 15-12566-BLS    Doc 41    Filed 12/18/15    Page 30 of 59

calendar week during the period from the Petition Date through and including the end of the thirteenth (13th) calendar week following the Petition Date, together with a certificate of the Debtors' Chief Financial Officer stating that such Initial Budget has been prepared on a reasonable basis and in good faith and is based on assumptions believed by the Debtors to be reasonable at the time made and from the best information then available to the Debtors. The Initial Budget (and each subsequent Approved Budget hereunder) shall be deemed the "Approved Budget" for all purposes hereof until superseded by another Approved Budget pursuant to the provisions set forth below.

(b)    *Updated Budget*.  Commencing with Thursday, January 14, 2016, and every fourth Thursday thereafter, the Debtors shall prepare in good faith and deliver to the DIP Agent and the DIP Lenders an updated cash flow forecast for the subsequent thirteen (13) week-period, consistent with the form and level of detail of the Initial Budget and otherwise in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders (as defined below)) (each such updated forecast, including the "Professional Fee Schedule" attached hereto as Exhibit B, an "Updated Budget"), reflecting the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the thirteen (13) calendar week period beginning on the Sunday following delivery of the applicable Updated Budget.  Upon (and subject to) the approval of any such Updated Budget by the DIP Agent (as directed by, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld or delayed), such Updated Budget shall constitute the then-Approved Budget for purposes hereof; *provided, however*, that in the event the DIP Agent and Debtors are unable to reach agreement regarding an Updated Budget, then the Approved Budget most recently in effect shall remain the Approved Budget; *provided, further, however*, that the failure

30

of the Debtors and the DIP Agent (as directed by, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld or delayed), to agree on an Approved Budget within ten (10) calendar days of any date upon which the Debtors are obligated to deliver an Updated Budget shall constitute an Event of Default under the DIP Credit Agreement.

(c)     *Variance Reporting*.   Commencing with Tuesday, December 29, 2015, and each Tuesday thereafter, the Debtors shall deliver to the DIP Agent and the DIP Lenders a weekly variance report, in form and substance satisfactory to the DIP Agent (at the direction of the Required Lenders) (each a "Variance Report", and together with the Approved Budget requirements described herein, the "Budget and Variance Reporting"), setting forth actual cash receipts and disbursements of the Debtors for the calendar week ended on the immediately preceding Saturday (or, in the case of the first such Variance report, for the period since the Petition Date), and setting forth all the variances, on a line-item and aggregate basis, as compared to the corresponding amounts set forth in the then-current Approved Budget for such week/period, in each case, on a weekly basis and a cumulative basis from the beginning of the period covered by the then-current Approved Budget, together with a certificate of the Debtors' Chief Financial Officer (x) explaining in reasonable detail all material variances from the then current Approved Budget for such week/period and (y) in the case of a Variance Report immediately following the end of any Testing Period (as defined below), certifying the Debtors' compliance with the Permitted Variances for such Testing Period or identifying and explaining in reasonable detail any non-compliance by the Debtors with the Permitted Variances for such Testing Period.

(d)     *Permitted Variances*.   The Debtors shall ensure that at no time shall (i) disbursements be made by the Debtors during the Testing Period (as defined below) ending

on any Testing Date (as defined below) exceed 15% of the applicable amounts set forth in each of the "Total Operating Disbursements" and total "General & Administrative" line items in the then current Approved Budget, in each case, on a cumulative basis for the applicable Testing Period; (ii) cash receipts deposited by the Debtors during the Testing Period ending on any Testing Date fall below 85% of the applicable amounts set forth in each of the "Total Net Production Receipts" and "Total Net Receipts", line items in the then current Approved Budget, in each case, on a cumulative basis for the applicable Testing Period; *provided, however*, that disbursements to Lender Professionals shall not be included or otherwise considered for such variance testing; and (iii) the "Net Cash Flow" line item have an unfavorable variance that is greater than $1.25 million in any Testing Period, in each case, on a cumulative basis for the applicable Testing Period; *provided* that the test in this clause (iii) shall not be applied if the "Net Cash Flow" line item in any Testing Period in each case, on a cumulative basis for the applicable Testing Period, is greater than negative $2.5 million.  The term "Testing Period" shall refer to (i) the two calendar week period ending Saturday, January 2, 2016, (ii) the four calendar week period ending Saturday, January 16, 2016, and (iii) thereafter, each rolling four calendar week period ending two weeks after the end of the preceding Testing Period.  The term "Testing Date" shall refer to the Saturday of every second week occurring after the Petition Date, beginning Saturday, January 2, 2016.

    (e) *Capital Expenditures*.  The Debtors shall be required to obtain the prior written consent of the Required Lenders (as defined below) before incurring, investing, committing to or making (i) any single Capital Expenditure (as defined in the DIP Credit Agreement) or acquisition of ownership interests of the type described in Section 6.3(h) of the DIP Credit Agreement in an amount greater than $350,000 or (ii) any series of Capital

Expenditures and/or acquisitions of ownership interests of the type described in such Section 6.3(h) of the DIP Credit Agreement in an aggregate amount (during any rolling four (4) week period) greater than $750,000 (in each case, other than with respect to those projects set forth on Schedule 6.21 to the DIP Credit Agreement to which the Debtors have irrevocably committed prior to the date of the DIP Credit Agreement, subject in each case to the amounts and timeframes set forth on such Schedule 6.21); *provided further, however*, that the Debtors shall not make payments to the Estate Professionals for any fees and expenses incurred by such Estate Professionals in any month in excess of the monthly amounts corresponding to each of the respective Estate Professionals listed in the Professional Fee Schedule, as applicable attached to the Approved Budget then in effect; *provided, further, however*, that each Estate Professional shall be entitled to a cumulative carry-forward and carry-back with respect to any unused amounts in respect of the fees and expenses of each such Estate Professional (and nothing herein shall constitute an allowance or disallowance of any claim for payment pursuant to sections 329 and 330 of the Bankruptcy Code).

(f)       *Approval Required for Variances.*  Variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to written agreement by the Debtors and the Required Lenders, in each case without further notice, motion or application to, order of, or hearing before, the Court.  The Debtors acknowledge and agree that the incurrence or payment by any of the Debtors of expenses (x) other than the itemized amounts set forth in the Approved Budget and (y) in excess of Permitted Variances shall constitute an Event of Default under and as defined in the DIP Credit Agreement; *provided, however*, that disbursements to Lender Professionals shall not be included or otherwise considered for such variance testing.

16.    <u>Modification of Automatic Stay</u>. The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Debtors to grant the DIP Liens and the Superpriority DIP Claim, and to perform such acts as the DIP Agent may request, either in its sole discretion or at the direction of the Required Lenders, to assure the perfection and priority of the DIP Liens; (b) the Debtors to take all appropriate action to grant the Second Lien Noteholder Adequate Protection Liens and the Second Lien Noteholder Superpriority Claims set forth herein, and to take all appropriate action to ensure that the Second Lien Noteholder Adequate Protection Liens granted thereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations, including all the DIP Obligations, to the Prepetition Agents, the Prepetition Lenders, the DIP Agent and the DIP Lenders as contemplated under this Order and the DIP Loan Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents, the DIP Commitment Letter, the Agent Fee Letter and this Order; (e) the DIP Secured Parties and the Prepetition Agents and the Prepetition Lenders to retain and apply payments made in accordance with the DIP Loan Documents and this Order; (f) subject to paragraph 23 hereof, the DIP Agent and the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein; and (g) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of this Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of, or hearing before, this Court.

17.    <u>Perfection of DIP Liens and Postpetition Liens</u>. This Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all liens granted herein, including,

without limitation, the DIP Liens and the Second Lien Noteholder Adequate Protection Liens, without the necessity of execution, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Prepetition Agents, the Prepetition Lenders, the DIP Agent or the DIP Lenders to the priorities granted herein. Notwithstanding the foregoing, each of the DIP Agent and the Prepetition Agents, without any further consent of any party, is authorized to execute, file or record, and the DIP Agent may require the execution, filing or recording, as each, in its sole discretion deems necessary, such financing statements, mortgages, notices of lien, and other similar documents to enable the DIP Agent and the Prepetition Agents to further validate, perfect, preserve and enforce the DIP Liens or other liens and security interests granted hereunder, perfect in accordance with applicable law or to otherwise evidence the DIP Liens and/or Second Lien Noteholder Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Second Lien Noteholder Adequate Protection Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent or the Prepetition Agents all such financing statements, mortgages, notices, and other documents as the DIP Agent or the Prepetition Agents may reasonably request. The DIP Agent or the Prepetition Agents, each in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with

any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments.

18.    <u>Protection of DIP Lenders' Rights and Adequate Protection Liens</u>.  So long as there are any DIP Obligations outstanding under the DIP Credit Agreement, the Prepetition Agents and the Prepetition Lenders shall (a) have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Loan Documents, this Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Prepetition Loan Documents or Second Lien Noteholder Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the Prepetition Loan Documents), (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (c) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to the DIP Loan Documents and/or this Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing, and (d) deliver or cause to be delivered, at the Debtors' costs and expense (for which the Prepetition Lenders shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP Agent and the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination

and/or assignment of Second Lien Noteholder Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

19.    Proceeds of Subsequent Financing.  Without limiting the provisions of the immediately preceding paragraph, if the Debtors, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Order or the DIP Loan Documents at any time prior to the indefeasible payment in full in cash of all of the Prepetition Obligations and the indefeasible payment in full in cash of all of the DIP Obligations, the satisfaction of the Superpriority DIP  Claim, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility and this Order, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates, then unless otherwise agreed by the DIP Agent (at the direction of the Required Lenders) in its sole discretion, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied to the DIP Obligations.

20.    Maintenance of DIP Collateral.  The Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents.  The Debtors shall provide the DIP Agent and its counsel (for distribution to the DIP Lenders) with evidence of such insurance within five (5) calendar days after entry of this Order. Upon entry of this Order and to the fullest extent provided by applicable law, the DIP Agent (on behalf of the DIP Secured Parties) shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.  The Debtors shall also maintain the

cash management system in effect as of the Petition Date, as modified by this Order and any order that may be entered by the Court in accordance with this Order which has first been agreed to by the DIP Agent or as otherwise required by the DIP Loan Documents.

21.    Disposition of or New Liens on DIP Collateral. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) other than in the ordinary course of business without the prior written consent of the DIP Agent (at the direction of the Required Lenders) (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Agent), except as otherwise provided for in the DIP Loan Documents or otherwise ordered by the Court.

22.    DIP Termination Date. Each of the following shall constitute a termination event under this Order and the DIP Loan Documents (each a "Termination Event", and the date upon which such Termination Event occurs, the "DIP Termination Date"), unless waived in writing by the Required Lenders:

(a)    the occurrence of an "Event of Default" under and as defined in the DIP Credit Agreement;

(b)    the date of acceleration of the DIP Loans under the DIP Facility in accordance with the DIP Credit Agreement;

(c)    the Termination Date (as defined in the DIP Credit Agreement).

(d)    the date that is forty-five (45) calendar days after the Petition Date, if the Final Order, in form and substance satisfactory to the DIP Agent and the Required Lenders, has not been entered on or before said date;

(e)    the Debtors seek any amendment, modification, or extension of this Order without the prior written consent of the Required Lenders (and no such consent shall be implied by any other action, inaction, or acquiescence of the DIP Secured Parties); or

(f)    the failure by the Debtors to timely perform any of the terms, provisions, conditions, covenants, or other obligations under this Order.

23.    <u>Rights and Remedies Upon Termination Event</u>.  Any automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent, to exercise the following rights and remedies upon the occurrence and during the continuance of any Termination Event and the delivery of written notice (including by e-mail) by the DIP Agent (at the direction of the Required Lenders) to counsel to the Debtors, counsel for the Official Committee, and the United States Trustee of the occurrence of a Termination Event:  (a) immediately terminate the Debtors' use of any Cash Collateral; (b) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties, but without affecting any of the DIP Obligations or the DIP Liens securing the DIP Obligations; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Facility, sweep all funds contained in the DIP Collateral Deposit Priority Account); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of any of the applicable DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted

under this Order, the DIP Loan Documents or applicable law; provided, however, that prior to the exercise of any right in clauses (e) or (f) of this paragraph, the DIP Agent shall be required to provide five (5) business days' written notice to counsel to the Debtors, counsel to any Official Committee and the U.S. Trustee of the DIP Agent's intent to exercise its rights and remedies (the "Remedies Notice Period"). Unless the Court orders during the Remedies Notice Period that a Termination Event has not in fact occurred, the DIP Agent and the DIP Lenders, shall be deemed to have received relief from the automatic stay and may foreclose on all or any portion of the DIP Collateral, collect accounts receivable, and apply the proceeds thereof to the DIP Obligations, occupy the Debtors' premises to sell or otherwise dispose of the DIP Collateral, or otherwise exercise all rights and remedies available against the DIP Collateral permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 of 362 of the Bankruptcy Code, or otherwise, and the Debtors shall cooperate with the DIP Agent and the DIP Lenders in their exercise of rights and remedies, whether against the DIP Collateral or otherwise shall not challenge or raise any objections to the exercise of such rights or remedies other than to challenge the occurrence of a Termination Event; *provided*, that none of the DIP Secured Parties shall object to a request by the Debtors for an expedited hearing before the Court during the Remedies Notice Period to determine whether a Termination Event has in fact occurred. During the Remedies Notice Period, the Debtors may only use Cash Collateral to pay only the following amounts and expenses solely in accordance with the respective Approved Budget line items: (i) the Carve-Out; (ii) amounts that the Debtors have determined in good faith are in the ordinary course, necessary expenses and critical to the preservation of the Debtors and their estates; and (ii) such other amounts as have been approved in advance in writing by the Required Lenders.

24.    <u>Landlord Agreements; Access</u>.  Subject to entry of the Final Order, without limiting any other rights or remedies of the DIP Agent or the other DIP Secured Parties, or otherwise available at law or in equity, and subject to the terms of the DIP Loan Documents, upon three business days' written notice to counsel to the Debtors and any landlord, lienholder, licensor, or other third party owner of any leased or licensed premises or intellectual property, that a Termination Event has occurred and is continuing, the DIP Agent, (i) may, unless otherwise expressly provided in any separate agreement by and between the applicable landlord or licensor and the DIP Agent or Second Lien Agent, as applicable (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any leased or licensed premises of the Debtors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (ii) shall be entitled to all of the Debtors' rights and privileges as lessee or licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their businesses, in either the case of subparagraph (i) or (ii) of this paragraph 24 without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; *provided, however*, that the DIP Agent (on behalf of the DIP Secured Parties) shall pay only rent and additional rent, fees, royalties, or other monetary obligations of the Debtors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by DIP Agent calculated on a per diem basis.  Nothing herein shall require the Debtors, the DIP Agent or the other DIP Secured Parties, to assume any lease or license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to the DIP Agent and the other DIP Secured Parties in this paragraph 24.

25.     Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order. The DIP Agent and the DIP Lenders have acted in good faith in connection with the DIP Facility, the Interim Financing, and with this Order, and their reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter modified, reversed, amended or vacated by a subsequent order of the Court or any other court, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code. Any such modification, reversal, amendment or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim or priority authorized or created hereby. Any liens or claims granted to the DIP Agent and the DIP Lenders arising prior to the effective date of any such modification, reversal, amendment or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

26.     DIP and Other Expenses. The Debtors are authorized and directed to pay, in cash and on a current basis, all reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Agent and the DIP Lenders incurred at any time, as provided by the DIP Loan Documents and this Order, including, without limitation, legal fees and expenses, accounting fees and expenses, collateral examination and monitoring fees and expenses, financial advisory fees and expenses, fees and expenses of other consultants and indemnification and reimbursement of fees and expenses (including, for the avoidance of doubt, all reasonable and documented fees, expenses and disbursements of the Lender Professionals) as set forth in the DIP Loan Documents and the Agent Fee Letter. The invoices for such fees and expenses shall

not be required to comply with the U.S. Trustee guidelines and shall be provided to the Fee

Notice Parties. If no objection to payment of the requested fees and expenses are made, in

writing by any of the Fee Notice Parties within the Fee Objection Period, then, without further

order of, or application to, the Court or notice to any other party, such fees and expenses shall be

promptly paid by the Debtors. If an objection (solely as to reasonableness) is made by any of the

Fee Notice Parties within the Fee Objection Period to payment of the requested fees and

expenses, then only the disputed portion of such fees and expenses shall not be paid until the

objection is resolved by the applicable parties in good faith or by order of the Court, and the

undisputed portion shall be promptly paid by the Debtors. Such fees and expenses shall not be

subject to any offset, defense, claim, counterclaim or diminution of any type, kind or nature

whatsoever.

27.    <u>Indemnification</u>. The Debtors are authorized, and empowered ~~and directed~~ to jointly

and severally indemnify and hold harmless the DIP Agent (solely in its capacity as a DIP Agent),

each DIP Lender (solely in its capacity as a DIP Lender) and each other Indemnified Party (as

defined in the DIP Credit Agreement) in accordance and subject to the terms and conditions set

forth in the DIP Credit Agreement (including, without limitation, section 9.5 of the DIP Credit

Agreement).

28.    <u>Proofs of Claim</u>. The DIP Agent, the DIP Lenders, the Second Lien Agent and

the Second Lien Noteholders shall not be required to file proofs of claim in any of the Chapter 11

Cases for any claim allowed herein. Any proof of claim filed by the DIP Agent, the DIP

Lenders, the Second Lien Agent or the Second Lien Noteholders shall be deemed to be in

addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.

Any order entered by the Court in relation to the establishment of a bar date in any of the Cases

shall not apply to the DIP Agent, the DIP Lenders, the Second Lien Agent or the Second Lien Noteholders.

29.    <u>Carve-Out; Payment of Estate Professionals</u>.

(a)    *Carve-Out*.  For the purposes of this Order, the term "<u>Carve-Out</u>" shall mean the following:  (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000; (iii) to the extent allowed by the Court, all accrued and unpaid fees, disbursements, costs and expenses incurred on or prior to the delivery of a Carve-Out Trigger Notice (as defined below) by professionals or professional firms retained by the Debtors (the "<u>Estate Professionals</u>"), pursuant to a final order of the Court (which order has not been vacated or stayed) under sections 327, 328, 363 or 1103(a) of the Bankruptcy Code, whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice, in the case of each Estate Professional, as calculated pursuant to the professional fee schedule attached hereto as <u>Exhibit C</u> (the "<u>Professional Fee Schedule</u>"); and (iv) all unpaid fees, disbursements, costs and expenses incurred after the date of the delivery by the DIP Agent, at the direction of the Required Lenders, of the Carve-Out Trigger Notice (such date, the "<u>Carve-Out Trigger Date</u>"), to the extent allowed by the Court at any time, in an aggregate amount not to exceed $250,000 for Estate Professionals (the amount set forth in this <u>clause (iv)</u> being the "<u>Post-Carve-Out Trigger Notice Cap</u>"); *provided, however*, that nothing herein shall be construed as a consent to the allowance of any Estate Professionals' fees or expenses or impair the ability of any party to object to any fees, expenses, reimbursements or compensation sought by any such Estate Professionals.  For purposes of the foregoing, "<u>Carve-Out Trigger Notice</u>" shall mean a written

notice delivered by the DIP Agent at the direction of the Required Lenders to counsel to the Debtors, the U.S. Trustee, and lead counsel to any Official Committee appointed in these Chapter 11 Cases, which notice may be delivered following the occurrence of a Termination Event and stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)     For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims (including, without limitation, administrative and superpriority claims) securing the DIP Obligations and the Prepetition Obligations, including Second Lien Noteholder Adequate Protection Liens and any and all other forms of adequate protection, liens, security interests and other claims granted herein to the Prepetition Agents, the Prepetition Lenders, the DIP Agent or the DIP Lenders.

(c)     Prior to the occurrence of the Carve-Out Trigger Date, the Debtors are authorized to pay compensation and reimbursement of fees and expenses that are authorized to be paid under sections 330 and 331 of the Bankruptcy Code pursuant to an order of the Court, as the same may be due and payable subject to the Professional Fee Schedule, and such payments shall not reduce the Carve-Out. Upon the receipt of the Carve-Out Trigger Notice, the Debtors shall provide immediate notice to all Estate Professionals informing them that such notice was delivered and further advising them that the Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve-Out. Any payment or reimbursement made on or after the date and time of the Carve-Out Trigger Date to an Estate Professional shall permanently reduce the Carve-Out on a dollar-for-dollar basis. To the extent that any payment to an Estate Professional is subsequently disallowed and/or disgorged, the proceeds of any claim against the Estate Professional for amounts so disallowed or disgorged shall constitute DIP Collateral and as such, shall be subject to DIP Liens and DIP Superpriority Claims hereunder. Any funding of the

Carve-Out by the DIP Lenders shall be added to and made part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Order, the DIP Loan Documents, the Bankruptcy Code and applicable law.

(d)     None of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders shall be responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases under any chapter of the Bankruptcy Code.

30.     <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the Carve-Out</u>.  No DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve-Out or any other amounts may be used directly or indirectly by any of the Debtors, the Official Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):  (a) to prevent, hinder, or delay the DIP Agent's, the DIP Lenders', the Prepetition Agents' or the Prepetition Lenders' enforcement or realization upon any of the DIP Collateral once a Termination Event occurs (other than with respect to rights otherwise granted herein with respect to the Remedies Notice Period); (b) to use or seek to use Cash Collateral or, except to the extent expressly permitted by the terms of the DIP Loan Documents, selling or otherwise disposing of DIP Collateral, in each case, without the consent of the DIP Agent and the Required Lenders; (c) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claim; or (d) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion,

objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, against any of the Released Parties with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Superpriority DIP Claim, the DIP Liens, the DIP Loan Documents, the First Lien Loan Documents, the First Lien Obligations, the Second Lien Note Documents or the Second Lien Obligations, (D) any action seeking to invalidate, modify, set aside, avoid or subordinate, in whole or in part, the DIP Obligations, the First Lien Obligations or the Second Lien Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to either the DIP Agent or the DIP Lenders hereunder or under any of the DIP Loan Documents, the First Lien Agent or the First Lien Lenders under any of the First Lien Loan Documents or the Second Lien Agent or the Second Lien Noteholders under any of the Second Lien Note Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agent's or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents and this Order and/or the Final Order (as applicable)), (F) objecting to, contesting, or interfering with, in any way, the DIP Agent's and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an Event of Default (as defined in the DIP Credit Agreement) has occurred; *provided, however,* that no more than $25,000 in the aggregate of the DIP Collateral, the Carve-Out, proceeds from the

borrowings under the DIP Facility or any other amounts, may be used by any Official Committee

to investigate claims and/or liens of the First Lien Agent and the First Lien Lenders under the

First Lien Loan Documents and the Second Lien Agent and the Second Lien Noteholders under

the Second Lien Note Documents.

      31.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

      (a)    Subject to paragraph 31(b) hereof, each stipulation, admission, and

agreement contained in this Order including, without limitation, the Debtors' stipulations, shall

be binding upon the applicable Debtors, their estates and any successor thereto, including,

without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases,

under all circumstances and for all purposes, and the Debtors are deemed to have irrevocably

waived and relinquished all Challenges (as defined below) as of the Petition Date.

      (b)    Nothing in this Order shall prejudice the rights of any Official Committee

or any other party in interest, if granted requisite standing by the Court within the Challenge

Period (as defined below), to seek, solely in accordance with the provisions of this paragraph

31(b), to assert claims against the Released Parties (or their successors or assigns), on behalf of

the Debtors or the Debtors' creditors or to otherwise challenge the Debtors' stipulations,

including, but not limited to those in relation to (i) the validity, extent, priority, or perfection of

the mortgages, security interests, and Prepetition Liens of the Prepetition Agents or any

Prepetition Lenders (or their successors or assigns), (ii) the validity, allowability, priority, or

amount of the Prepetition Obligations, or (iii) any liability of either the Prepetition Agents and/or

any Prepetition Lenders (or their successors or assigns) with respect to anything arising from the

Prepetition Loan Documents.  Any Official Committee or any other party in interest must, after

obtaining requisite standing approved by the Court, commence a contested matter or adversary

proceeding raising such claim, objection, or challenge, including, without limitation, any claim

or cause of action against the Released Parties (each, a "Challenge") no later than (A) with

respect to any Official Committee, the date that is sixty (60) days after the Official Committee's

formation, or (B) with respect to other parties in interest, no later than the date that is seventy-

five (75) days after the entry of this Order (such time period shall be referred to as the

"Challenge Period").  The Challenge Period may only be extended with the written consent of

the First Lien Agent or the Requisite Supporting Noteholders, as applicable, prior to the

expiration of the Challenge Period, or by further order of the Court for good cause shown.  Only

those parties in interest who properly commence a Challenge within the Challenge Period may

prosecute such Challenge.  As to (x) any parties in interest, including any Official Committee,

who fail to file a Challenge within the Challenge Period, or if any such Challenge is filed and

overruled, or (y) any and all matters that are not expressly the subject of a timely Challenge:

(1) any and all such Challenges by any party (including, without limitation, any Official

Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in

the Chapter 11 Cases, or any chapter 7 trustee, any examiner or any other estate representative

appointed in any Successor Cases), shall be deemed to be forever waived and barred, (2) all of

the findings, Debtors' stipulations, waivers, releases, affirmations and other stipulations

hereunder as to the priority, extent, allowability, validity and perfection as to the Prepetition

Liens, the Prepetition Obligations or the Prepetition Loan Documents shall be of full force and

effect and forever binding upon the applicable Debtors' bankruptcy estates and all creditors,

interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases,

and (3) any and all claims or causes of action against the Prepetition Agents or the Prepetition

Lenders shall be released by the Debtors' estates, all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases.

(c)      Nothing in this Order vests or confers on any person (as defined in the Bankruptcy Code), including any Official Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

32.      <u>No Third Party Rights</u>.  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

33.      <u>Section 506(c)</u>.  Upon entry of the Final Order, in partial consideration for, among other things, the Carve Out and the payments made under the Approved Budget to administer the Chapter 11 Cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against any Prepetition Agent or any Prepetition Lenders or any of the Prepetition Obligations or the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Prepetition Lenders upon the Prepetition Collateral, as applicable, without the prior express written consent of the affected Prepetition Agent and/or affected Prepetition Lender, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors (including, without limitation, consent to the Carve-Out or the approval of any budget hereunder).

34.      <u>Section 552(b)</u>.  Upon entry of the Final Order, the Prepetition Agents and the Prepetition Lenders are and shall each be entitled to all of the rights and benefits of section

552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Agents, the Prepetition Lenders or the Prepetition Obligations.

35.   <u>No Marshaling/Application of Proceeds</u>.  Subject to entry of the Final Order, in no event shall the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Order.  Subject to entry of the Final Order, in the event that the DIP Obligations are paid full in cash by the Debtors pursuant to the terms of a confirmed chapter 11 plan or from the proceeds of a sale that includes assets of the Debtors, if any, that were not the subject of a valid perfected lien or security interest on the Petition Date ("<u>Unencumbered Assets</u>"), the proceeds of such Unencumbered Assets shall be deemed applied to the DIP Obligations prior to the proceeds of other DIP Collateral.

36.   <u>Right to Credit Bid</u>.  Each of the DIP Agent (at the direction of the Required Lenders) and, subject to entry of the Final Order, the Second Lien Agent (at the direction of the Requisite Supporting Noteholders) shall have the unqualified right to "credit bid" up to the full amount of the DIP Obligations or the Second Lien Obligations, respectively, in connection with any sale or other disposition of all or any portion of the DIP Collateral or the Prepetition Second Lien Note Collateral, respectively, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a

sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code. The DIP Agent (at the direction of the Required Lenders) has the absolute right to assign, transfer, sell or otherwise dispose of its rights to credit bid, except as prohibited by the DIP Loan Documents.

37.    Discharge Waiver/Release. The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been indefeasibly paid in full in cash, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Agent and the DIP Lenders has otherwise agreed. None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment of the DIP Obligations in full in cash on or prior to the earlier to occur of the effective date of such plan of reorganization or sale, without the consent of the DIP Agent and the DIP Lenders.

38.    Rights Preserved. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders under the DIP Loan Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Cases to a case under chapter 7, or appointment of a Chapter 11 trustee or examiner with

expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors' or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Order.

39.    Joint and Several Liability. Nothing in this Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable for the obligations hereunder and in accordance with the terms of this Order.

40.    No Waiver by Failure to Seek Relief. The failure of the DIP Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders to seek relief or otherwise exercise their rights and remedies under this Order, the DIP Loan Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.

41.    Binding Effect of this Order. Immediately upon entry by the Court, this Order shall inure to the benefit of the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Pre-Petition Lenders, and it shall become valid and binding upon the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agents and the Prepetition Lenders, any and all other creditors of the Debtors, any Official Committee or other committee appointed in the Chapter 11 Cases, any and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in

any of the Chapter 11 Cases, or upon dismissal of any of the Chapter 11 Cases. Further, upon entry of this Order, the Debtors' stipulations contained herein shall be binding on the Debtors, and the DIP Obligations shall constitute allowed claims for all purposes in each of the Chapter 11 Cases.

42.   No Modification to Interim Order. Until and unless the DIP Obligations and the Prepetition Obligations evidenced by the Prepetition Revolving Credit Documents have been indefeasibly paid in full in cash (or the DIP Agent, at the direction of the Required Lenders otherwise agrees in writing), the Debtors ~~irrevocably~~ waive the right to seek and shall not seek or consent to, directly or indirectly: (a) without the prior written consent of the DIP Agent (at the direction of the Required Lenders), (i) any modification, stay, vacatur or amendment to this Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in Sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the DIP Superpriority Claim, other than the Carve Out; (b)  without the prior written consent of the DIP Agent (at the direction of the Required Lenders), any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Loan Documents; or (c) without the prior written consent of the Second Lien Agent, any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Second Lien Note Liens or the Second Lien Noteholder Adequate Protection Liens. The Debtors ~~irrevocably~~ waives any right to seek any amendment, modification or extension of this Order without the prior written consent, as provided in the foregoing, of the DIP Agent (at the direction of the Required

*Provided* ~~Case 15-12566-BLS    Doc 41    Filed 12/18/15    Page 55 of 59~~ *precluded from seeking to refinance the DIP Facility in full in cash subject to further notice, hearing and order of the Court.*

Lenders) and the Second Lien Agent and no such consent shall be implied by any other action,

inaction or acquiescence of the DIP Agent, the Required Lenders or the Second Lien Agent;

43.    <u>Order Controls</u>.  In the event of any inconsistency between the terms and

conditions of the DIP Loan Documents, any other document or any other order of the Court and

of this Order, the provisions of this Order shall govern and control.

44.    <u>Limits on Lender Liability</u>.  Nothing in this Order or in any of the DIP Loan

Documents, the Prepetition Loan Documents or any other documents related to this transaction

shall in any way be construed or interpreted to impose or allow the imposition upon the DIP

Agent, the DIP Lenders, the Prepetition Agents or the Prepetition Lenders of any liability for any

claims arising from any and all activities by the Debtors in the operation of their businesses in

connection with the Debtors' postpetition restructuring efforts.

45.    <u>Survival</u>.  The provisions of this Order and any actions taken pursuant hereto shall

survive, and shall not be modified, impaired or discharged by, entry of any order that may be

entered (a) confirming any plan of reorganization in any of the Chapter 11 Cases, (b) converting

any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code,

(c) dismissing any or all of the Chapter 11 Cases, or (d) pursuant to which the Court abstains

from hearing any of the Chapter 11 Cases.  The terms and provisions of this Order, including the

claims, liens, security interests, and other protections (as applicable) granted to the DIP Agent,

the DIP Lenders, the Prepetition Agents and the Prepetition Lenders pursuant to this Order,

notwithstanding the entry of any such order, shall continue in any of the Chapter 11 Cases,

following dismissal of any of the Chapter 11 Cases, or any Successor Cases, and shall maintain

their priority as provided by this Order.  The DIP Protections, as well as the terms and provisions

concerning the indemnification of the DIP Agent, the DIP Lenders, the Prepetition Agents and

the Prepetition Lenders, shall continue in any of the Chapter 11 Cases following dismissal of any

of the Chapter 11 Cases, termination of the provisions of this Order, and/or the indefeasible

payment in full of the DIP Obligations.

46. <u>Dismissal</u>. If any order dismissing any of the Chapter 11 Cases under section

1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in

accordance with sections 105 and 349 of the Bankruptcy Code), that (i) the rights, privileges,

benefits and protections afforded herein and in the DIP Loan Documents, including the DIP

Liens and the DIP Superpriority Claim (collectively, the "<u>DIP Protections</u>"), shall continue in

full force and effect and shall maintain their priorities as provided in this Order until all DIP

Obligations have been paid in full, the Second Lien Obligations have been paid in full (and that

all DIP Protections and the Prepetition Secured Parties' Adequate Protection shall,

notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall

retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP

Protections and the Prepetition Secured Parties' Adequate Protection.

47. <u>Entry of this Order/Waiver of Applicable Stay</u>. This Order shall be effective upon

its entry and not subject to any stay (all of which are hereby waived), notwithstanding anything

to the contrary contained in Bankruptcy Rule 4001(a)(3).

48. <u>Notice of Entry of this Order</u>. The Debtors' counsel shall serve a copy of this

Order or a suitable notice respecting same on all of the following parties: (a) the U.S. Trustee;

(b) the Securities and Exchange Commission; (c) the Internal Revenue Service; (d) the parties

included on the Debtors' consolidated list of their thirty (30) largest unsecured creditors;

(e) Stroock, as counsel to the Second Lien Ad Hoc Group; (f) all other known parties with liens

of record on assets of the Debtors as of the Petition Date; (g) all financial institutions at which

the Debtors maintain deposit accounts; and (h) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.

49.    Final Hearing.  The Final Hearing shall take place on January [*19*], 2015 at [*12:00*] [a.m./p.m.], and parties shall have until January [*i 2*], 2015 at [*4:00*] [a.m./p.m.] to file an objection if necessary and serve such objection on proposed counsel for the Debtors, Baker Botts L.L.P., 2001 Ross Avenue, Dallas, Texas 75201-2980, Attn:  C. Luckey McDowell, and Young Conaway Stargatt & Taylor, LLP, 1000 North King Street, Wilmington, Delaware 19801, Attn:  M. Blake Cleary; and counsel for the Second Lien Ad Hoc Group, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York 10038-4982, Attn:  Kristopher M. Hansen and Erez E. Gilad and Richards Layton & Finger, PA, One Rodney Square, 920 North King Street, Wilmington Delaware 19801, Attn:  Daniel J. DeFranceschi.  Any objections by creditors or any other party-in-interest to the DIP Motion or any of the provisions of this Order shall be deemed waived unless filed and received in accordance with the foregoing on or before the close of business on such date.  In the event the Court modifies any of the provisions of this Order or other documents following the Final Hearing, such modifications shall not affect the rights and priorities of the DIP Agent and the DIP Lenders pursuant to this Order with respect to the DIP Collateral and any portion of the DIP Facility that arises, or is incurred or is advanced prior to such modifications (or otherwise arising prior to such modifications), and this Order shall remain in full force and effect except as specifically modified pursuant to the Final Hearing.

50.    Effect of this Order.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of

Civil Procedure, this Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Order.

01:18081190.2

51.    Retention of Jurisdiction.  The Court shall retain jurisdiction to hear, determine

and, if applicable, enforce the terms of, any and all matters arising from or related to the

DIP Facility and/or this Order.

Dated: December 18, 2015
       Wilmington, Delaware

THE HONORABLE BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE